## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and the STATE OF ILLINOIS, THE STATE OF INDIANA, *ex rel.* KENYA SIBLEY, JASMEKA COLLINS and JESSICA LOPEZ, | )<br>)<br>)<br>)<br>) |
| | ) |
| Plaintiffs-Relators | )<br>) |
| | ) |
| v. | )<br>) |
| | ) |
| UNIVERSITY OF CHICAGO MEDICINE; KEITH SAUTER, an individual; UNIVERSITY OF ILLINOIS HOSPITAL & HEALTH SCIENCES SYSTEM; TRUSTMARK RECOVERY SERVICES; MEDICAL BUSINESS OFFICE; JOSEPH ZACHARIAS and JUSTIN MANNING, individuals; TRILAB; COMMUNITY HOSPITAL ANESTHESIA; UJ PURANIK AND CHETAN PURANIK, individuals; CENTERS FOR PAIN CONTROL and INTERVENTIONAL PAIN MANAGEMENT and METHODIST COMMUNITY HOSPITAL, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| | ) |
| Defendants. | ) |

17CV4457
C. JUDGE CASTILLO
MAG. JUDGE VALDEZ
Cl

**FILED UNDER SEAL
PURSUANT TO THE FEDERAL,
ILLINOIS AND INDIANA FALSE
CLAIMS ACTS**

**FILED**

JUN 13 2017

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## COMPLAINT

Plaintiffs-Relators Kenya Sibley, Jasmeka Collins and Jessica Lopez ("Relators"), by and

through their undersigned attorneys, POTTER BOLANOS LLC, and pursuant to the Federal,

Illinois and Indiana False Claims Acts and related statutes, file their Complaint *under* seal

against Defendants as follows:

1

## NATURE OF THE CASE

1.      Kenya Sibley, Jasmeka Collins and Jessica Lopez ("Relators"), bring this action on behalf of the United States of America, the State of Illinois and the State of Indiana against Defendants to recover damages and civil penalties and to enjoin defendants' ongoing and unabated fraud against the government and related illegal activities. Defendants and/or their agents, employees and co-conspirators knowingly submitted false claims for payment to the United States and the States of Illinois and Indiana, and in violation of the Stark Law, 42 U.S.C. §§1395nn; the Anti-Kickback Statute ("AKS"), 42 U.S.C. §1320a-7b; the False Claims Act ("FCA"), 31 U.S.C. §3729 *et seq.*, as amended by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), the Patient Protection and Affordable Care Act of 2010 (the "FCA"); the Illinois False Claims Act, 740 Ill. Comp. Stat.175/1 et seq., the Indiana False Claims and Whistleblower Protection Act ("IFCWPA"), Indiana Code §5-11-5.5 (for claims arising prior to July 1, 2014) and its successor statute, the Indiana Medicaid False Claims and Whistleblower Protection Act ("IMFCWPA"), Ind. Code §5-11-5.7-1, et seq. (for claims arising after July 1, 2014).

2.      Since at least 2001 on the kickback-commission schemes, and since 2014 on the remaining claims, Defendants knowingly submitted or caused to be billed and submitted, false claims to Medicare, Illinois and Indiana Medicaid and other government programs (collectively "government payors."). Defendants' blatant fraud includes practices such as billing for normal vaginal *and* cesarean section deliveries for the same mother and same baby, on the same day and operating a ghost payroll system with the University of Chicago.

3.      Relators' claims arise under the Federal, Illinois and Indiana False Claims Act for fraud. Additionally claims for retaliatory discharge are plead against the MBO/TRS defendants

2

on behalf of Relator Lopez terminated on February 9, 2017, Relator Sibley on March 3, 2017 and Relator Collins on or about April 4, 2017 after they protested and refused to engage in defendants' "illegal" billing practices. In addition, Relator Sibley was terminated after defendants learned she had filed a Qui Tam lawsuit against a prior employer and authored a book about Medicare fraud.

4.     Defendants' fraud schemes include: (1) operating a ghost payroll and kickback schemes with the University of Chicago; (2) improper outsourcing billing and coding operations to foreign offshore billing companies in India; (3) billing for duplicate, inflated or disallowed charges; (4) kickbacks to defendant Trilab; (4) billing Medicare at higher rates for medical services than non-Medicare carriers, and (5) improper and fraudulent debt collection practices to increase billing and commissions.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over the subject matter of this action pursuant to 31 U.S.C. §§3730(b)(1), and 3732(a) of the FCA; 28 U.S.C. §1331 federal question jurisdiction; 28 U.S.C. §1345 as an action commenced by the United States and supplemental jurisdiction over the Illinois and Indiana state claims under 28 U.S.C. §1367.

6.     This Court has personal jurisdiction over defendants under 31 U.S.C. §3732(a) because they can be found in, reside in, and transact or have transacted business within the Northern District of Illinois.

7.     Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. §§1391 (b) and (c) and 31 U.S.C §3732 because defendants have transacted business in this District and the events and/or omissions asserted herein occurred in this District.

8. This lawsuit is not based on any publicly disclosed information, and Relators are original sources of information within the meaning of 31 U.S.C. §3730(e)(4). Relators have direct and independent knowledge of the fraud through their work at defendants MBO and Trustmark and voluntarily disclosed to the government the information on which these allegations are based before filing this action.

## PARTIES

9. At all relevant times and until their recent terminations, Relators were employed by defendants Medical Business Office (MBO) and/or Trustmark and their owners and top management Joseph Zacharias and Justin Manning (collectively referred to herein as "MBO/TRS).

10. Relators were excellent employees at MBO/TRS.

## RELATOR KENYA SIBLEY

11. Sibley resides in Illinois. She has a Bachelor of Arts degree in computer networking and is an experienced certified Medical Biller.

12. Sibley was fired on March 3, 2017 after she protested and refused to engage in illegal and fraudulent acts requested by Defendants Manning, Zacharias and MBO/TRS and Sandra VP Schade, an experienced coder and the newly hired Vice President of Revenue Integrity and Coding Services ("VP Schade").

13. As a result of Relator Sibley's protests, VP Schade began to investigate her and learned that Sibley was a whistleblower and Relator in a pending FCA. The alleged reason for her termination, taking an *approved* temporary medical leave of absence, is pretextual and retaliatory. See Exhibits 28 and 125.

4

14.     Commencing on September 6, 2016 Relator Sibley began working at defendant MBO as a Call Center Customer Service Manager supervising approximately six (6) employees. By mid-October 2016, Sibley took over the positions of former Director of Trustmark Debra Porter, and assumed responsibility for directing approximately 12 Trustmark employees. Sibley was also the MBO Manager for Call Center Operations, Customer Service, Customer Service Call Center, front office Virtualization and the Trustmark Director for Payment Posters, data entry clerks, legal, collections and bad debt departments and worked on portions of Porters' new role as client liaison.

15.     Relators Lopez and Collins had a direct-line reporting relationship to Sibley, their manager/director.

16.     Sibley reported directly to defendant MBO/TRS's CEO Justin Manning until February 7, 2017 when he instructed her to report to VP Schade. VP Schade's management authority extended over all the departments at MBO/TRS. At that time, Sibley was a valued employee, with much authority, respect and responsibility throughout MBO/TRS. Sibley was told by MBO/TRS CEO Manning and Cheryl Chick, Compliance Officer, HR Director and Director of Administrative Service ("Chick") that as a result of VP Schade's hire, Sibley's title, compensation and employment status were secure.

17.     Sibley replaced Debra Porter as "Director of Trustmark". Porter retired in October, 2016, but was retained by defendants MBO/TRS as an "independent contractor consultant" working from home as a "Client Services Liaison".

18.     Porter is a long-time friend of defendant MBO/TRS's owner, defendant Joseph Zacharias.

5

19.     In October, 2016 Porter trained Sibley in her job. She instructed Sibley to create fake invoices for University of Chicago ("U of C") payroll. A representative sample of the ghost payroll billing for U of C for October and December, 2016 is attached as Exhibit 27.

20.     Although Porter is listed on the U of C payroll working 100% of her time on the account, those allegations are false. See Exhibit 27.

21.     On or about November 3, 2016, Sibley observed that along with other employees, she was listed on defendant MBO/TRS invoices sent to the U of C as performing work on the accounts and 100% of their time. Sibley did not work on the U of C accounts at all. She told defendant Manning that U of C and MBO/TRS submitted false statements to the government for payment, including for Sibley and other employees who did not work on the accounts, and that she was unwilling to be complicit in the fraud. She asked Manning to remove her name from the invoices because it was a ghost payroll. Manning was upset with her, but agreed to remove her name from invoices. See Exhibit 26. In fact, Sibley continued to be listed on the October 2016 through at least January, 2017 invoices to the U of C. Exhibits 79-80.

22.     On or about February 12, 2017 VP Schade instructed Sibley to falsify to the State of Indiana, Department of Workforce Development (Unemployment) that Relator Lopez was fired for cause, for failing to follow company policy and procedures. In fact, Lopez was fired without cause when she protested and refused to follow MBO/TRS's fraudulent and "illegal" billing and collection procedures.

23.     After Sibley engaged in the protected activity, including protesting defendants' fraudulent billing, VP Schade grew suspicious and began investigating her. MBO/TRS Chief Operating Officer (COO) Robert Zacharias told Relator Collins on or about March 27, 2017 that

Sibley was fired because VP Schade googled her and learned that Sibley had filed a False Claims Act lawsuit and wrote a book about fraud. Sibley is the relator in *USA et al. v. A Plus Physicians Billing, et al.*, Case No. 13 C 7733 (N.D. IL.).

24.     Sibley is the author of the book "*Doctors The New Face of Drug Dealers*". See, e.g., https://www.amazon.com/DOCTORS-New-Face-Drug-Dealers-ebook/dp/B00BUGVDW2

**RELATOR JASMEKA COLLINS**

25.     Jasmeka Collins resides in Illinois. She began her employment as on January 19, 2016 as the TRS Bad Debt Collections and Legal Department Manager, where she managed staff in both departments. Collins is an experienced third party collections manager.

26.     Collins commenced *approved* maternity and FMLA leaves on January 11, 2017 and returned to work on March 27, 2017. In January 2017, MBO/TRS CEO Defendant Manning instructed Sibley to terminate Collins because she was pregnant and took an FMLA leave. Sibley told Manning she would not to implement his directive because it was illegal to discriminate and/or to terminate Collins.

27.     In mid-January, 2017, Defendant Manning and VP Schade instructed Sibley to alter Collins' official personnel records to falsify a title change/demotion Manager to supervisor. Sibley refused and protested the change one, inaccurate and two, as interference with Collins' protected FMLA and pregnancy rights.

28.     Relator Collins had a direct line reporting relationship to Sibley from approximately mid October 2016 until Collins' FMLA leave began in January 2017. Collins

also reported to former Manager Debra Porter and defendants' Attorney Rosen in legal department matters.

29.     Collins had responsibility for TRS's collections on behalf of hospital providers and physicians.  TRS collected from patients after the MBO billing department failed to obtain payment from the patient or payors, including Medicare and Medicaid.

30.     In her position as Debt Collection Manager for Trustmark, Collins oversaw collections and attempted to insure defendants' compliance the Fair Credit Reporting Act (FCRA), the Fair Debt Collection Practices Act (FDCPA) and laws governing third party collection.

31.     On or about March 29, 2017, Collins was instructed to send patients to bad debt and collection when they did *not* receive required debt notices. She protested and told VP Schade and TRS management, including Compliance Director Chick, that practice was illegal. VP Schade instructed Collins that VP Schade was in charge, the rules were mandatory and must be followed.

32.     On April 4, 2017, Defendants MBO/TRS management instructed staff that they must require patients to enter into payment plans and garnishment to avoid being turned over to collection. Collins protested and told VP Schade and TRS management this practice was illegal, that a patient could repay a debt many other ways, including direct payment on site.  VP Schade told Collins that she was prohibited from using the term "illegal" on the job or to the staff.

33.     With Sibley fired, VP Schade altered Collins' job description to demote her from "manager" to "supervisor" and to include the above-described debt collection duties that Relator

believed to be illegal. VP Schade fired Collins on the spot on April 4, 2017, when Collins

declined to execute the altered job description. Exhibits 31-31A.

34.     VP Schade and Chick lied to the Indiana Department of Workforce Development

(Unemployment) and claimed Collins was not fired, but just failed to appear for work as a "no

call, no show (NCNS)" on April 5 and 6, 2017. The Administrative Law Judge (ALJ) ruled in

Relator's favor, and found *inter alia*, "that the Claimant's testimony is accurate", that Defendants

presented an altered job description and then fired Relator without just cause when she declined

to sign it.  See Exhibits 31-31A.

**RELATOR LOPEZ**

35.     Jessica Lopez resides in Gary, Indiana.

36.     Lopez is an experienced in customer service representative (CSR). She began her

employment as a CSR for MBO on April 4, 2015, earning $12.00/hour.  In November 2015, she

was transferred to the "Claims follow-up" department.  On about January 1, 2016, defendants

raised her hourly wage by $.31 and in late 2016, MBO/TRS CEO Manning increased her salary

to $15.00 / hour. Lopez was transferred back to MBO Customer Service Call Center Department

as a CSR in May 2016.

37.     Lopez and the other CSR representatives are not trained as claims representatives,

billers or coders.  They work from and follow mandated written scripts or instructions prepared

and/or approved by defendant MBO/TRS's owner Joseph Zacharias and CEO Manning. See e.g.,

Wikipedia instructions, Exhibits 29 (Trilab), 41 (CPC) and 62 (Script Q & A's).

38.     Lopez and CSRs' job was to obtain payments from patients, including Medicare

beneficiaries, who allegedly owed MBO/TRS provider clients for medical services. Absent

9

payment, the patients were referred to Trustmark for collection or to the law firm of Komyatte &
Casbon (the bad debt vendor for one MBO/TRS client, Community Anesthetics).

39.     As detailed below, on February 10, 2017, Lopez was illegally terminated by
defendants and VP Schade for "insubordination", after she protested to Defendant MBO/TRS
Compliance Officer Cheryl Chick and used the words "illegal" to management and staff to
describe defendants' billing practices.

40.     Defendants' practice was to hold mandatory "lunch and learn" staff meetings off
the clock, during employees' unpaid lunch periods. During one session on or about October 26,
2016, Relator Lopez described to management and staff as valid, patients' complaints of double-
billing, including for anesthesia services. In response, defendant Manning admitted that the
duplicate billing occurred and said it was because MBO and the providers both billed for the
same services.

41.     Shortly after the above "lunch and learn" and in retaliation for opposing illegal
billing, on or about December 19, 2016, defendant Manning told Relator Sibley to "come up
with a reason to fire" Relator Lopez and "make it stick." Sibley refused because there was no
valid or non-discriminatory reason to fire Lopez.

42.     On or about February 2-3, 2017, VP Schade met with Lopez, complimented her
on her work, said she would make a great team lead and was a natural leader.

43.     On or about February 7, 2017, VP Schade asked Lopez to document issues that
she and the other CSR's had. Along with Sibley, Lopez gathered patient tickets detailing
defendants' illegal billing and upcoding, including to government payors and beneficiaries.

Lopez documented *inter alia,* defendant Community Hospital Anesthesia's double billing and defendant Trilab's overbilling patients by thousands of dollars for drug screens.

44.     On February 8, 2017, Lopez and Sibley asked VP Schade how to resolve the improper billing practices, such as missing TOS (Time of service) payments; altered fee schedules and upcoding patients' co-pay charges, Community Hospital double billing anesthesia services and Trilab over-charging $3248 to Medicare and other payors for drug laboratory tests.

45.     VP Schade told Lopez that the Trilab overbilling was proper because they reduce it to $250 (if the patient complained) and to "not pour on the piss and vinegar".

46.     On Thursday February 9, 2017 VP Schade summoned Lopez to the desk of MBO/TRS employee Laura Lomeli, where a meeting was in progress with MBO/TRS managers and staff, including Jaquelin Baine, Kenya Sibley, Lufreida Shine, VP Schade and Joya Cherry. In response to Lopez's complaints that bills were inflated and illegal, VP Schade had Baine explain that up-charging was proper due to "inflation" and that "doctors can charge whatever they want." VP Schade told Lopez and the staff to lie to patients and state that "prices went up …. if you have a problem call your insurance". Lopez replied that she would tell the patients the truth, that the doctors' fee schedules had changed. VP Schade told her no, she was not permitted to say that.

47.     Following Lopez's presentation of "illegal" billing practices, VP Schade told Sibley to terminate Lopez. VP Schade then called Lopez into Sibley's office and wrote her up for using the word "illegal" and accusing defendants of illegal billing practices.

48.     Shortly thereafter on the same day, February 9, 2017, Lopez was summoned to the office of Compliance Officer Cheryl Chick to await her termination papers. Lopez again

detailed the fraudulent billing. In response, Chick barraged Lopez and brought her to tears. Chick said Lopez's conduct was improper and she was terminated for violating MBO policy in saying the words "illegal" and "unethical" and "corrupting the other employees" with those words.

49.     Chick told Lopez that the MBO/TRS computer systems have different billing rates and "[T]he doctor can raise the rate at any time that he wants to raise the rate. It's not illegal or unethical" even if they charge "a million dollars" and exceed the Medicare prescribed rates. Lopez asked why she could not question illegal and double billing. Chick said she was fired for "[R]efusing to work duties by claiming that it's unethical and illegal process". Chick gave Lopez "friendly" advice, to never use those words "illegal" and "unethical" again.

## DEFENDANTS AND RELATED ENTITIES

50.     MBO/TRS are Indiana corporations, with their principal place of business in a shared space at 541 Otis Bowen Drive, Munster, Indiana 46321. They do business in Illinois. Their registered agent and office is CT Corporation System, 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604.

51.     Defendants MBO and TRS are owned and operated by a single owner, defendant Joseph Zacharias. MBO and TRS share office space, staff and equipment at 541 Otis Bowen Drive, Munster, Indiana, 46321. MBO operates under TIN # 35-0458270. See company webpages at www.medbusoffice.com. See also, Exhibits 52, 67 and 124 (Organizational chart).

52.     Joseph Zacharias is the owner of MBO/TRS. He resides in Dyer, Indiana.

53.     Robert Zacharias, brother Joseph, is the MBO/Trustmark Chief Operating Officer. He is also the Managing principal of Maxim Realty Group, an entity formed on or about October 27, 2015 and located at 487 Thorndale Drive, Buffalo Grove. IL. 60089.

54.     Justin Manning is approximately 38 years of age. He resides in Dyer, Indiana. Since November 2015, he has been the CEO at MBO/TRS.  From January 2012 through 2015, he was the Chief Information Officer and VP of Operations for TRS.

55.     MBO provides billing, coding, consultant, collection and Medicare/Medicaid credentialing services to medical providers. Along with their offshore outsourcers, MBO submits claims for payment to government and private payors for their clients. MBO and Trustmark process and submit Medicaid and Medicare coding and claims for payment for University of Chicago, the University of Illinois and their physician group "WWT" and for Community Hospital.  MBO/ TRS also bill and submit claims for Trilab and Centers for Pain. See MBO/TRS Brochure.  Exhibits 18 – 19 (MBO history and PPT Presentation to Methodist Hospital).

56.     MBO and Trustmark are debt collectors or collection agencies pursuant to the Fair Debt Collection Practices Act of 1977, 15 U.S.C. §1692-1692p ("FDCPA").

57.     MBO/TRS are highly organized and computerized entities. Daily, they track in detail in their internal client "Zoho Reports " in "Dashboards" hourly, daily, monthly and annual collections and payments by provider and payor source as well as the contingency fee paid to MBO for the collections.  See MBO Total Payments by client and payor through January - Oct. 2016. Exhibit 40 (excerpts).  For example, for defendant Trilab (MBOTB) between May through October, 2016, MBO collected approximately $467,453 in Medicare billings alone, and for which it was paid commission or a "contingency fee" of $25,675 or approximately 5% of the billing proceeds.  See Exhibit 40.   See e.g., reports at Exhibits 1-3, 7, 82, 83, 86,

58.     As of March, 2017, MBO and Trustmark key management officials and owners were  as follows:

13

| NAME | TITLE/POSITION |
|---|---|
| Cheryl Chick | Compliance Officer, Director of Human Resources and Administrative Services |
| Monica Luna | Director of Medical Business Office, Client Communications Representative and Billing Manager |
| Justin Manning | Chief Executive Officer |
| Debra Porter | Retired Paid consultant – University of Chicago and University of Illinois contracts |
| Alan Rawlings | IT Director |
| | |
| Donna Rodriguez | TRS Director of Accounts Receivable MBO Manager of Billing |
| Attorney Jeffrey Rosen | Attorney for Trustmark & Trustmark Bad Debt Vendor Clients.  Independent Contractor |
| Sandy VP Schade | VP of Revenue Integrity and Coding |
| Shelly Watson | Bad Deb Collections Manager and Manager over the legal department – replaced Relator Collins |
| Joseph Zacharias | Owner |
| Robert Zacharias | Owner's brother, Chief Operating Officer for MBO/TRS and Managing Principal of Maxim Realty Group |

59.     MBO has approximately 30 or more billing and credentialing contracts, including with the University of Illinois (U of I) and University of Chicago (U of C).

60.     Defendants MBO/TRS employ offshore employees ("OS") who have remote access both the MBO/TRS software/systems and to MBO/TRS client data bases, including confidential personal health information (PHI).

61.     University of Chicago Medicine (U of C) is located at 5841 South Maryland Avenue, Chicago, Illinois.  As of June 30, 2016, it had 9000 employees and includes an 800+ in-patient beds, and outpatient services and clinics with 760,201 encounters.

http://www.uchospitals.edu/about/fact/hospitals-sheet.html

14

62.     Keith Sauter, an individual, resides in Bradley, Illinois. At all relevant times, Sauter was employed by U of C, and since 1981, as Director of Finance and PFS Director. Sauter does not work for defendant Trustmark. Sauter receives a regular payroll check from Trustmark for "Consultant Fees" between $3000-3900 per month and at times, $125 or more per hour. Additionally, he receives gifts from the MBO/TRS defendants in exchange for providing them business, See e.g., Exhibits 39-41 (Bears tickets); Exhibit 78 (instructions to pay Sauter).

63.     Defendant University of Illinois Hospital & Health Sciences System (UIC) is part of the University of Illinois at Chicago and includes a 495 bed hospital, 22 outpatient clinic and Federally Qualified Health Centers.  https://hospital.uillinois.edu/about-ui-health.

64.     The UIC physician group is Wolcott, Wood & Taylor or WWT. https://www.wwtps.com. MBO performs billing and coding for WWT as well.

65.     Defendant Trilab (MBOTB) is a laboratory located at 1089 North Salem Drive, Schaumburg, IL. 60194.  It is owned by one Patrick Sorrentino.  http://www.trilabllc.com/.

66.     Defendants MBO/TRS list dozens of companies and providers who refer patients to defendant Trilab (Exhibit 29). As set forth below, some of these providers receive kickbacks from Trilab in exchange for the referrals, including Medicare and Medicaid patients.

67.     Defendant Community Hospital Anesthesia (CH or MBOCH) a/k/a Munster Medical Research and operating under HFS NPI 1003918210 provides general and physical rehabilitation in-patient, general outpatient, physical rehabilitation clinic and other medical services in an over 200 bed facility located at 901 MacArthur Boulevard, Munster, Indiana, 46321.  In addition to performing billing and collection functions for CH, Defendants

15

MBO/TRS handle provider enrollment to the various private and governmental carriers, including Medicare and Medicaid. See Provider Information Sheet, Exhibit 38.

68.     Defendants UJ Puranik and Chetan Puranik were at all relevant times, the owners of Centers for Pain Control/Interventional Pain Management ("MBOCP or CPC" or "IPM"), pain management clinics.  Defendant MBO provides credentialing, billing and collection services for CPC.  CPC is located in multiple locations, including at 2014 Legal Plaza West in LaPorte, Indiana, NPI No. 1790920452 and Interventional Pain Management at 2205 Roosevelt Road in Valparaiso, Indiana, NPI Nos. 116833687 (Hobart); 1306274097 (LaPorte) and 1093051346 (Valparaiso).  CPS is certified to accept Medicare (ID #258990), Railroad Medicare (ID#D04795) and Indiana Medicaid (ID#201193440A) and IPM Medicare (Hobart) (ID#IN2557); Medicare (LaPorte) (ID#IN1970) and Medicare (Valpo) (ID#IN1801) Railroad Medicare P01297996.  CPC employs dozens of individual treaters and in multiple locations throughout Indiana. See Exhibit 40.

69.     Methodist Community Hospital ("Methodist") is located at 600 Grant Street, Gary, Indiana, 46402; Southlake, Indiana and 8701 Broadway in Merrillville, Indiana, 46410. Recently, Methodist was acquired by Franciscan.  As detailed below, Methodist and defendants MBO/TRS have entered into numerous billing and collection contracts. Exhibit 71.

**Structure and operations of MBO and Trustmark**

70.     In addition to providing direct submission of claims to government and private carriers, MBO/TRS acts as a collection agent for their medical providers, in exchange for commissions and fees of approximately 14-34% of the collections. MBO collected

approximately $17,000,000 in the following amounts in the representative sample six (6) months of May 2016- October 2016 and detailed by client and provider class:

| Month (Per Zoho Report – Client Report) | Payments Collected Totals |
|---|---|
| May 2016 | $3,634,256 |
| June 2016 | $3,350,283 |
| July | $3,035,031 |
| August | $3,287,912 |
| September | $2,876,271 |
| October | $775,618 |
| TOTAL | c. $17,000,000 |

71.     Trustmark contracts with clients, including private and Medicare-Medicaid providers University of Chicago (U of C), University of Illinois (U of I), hospitals, clinics, laboratories and physicians.  The contracts are attached as Exhibits  69-70, 84, 102, 114.

72.     Every MBO/TRS-provider contract states in relevant part that defendants will review every claim and process on an individualized basis, including claims submitted for payment to governmental payors. Instead, Defendant MBO/TRS skips between every 5 to 10 claims, and without reviewing the paperwork, automatically turns those patients over to bad debt collections.

**LEGAL AUTHORITIES**
**SOURCES OF FEDERAL AND STATE PAYMENTS TO DEFENDANTS**

**False Claims Act & Related Illinois & Indiana Statutes**

73.     The False Claims Act ("FCA") was originally enacted during the Civil War and

was amended in 1986, 2009, and 2010, to enhance the ability of the Government to recover

losses it sustained as a result of its payment of fraudulent claims and to incentivize relators to

disclose fraud without fear of reprisals.

74.     The FCA expressly prohibits each of the following acts:

a.     knowingly presenting, or causing to be presented, to the federal government a
false or fraudulent claim for payment or approval. 31 U.S.C. §3729(a)(1)(A) (eff.  May
20, 2009)[1]; *see also* 31 U.S.C. §3729(a)(1) (eff. 1994).

b.     knowingly making, using, or causing to be made or used, a false record or
statement material to a false or fraudulent claim. 31 U.S.C. §3729(a) (1) (B) (eff. May 20,
2009); *see also* 31 U.S.C. §3729(a) (2) (eff. 1994).

c.     conspiring to commit a False Claims Act violation. 31 U.S.C. §3729(a)(1)(C)
(eff. May 20, 2009); *see also* 31 U.S.C. §3729(a)(3) (eff. 1994).

d.     knowingly concealing or knowingly making, using, or causing to be made or
used, a false record or statement material to an obligation to pay or transmit money
or property to the Government, or knowingly concealing or knowingly and
improperly avoiding or decreasing an obligation to pay or transmit money or property
back to the federal government. 31 U.S.C. §3729(a)(1)(G) (eff. May 20, 2009); *see
also* 31 U.S.C. §3729(a)(7) (eff. 1994).

75.     The term "knowingly" under the federal and state FCAs means that a person, with

respect to information, (i) has actual knowledge of the information, (ii) acts in deliberate

---

[1] Congress amended the FCA as a part of the Fraud Enforcement Recovery Act of 2009
("FERA") on May 20, 2009, including amendments to 31 U.S.C. § 3729 (a)(1)(B).

ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth

or falsity of the information. 31 U.S.C. §3729(b). No proof of specific intent to defraud is

required to show that a person acted knowingly under the FCA. *Id.*

76.     Under the False Claims Act, a "claim" is defined as:

> any request or demand, whether under a contract or otherwise, for money
> or property which is made to a contractor, grantee, or other recipient if the
> United States Government provides any portion of the money or property
> which is requested or demanded, or if the Government will reimburse such
> contractor, grantee, or other recipient for any portion of the money or
> property which is requested or demanded.

31 U.S.C. §3729(c).

77.     The False Claims Act prohibits retaliation and provides:

**(h) Relief From Retaliatory Actions.—**
**(1)In general.—** Any employee, contractor, or agent shall be entitled to all relief necessary to
make that employee, contractor, or agent whole, if that employee, contractor, or agent is
discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated
against in the terms and conditions of employment because of lawful acts done by the employee,
contractor, agent or associated others in furtherance of an action under this section or other
efforts to stop 1 or more violations of this subchapter.

**(2)Relief.—** Relief under paragraph (1) shall include reinstatement with the same seniority status
that employee, contractor, or agent would have had but for the discrimination, 2 times the
amount of back pay, interest on the back pay, and compensation for any special damages
sustained as a result of the discrimination, including litigation costs and reasonable attorneys'
fees. An action under this subsection may be brought in the appropriate district court of the
United States for the relief provided in this subsection.

31 U.S.C. §3730(h).

78.     Any person who violates the FCA is liable for civil penalties up to $11,000 per

false claim prior to November 2. 2015, as adjusted for inflation, plus three times the amount of

damages that the Government sustains as a result of the defendant's actions. 31 U.S.C. §3729(a).

These civil penalties increase to up to $21,563 per false claim for claims submitted after November 2, 2016 and including treble damages. 28 C.F.R. §85.5.

**Illinois False Claims and Whistleblower Protection Act**

79.     The Illinois False Claims Act (IFCA), 740 Ill. Comp. Stat. 175/3(a)(1)(A), tracks the federal False Claims Act. The IFCA imposes liability on any person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; or (C) conspires to commit violation of the IFCA.

80.     The Illinois False Claims Act prohibits retaliation and protects whistleblowers such as Relators, and provides in relevant part:

(1) In general, any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent, or associated others in furtherance of an action under this Section or other efforts to stop one or more violations of this Act.

(2) Relief under paragraph (1) shall include reinstatement with the same seniority status that the employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

740 ILCS 175/4 (g)

**Medicaid**

81.     The State of Illinois administers Medicaid through the Illinois Department of Healthcare and Family Services (IDHFS). The United States funds approximately 51.3% of Illinois Medicaid, and pursuant to Title XIX of the Social Security Act, 42 U.S.C. §1396 et seq.

20

82.     The federal Medicaid program was created in 1965 as part of the Social Security

Act (SSA), which authorized federal grants to states for medical assistance to low-income, blind,

or disabled persons, qualified pregnant women or children, or members of families with

dependent children. Medicaid is jointly funded by the federal and state governments and is

administered by the Secretary of Health and Human Services (HHS) through the Centers for

Medicare and Medicaid Services ("CMS").  The states pay providers (either directly or through

contracted intermediaries), and then obtain their allotted federal share of the payment from the

United States Treasury.

83.     As a prerequisite to enrollment as a provider in the Medicaid Program, medical

providers, including defendants, must enter into provider agreements and agree, among other

things, agree to comply with federal and state provider participation requirements as a condition

of federal and state funding.  42 U.S.C. §1396a (w).  See Exhibit 23 (Indiana Medicare

Enrollment Packet)

84.     As a condition of payment and to receive Medicaid funds, enrolled providers,

together with authorized agents, employees, and contractors are required to abide by all the

provisions and regulations of the SSA, and applicable policies and procedures issued by the state.

85.     Medicaid claims submitted to state Medicaid agencies are claims presented to the

federal government, and give rise to liability under the FCA. See, *United States ex rel. Tyson v.

Amerigroup Illinois, Inc.*, 2005 U.S. Dist. LEXIS 24032, 2005 WL 2667207 at *3 (N.D. Ill.

2005); *U.S. v. Ortho-McNeil Pharmaceutical, Inc.*, 2007 U.S. Dist. LEXIS 52666, 2007 WL

2091185 at *2 (N.D. Ill. 2007).

**Indiana False Claims and Whistleblower Protection Act**

86.     The Indiana False Claims and Whistleblower Protection Act ("IFCWPA")(for claims arising between July 1, 2005 and June 30, 2014)  and under its successor statute, the Indiana Medicaid False Claims and Whistleblower Protection Act ("IMFCWPA")(for claims arising after July 2014) tracks the FCA prohibiting the submission of false claims IC §5-11-5.5-2(b)(1)-(2) and 5.7-1, et seq. and retaliation against whistleblowers. IC §5-11-5.5-8

87.     Indiana's Medicaid program, the Indiana Health Coverage Program ("IHCP"), is administered by the Indiana Family and Social Services Administration (IFSSA).  IHCP offers both fee-for-service and capitated managed care program. The annual maximum deductible a beneficiary might pay is $1100 per year. See e.g., Medicaid Basics and Indiana Health Coverage Programs (IHCPs) https://www.in.gov/idoi/files/Module_2_medicaid_basics.pdf

88.     Any Indiana healthcare provider, including defendants, who seek to provide and be paid for services to Medicaid beneficiaries under any IHCP program must first become approved Medicaid providers, by completing an IHCP Enrollment Packet, a copy of which is attached as Exhibit 23. As part of that packet, each provider must execute a "Provider Agreement" which  expressly includes the following statement, set forth in all capital letters immediately before the  authorized signature line:

AS A CONDITION OF PAYMENT AND CONTINUED ENROLLMENT IN THE IHCP THE UNDERSIGNED, BEING THE PROVIDER  OR  HAVING THE SPECIFIC AUTHORITY TO BIND HTE PROVIDER TO THE TERMS OF THIS AGREEMENT, AND HAVING READ THIS AGREEMENT AND UNDERSTANDING IT IN ITS ENTIRELY, DOES HEREBY AGREE TO ABIDE BY AND COMPLY WITH ALL THE STIPULATIONS, CONDITIONS, AND TERMS SET FORTH HEREIN. THE UNDERSIGNED ACKNOWLEDGES THAT THE COMMISSION OF ANY INDIANA HEALTH COVERAGE PROGRAM RELATED OFFENSE AS SET OUT IN *42 USC 1320a-7b* MAY BE PUNISHABLE BY A FINE OF UP TO $25,000 OR IMPRISONMENT OF UP TO FIVE YEARS OR BOTH.  IHCP Exhibit. 23, page 13.

22

89. Among the "stipulations, conditions and terms set forth" in the Indiana Provider Agreement are the following relevant provisions:

- (2) To comply with all federal and state statutes and regulations pertaining to the Indiana Health Coverage Programs…
- (11) To abide by the ICHP Provider Reference Modules as amended from time to time, as well as all provider bulletins and notices…
- (13) To certify that any and all information contained on any IHCP billings submitted on the Provider's behalf by electronic, telephonic, mechanical, and/or standard paper means of submission shall be true, accurate and complete….The Provider understands that the submission of false claims, statement, and documents or the concealment of material fact [sic] may be prosecuted under the applicable federal and/or state law.
- (17) To submit claims that can be documented by Provider as being strictly for:
  a. medically necessary medical assistance services;
  b. medical assistance services actually provided to the person in whose name the claim is being made; and
  c. compensation that Provider is legally entitled to receive.
- (18) To accept as payment in full the amounts determined by the FSSA or its fiscal agent, in accordance with federal and state statutes and regulations as the appropriate payment for IHCP covered services paid to IHCP members (recipients). Provider agrees not to bill members, or any member of a recipient's family, for any additional charge for IHCP-covered services, excluding any co-payment permitted by law.
- 19. To refund within fifteen (15) days of receipt, to the FSSA or its fiscal agent any duplicate or erroneous payment received

## Medicare and Other Federal Healthcare Programs

90. Since 1965, the United States, through the Department of Health and Human Services (DHHS), administers and funds Medicare under Title XVIII, of the Social Security Act ("SSA"). 42 U.S.C. §1395j-1395w et seq. ("Medicare Part A, Part B Program"), and Medicaid pursuant to Title XIX of the SSA, 42 U.S.C. §§1396 et seq. ("Medicaid").

91. Medicare provides medical insurance for covered services to persons 65 years or older, to certain disabled persons, and persons with chronic renal disease who elect coverage.

23

See 42 U.S.C. §1395 to 1395ccc. Medicare is administrated by the Centers for Medicare and Medicaid Services (CMS) on behalf of HHS.

92.     Medicare Part A ("Part A"), the Basic Plan of Hospital Insurance, covers the cost of inpatient hospital services, hospice services and related care. Medicare Part B ("Part B"), the Voluntary Supplemental Insurance Plan, covers the cost of physicians' services and outpatient diagnostic tests. For all Medicare plans, medical treatment and services are generally reimbursable *if* the services are provided, are covered services, reasonable and medically necessary.

93.     Medicare Parts A and B are a 100% federally subsidized health insurance system for persons who are disabled or 65 years or older.  Part A covers in-patient hospital stays, skilled nursing care, medical equipment, drugs, hospice, anesthesia and home health care services. There are no premiums for Part A or co-pays for the first 60 days of the admission. Deductibles can be charged and are assessed immediately in the hospital stay.  For 2016, the Part A deductible was $1288 and 2017 it is $1316.

94.     Medicare beneficiaries can elect to purchase supplemental Medigap plans to cover deductibles, copayments and co-insurance. An enrolled individual who obtains a covered medical service can either pay for the medical service himself, and request reimbursement of 80% of the reasonable charge, or assign the right to reimbursement to the physician providing the service, who collects the reimbursement directly from the Medicare Trust Fund, as an assignee of the beneficiary under 42 U.S.C. §1395(b)(3)(B)(ii).

95.     There are no co-insurance charges for Medicare Part A or traditional Medicaid beneficiaries. However, Medicaid managed care (Part C) beneficiaries can be billed a co-pay.

24

96.     Medicare Part B includes medical treatment and services by physicians, clinics, medically necessary out-patient diagnostic and treatment services and may include:

- Emergency or observation services, which may include an overnight stay in the hospital
- Services in an outpatient clinic, including same-day surgery
- Laboratory tests billed by the hospital
- X-rays and other radiology services billed by the hospital
- Medical supplies, like splints and casts
- Preventive and screening services
- Certain drugs and biologicals that are not typically self-administered, including anesthesia

97.     Medicare Part B beneficiaries pay income-based premiums, set by HHS, as well as deductibles of $183 and co-insurance is 80-20%. Providers and their billing agents such as MBO / TRS *cannot charge* the individual beneficiary more than 20% of the Medicare-approved amount for the doctor or other health care provider's services and the Part B deductible.

98.     Providers participating federally funded government healthcare programs and their billing agents such as defendants MBO/TRS are required to submit claims for reimbursement using either a digital or hard copy Form CMS 1450 (also known as "Form UB-04") or Form 1500. Exhibit 26 (blank form) and Exhibit 85 (form submitted to Anthem Indiana/Medicaid by MBO/TRS). The provider or its billing agents such as MBO/TRS must certify that:

a.      "the submitter of this form understands that misrepresentation or falsification of essential information as requested by this form, may form the basis for civil monetary penalties and assessments and may upon conviction include fines and/or imprisonment under federal and/or state law(s)."

b.      "for the purposes of Medicaid: the submitter understands that because payment and satisfaction of this claim will be from Federal and State funds, any false statements, documents, or concealment of a material fact are subject to prosecution under applicable

25

Federal or State laws" and further, "I certify that the services shown on this form were medically indicated and necessary for the health of the patient.

99.     When providers and their agents such as MBO/TRS submit a claim which includes requests for payment for services not rendered, for services rendered other than what they bill the government, or at a rate higher than legally permissible, the claims for those expenses are legally false.

100.     The Social Security Act ("SSA") governs Medicare reimbursement for all physician services. Section 1862(a)(1)(A) of the SSA states that "no payment may be made under . . . part B for any expenses incurred for items or services which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. §1395y(a)(1)(A).  Section 1833(e) of the Act further prohibits payment for claims "unless there has been furnished such information as may be necessary to determine the amounts due such provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period." 42 U.S.C. §1395l(e).  These obligations include the following duties to:

    a. Bill Medicare for only reasonable and necessary medical services. 42 U.S.C. §1395y(a)(1)(A);
    b. Not make false statements or misrepresentations of material facts concerning requests for payment under Medicare. 42 U.S.C. §1320a-7b(a)(1) & (2); 1320a-7; 1320a-7a;
    c. Provide economical medical services, and then, only where medically necessary. 42 U.S.C. §1320c-5(a)(1);
    d. Provide evidence that the service given is medically necessary. 42 U.S.C. §1320c-5(a)(3);
    e. Assure that such services are not substantially in excess of the needs of such patients. 42 U.S.C. §1320a-7(b)(6) & (8);
    f. Not submit or cause to be submitted bills or requests for payment substantially in excess of the physician's usual charges for the same treatment or services. 42 U.S.C. §1320a-7(b)(6)(A);

26

    g.  Certify when presenting a claim that the service provided is a medical necessity. 42 U.S.C. §1395n(a)(2)(B); and

    h.  Not as a matter of billing policy waive co-payment amounts in violation of the federal anti-kickback and self-referral statutes. 42 U.S.C. §1320a-7a(a)(5); 42 U.S.C. §1320a-7a(i)(6).

    i.  As a condition of payment, must agree "to bill other primary payers before billing Medicare". 42 CFR 489.20(g) and

101.    As a condition of participation in the Medicare Part B program, providers agree to be familiar with, and abide by, the program's reimbursement policies. In particular, defendant providers and/or MBO/ TRS on their behalf certified to the following requirements in their Medicare enrollment (Exhibits 24-25, Medicare Enrollment Applications).

(3) I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier. . . . I understand that payment of a claim by Medicare is condition upon the claim and the underlying transaction complying with such laws, regulations and program instructions . . . and on the suppliers compliance with all applicable conditions of participation in Medicare.

(6) I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

102.    As set forth below in detail, defendants MBO/TRS and their clients, charge government programs and beneficiaries in excess of the Medicare approved charges for treatment. If a provider accepts Medicare assignments, it accepts Medicare's approved charges in full and **cannot** charge more than the Medicare approved rate, the deductible and co-insurance. Under Medicare's limiting charge rules, a provider cannot charge a Medicare beneficiary more than 115% of Medicare's approved amount for each charge or services. In other words, providers can only charge a Medicare beneficiary up to 15% over and above the amount that non-Medicare providers are paid, **and** they are only paid 95% of the fee schedule

27

amount. See, https://www.medicare.gov/your-medicare-costs/part-a-costs/assignment/costs-and-assignment.html.

103. The Medicare fee schedule is published annually and must be adhered to by all Medicare and Medicaid providers. https://www.cgov/Center/Provider-Type/All-Fee-For-Service-Providers-Center.html.

104. It is defendants' practice to charge patients and payors three times or more in excess of the Medicare fee schedule. See, e.g., Exhibit 32 (Indiana Medicaid Schedule); Exhibit 33 (Medicare Fee Schedule, WPS Indiana); Exhibit 34 (MBOCP 2017 Physician Fee Schedule) and Exhibit 35 (Trilab Clinical Lab Fee Schedule, 2017).

105. Under Medicare Part B, when Medicare is *not* the primary carrier, it is the Medicare Secondary Payer (MSP). As a MSP, Medicare will only pay covered costs not paid or covered by the primary insurance. See, "Medicare Secondary Payer (MSP) Manual, 08-03-12, Section 10.1).

106. All entities that receive a primary payment from both Medicare and a primary plan must repay Medicare. 42 CFR 411.24(h) and 411.25. This refund is due Medicare, regardless of which payment the provider, physician, or other supplier received first and even if the insurance payment was refunded to the beneficiary or the insurer. Section 10-4. 42 CFR 489.20. As set forth below, Defendants MBO and Trustmark fail to comply with and consistently violate the MSP rules.

### Stark and the Anti-Kickback Statute

### The Anti-Kickback Statute

107. The federal Anti-Kickback Statute ("AKS"), 42 U.S.C. §1320a-7b(b), per se prohibits any person or entity from making or accepting payment to induce or reward any person from referring, recommending or arranging for federally-funded medical services.

108. Claims for reimbursement for services that result from kickbacks are false under the False Claims Act. 42 U.S.C. §1320a-7b(g).

109. The Patient Protection and Affordable Care Act ("PPACA"), Public Law No. 111-148, Sec. 6402(g), amended the AKS or "Social Security Act," 42 U.S.C. §1320a-7b(b), to specifically provide for enforcement of AKS violations under the FCA. The PPACA also amended the "intent requirement" to clarify that violations of the Social Security Act's anti-kickback provisions may occur even if an individual does "not have actual knowledge" or "specific intent to commit a violation." Id. at Sec. 6402(h).

110. Compliance with the AKS is a precondition for participation in government payor program. See, e.g., the Medicare Enrollment Application- Provider Agreements, Form CMS-855A, for Institutional Providers) and Form CMS-855I, for Physicians and Non-Physician Practitioners). Exhibits 24-25.

111. Compliance with the AKS is a condition of payment by government payors.

112. Providers and their billing agents, such as MBO/TRS who participate in federal health care programs must certify in multiple submissions that they have complied with the applicable federal rules and regulations, including the AKS, See, e.g. provider agreements and claim forms (Exhibits 23-25). 42 C.F.R. §424.510(d)(3).

29

113.    Violation of the AKS subjects the violator to exclusion from participation in

federal health care programs, civil monetary penalties, and imprisonment of up to five years per

violation.  42 U.S.C. §1320a-7(b)(7), 1320a-7a(a)(7).In pertinent part, the AKS statute states:

> (b) Illegal remuneration
> (1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or overtly, in cash or in kind
> (A) in return for referring an individual to a person for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, . . . shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.
> (2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person –
> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health program, . . . shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both. 42 U.S.C. §1320a-7b(b).

**Stark Act**

114.    42 U.S.C. §1395nn, commonly referred to as the "Stark II" statute, and its

associated regulations, 42 C.F.R. §350 et seq. (collectively, "Stark"), provides that if a physician

has a "financial relationship" with an entity, the physician may not make a referral to the entity

for the provision of "designated health services," unless the relationship satisfies a Stark

exception. 42 U.S.C. §1395nn(a)(1).  Stark is also applicable to Medicaid. 42 U.S.C. §1396b(s).

115.    Stark further provides that an entity may not present or cause to be presented to

Medicare a claim for "designated health services" (includes in-patient and out-patient services)

furnished pursuant to a prohibited referral. Likewise, Medicare is prohibited from making

payment on any such claim.

30

116.    Compliance with Stark is also a material condition of payment of a government

claim, including Medicare or Medicaid. See 42 U.S.C. §1395nn(g)(1) (prohibiting payment for

designated health services provided in violation of Stark).

## EXAMPLES OF DEFENDANTS' ILLEGAL BILLING PRACTICES

117.    On January 10, 2017, Relators Sibley and Collins attended a management meeting

with legal department Manager Shelly Watson and MBO/TRS owner, Defendant Zacharias.

Zacharias instructed the managers as follows:

a.    Pursuant to MBO/TRS policy followed with all clients, Watson was to forge the
name of "Angie Zurich", Methodist Hospital's point of Contact on Permission to
Sue documents, he said, to expedite the legal process and to maximize income.
Watson complied and forged Zurich's signature.

b.    Pursuant to MBO/TRS' standard operating procedure, Relators Sibley and Collins
and their staff must turn patients over to collection, if the client provider
requested, even if the bill was paid by the Patient or carriers or was not due.

c.    CSRs and collectors were prohibited from requesting or reviewing insurance
carrier notes to determine if patients or their carriers, including Medicare and
Medicaid, were properly billed.

d.    Relators Sibley and Collins objected and protested Defendant Zacharias'
instructions. Sibley told Zacharias it was illegal to send patients and
government beneficiaries to bad debt collection or to bill the government for
duplicate bills or bills not due. Relator Sibley reviewed the Methodist Hospital
bill of Patient Brittany Williams with Zacharias. She explained that Indiana
Medicaid was responsible and would pay the bill; that Williams did *not* owe the
$11,352 debt but was turned over to collection, at the request of the provider,
Methodist Hospital. Zacharias told Relator Sibley that it did not matter;
Methodist wanted the client   turned over to collection and to do so even if
Medicaid paid the bill.

See Exhibit 56, Bad debt and Billing to Patient, Brittany Williams, Methodist
Hospital). Zacharias' email billing instruction, Exhibit 55.

118.    Relator Sibley told defendant CEO Manning about the meeting and Zacharias' instruction to bill patients and government beneficiaries and payors for debts they do not owe. Manning sent a "CYA" email to Relators Collins and Sibley and their team retracting Zacharias' directive. Later that day Manning and Zacharias both came to Relator Sibley's office and verbally instructed her that she and her entire team must implement Zacharias' instructions, and in addition, to ignore carrier insurance notes (Exhibit 55) on Methodist Hospital accounts. Relators Collins and Sibley refused to implement the illegal processes.

119.    Defendants MBO/TRS instructed CSR's, including Lopez, to obtain Explanation of Benefits (EOB's) only from defendants' internal cite, "Zirmed", and not from the actual carriers because the EOB's differed. Lopez was reprimanded for using official carrier EOB's, which are accurate, as opposed to inaccurate internal Zirmed EOBs.

120.    In about late September, 2016, Defendant MBO's managers Jillian (Jill) Crayn and/or Monica Luna Lopez instructed Relator Lopez and the CSRs that it was a mandatory policy of MBO/TRS to bypass individualized review of every account turned over by defendant providers for collection (or for claimed submitted to government payors). Instead, they were instructed to skip review of 5-10 files at a time and to automatically bill the claim or turn it over to bad debt and collection. See e.g., Exhibit. 85, CMS 1500 submitted by MBO/TRS to Anthem Medicaid on behalf of St. Catherine's Hospital (Patient Celine Smith)(CS).

121.    As a result of the above policy and practice to blindly bill carriers and patients without any review, defendants MBO/TRS knowingly and erroneously (1) send patients, including Medicare and Medicaid beneficiaries, to for collection when no debt is verified or due and (2) submit claims for payment to governmental carriers which likewise are unaudited and

may not be due. Defendants' practice further results in double billing insofar as in some cases, a private or government carrier or the patient already paid the bill.

## DEFENDANT MBO/TRS' BILLING AND COLLECTION PRACTICES

122.    Defendants MBO/TRS bill various patients and submit claims for payment to government carriers on behalf of defendant Trilab. Defendant Trilab and MBO/TRS policy and practice is to discount self-pay accounts to a maximum of $250 per drug screen. Patients from two providers, Brightside and Park Ridge Pain, are billed zero, if the insurance carriers pay anything on the account. See Exhibit 29, page 18, ¶ 10. Other carriers, including government payors, are billed the maximum of $2288-$3248. After a payment is made, MBO/TRS will often then adjust non-governmental accounts to -0- due. See, e.g., Medicare Part B billing and $382 charge. (Exhibit 29, pages 15, 17)

123.    The attached Bad Debt Turn Over Errors Spreadsheet (Exhibit 2) is a representative sample of the weekly data set created by MBO/TRS.  Of the 37 accounts listed for defendant Trilab, the debts were **not** adjusted downward to the maximum payment of $250 for Trilab "self-pay",  but were instead billed $2288 or $3248.

124.    On the Bad Debt Turn Over Errors Spreadsheet (Exhibit 2), 18 Patients either received no statement or less than 3 statements.  For provider MBOMF (Miklos Foot and Ankle Specialists, PC) 12 patients did not receive two statements before being turned over to collection. For MBOCH (Community Hospital), 3 patients did not receive 2 statements, 8 patients were actually paying on the account and for MMA, and Medicare had already paid the bill on October 20, 2016.  One beneficiary overpaid on the account, two were paying and one was in bankruptcy. One patient was sent only one statement and the other should not have been billed at all for an

33

emergency C section. For Lakeshore Anesthesia, 7 patients received only one statement Approximately 29% of the patients initially turned over for "bad debt" were in error. See e.g., January 23, 2017 bad debt preview/actual sent chart, Exhibit 2.

### DEFENDANTS' PRACTICE IS TO OVERCHARGE MEDICARE BY DISCOUNTING BILLS TO OTHER PAYORS

125.     As set forth above, Defendants MBO/TRS discount provider bills turned over to them for collection or billing. See master listing of Clients taking Adjustments and Discounts. Exhibit 7. However, these providers do *not* discount the Medicare or Medicaid billing, and thus, they are charging governmental payors more than private payors.

126.     For example, Porter Anesthesia takes an automatic 20% and Pinnacle Anesthesia a 50% adjustment *immediately* if any self-patient calls, requests an accommodation or disputes the bill. Centers for Pain Management take a 50% adjustment if the patient calls. See Exhibit 7.

127.     Defendants' discounting practice and policy results in charging private payors less than they are charging government programs for the same services. This practices violates the FCA. "It is unlawful to routinely waive co-payments, deductibles, coinsurances or other patient responsibility payments" 67 Fed Reg. 72,896 (12-9-2002) (HHS OIG). "This applies to health care and services paid by government payors…and includes "take what insurance pays (TWIP) policies. See Exhibit 30, OIG Special Fraud Alert (1994) "Routine Waiver of Medicare Part B Copayments and Deductibles https://oig.hhs.gov/fraud/docs/alertsandbulletins/121994.html

## SPECIFIC ILLEGAL PATIENT / MEDICARE/MEDICARE BILLING

128.    Defendants' practice is to knowingly bill patients and government payors, for debts that are not owed, including Medicare patients. The following are representative examples.

129.    In August 2016, Medicare patient Antonio Garcia (AG) was billed and paid defendants MBS/TRS $150 on behalf of Miklos Foot Ankle Specialists, P.C. (MBOMF or Miklos) for diabetic shoes and inserts. The bill was and/or should have been covered by Medicare. See Exhibit 4.

130.    Medicare beneficiary Dolores Balauskas (DB) was billed and paid defendants MBO/TRS $424.59 on behalf of Miklos using defendants' Munster Indiana address as the provider's address, although she did *not* owe the bill, the time period to collect had expired and Medicare was either not billed or had not yet paid the bill.  See Exhibit 5.

131.    Medicare beneficiary Brandon Freeland (BF) was turned over to Bad Debt and reported to his creditors by Trustmark, although he was paying on the bill from Lakeshore Anesthesia-St. Mary.  He complained he was double-billed. Freeland should *not* have been billed at all …. his EOB stated "the patient may not be billed for this amount. Charge exceeds fee schedule / maximum allowable or contracted/legislated fee arrangement".  Exhibit 10.

132.    Medicare and Indiana Medicaid beneficiary Constance Rivera (CR) was a patient at Centers for Pain Control (MBOCH) in 2016.  She also had a secondary Part B plan from AARP. Notwithstanding the carriers' payment of all the charges, Rivera was billed and paid $20.55. The Medicare intermediary WPS determined that certain of the charges on July 6, 2016 were not covered as they were not medically necessary and that "the patient may not be billed for this amount". The charges were billed three times for injections under CPT Code 64493, 94 and

95 and were allowed by Medicare although the provider also billed Medicare. Lastly, all the charges exceeded the fee schedule/maximum allowable or contracted/legislated fee arrangement. Exhibits 10-11. See also fee schedules at Exhibits 32- 34.

133.   Patient Constance Rivera is an example of Defendants MBO/TRS changing the fee schedule midstream – they doubled her charges between July and October. Exhibit 11, p. 18.

134.   On or about January 3, 2017, patient Andrew Svabas (AS) complained that his injection treatments had escalated from a charge of $700 to $1200 or more by Centers for Pain /Interventional Pain Management.  Exhibit 15.  Sibley was instructed, consistent with defendant Manning's mandate, to falsely state to the patient that MBO bills amounts set by the provider, and although Medicare / Anthem allowed $102 to be applied to the deductible, the balance was patient responsibility.

135.   In 2016, Anthem / Blue Cross was billed for patient Natasha Martin (NM) $3000 for Trilab drug screening. The patient actually paid $250 on the visit date.  After Anthem declined any payment, the account was adjusted down from $2750 to $250, although Martin was billed a second time for the same $3250.  In 2016, patient Justin Sarnowski (JS) was billed monthly for monthly drug screens at Trilab. See Exhibit 17. Each time the initial bill was $2448. By January 3, 2017, his bill was $12,400 and he was turned over to bad debt.  When he would or could not pay the $2448 per monthly screen, the bill was then written down to $248.00, per drug screen.

136.   Patient Patricia Campbell's (PC) insurance company paid the entirety of the Trilab bill of $3248 and as such, the superbill reflects a patient balance of $00. However defendant TRS billed Campbell and she disputed the bill. Lopez followed defendant MBO/TRS'

36

script and instructions and on December 20, 2016 told the patient, to speak to her insurance

company.  See Exhibits 118.

## FAIR CREDIT REPORTING AND FAIR DEBT COLLECTION PRACTICES ACTS

137.     Defendant MBO/TRS's contracts with providers require compliance with the Fair

Credit Reporting Act (FCRA), 15 U.S.C. §1681 et seq., including prohibitions against abusive

debt collection practices pursuant to the Fair Debt Collection Practices Act of 1977, 15 U.S.C.

§1692-1692p ("FDCPA"). See attached contracts, Exhibit 17, 70, 71, 74 and 84.

138.     The FDCPA applies to third party debt collectors such as defendants MBO/TRS.

139.     On April 4, 2017, Relator Collins was fired for protesting Trustmark's false and

misleading threats to patients and debtors that their entire balance was required to be financed or

subject to garnishment. The new rule was set forth in the demoted job description for Collins.

Exhibit 31. It states among other things, that Patients could no longer receive mailed receipts,

statements or payment reminder notices. See Exhibit 31.

140.     **FDCPA 15 U.S.C. §1692e provides in relevant part:**

**§1692e.       False or misleading representations**

A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section: ...

**(2)**     The false representation of-

**(A)**     the character, amount, or legal status of any debt; . . .

**(3)**     The false representation or implication that any individual is an attorney or that any communication is from an attorney. ...

(10) The use of any false representation or deceptive means to collect or attempt

37

to collect any debt or to obtain information concerning a consumer...

(14) The use of any business, company, or organization name other than the true name of the debt collector's business, company, or organization....

141.    15 U.S.C. §1692g(a) provides in relevant part:

§1692g.    Validation of debts

(a) Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing-

**(4)**    the amount of the debt;

**(5)**    the name of the creditor to whom the debt is owed;

**(6)**    a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;

**(7)**    a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and

**(8)**    a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name of the original creditor, if different from the current creditor....of the original creditor, if different from the current creditor....

142.    Defendant MBO/TRS's practice of placing patients on a bad debt list or to seek any amount not permitted under a contract or the law is illegal under the FDCPA

143.    Defendants MBO/TRS's practice of providing "debtor" patients, including Medicare and Medicaid beneficiaries, with knowingly false information and billing or collecting charges that are overbilled, upcoded or not due is illegal under the FDCPA.

144. Defendant MBO/TRS's practice of failing to send consumers the required written notice of including the amount of the debt, name of the credit, and assumption the debt is valid unless disputed in 30 days; is illegal under the FDCPA. 15 USC 1692g(a)

145. If the consumer disputes the debt, the debt collector must cease until the debt collector obtains verification of the debt or a copy of a judgment, or the name and address of the original creditor, and a copy of such verification or judgment, or name and address of the original creditor, is mailed to the consumer by the debt collector... 15 USC 1692g(b).

146. Defendants' MBO/TRS policy is to *not* provide consumers with required notice before turning them over to bad debt or legal collection. For example, TRS attorney Rosen sued patient Sonny Skinner in July 2016. In December, Skinner sued Trustmark, claiming she owed no money to TRS and that TRS had failed to send her any verification or the original contract before suit. See Skinner lawsuit, Exhibit 42.

147. Defendants are required to provide consumers/patients with three written notices that their accounts are in default *before* they are turned over to collection. Instead per Defendant Manning's instruction, one notice is sufficient, to avoid the expense of postage, he claimed.

148. Defendants MBO/TRS misrepresent themselves as being onsite at the hospital or physician provider, and misrepresents to patients they are the providers' internal customer service center and medical billing office. See Exhibit 88.

149. Attorney Rosen's general practice is to file falsified court Affidavits in the states of Illinois and Indiana, attesting that he is a full time employee of Trustmark, and representing MBO/TRS clients and is the assignee authorized to pursue legal action on their behalf. This is not accurate. In fact, Attorney Rosen is an independent contractor of Trustmark. See Exhibit 88.

### STAFFING

150.     As part of their billing protocols and schemes, defendants MBO and Trustmark knowingly hire CSRs who lack training in billing, collections, law or claim. They are novice collection agents. They received no substantive on the job training.

151.     HHS Guidelines for Third Party Medical Billing companies seeks voluntary compliance. The Guidance recognized that "Increasingly, third-party medical billing companies are providing crucial services that could greatly impact the solvency and stability of the Medicare Trust Fund. " See OIG Compliance Program Guidance for Third-Party Medical Billing Companies, December 1998. https://oig.hhs.gov/fraud/docs/complianceguidance/thirdparty.pdf. Defendants knowingly fail to do so and intentionally misrepresent compliance to their Providers in a "form" Compliance Statement. The Statement falsely asserts that the MBO/TRS billers have "knowledge and experience" to provide health care billing and collection services; that the billers operate in compliance with Medicare, Medicaid and Champus regulations and comply with the OIG guidance. See e,g., Compliance Statement, 2-19-99.  Exhibit 22.

152.     Lack of Compliance with the OIG Compliance Program Guidance is defendants' MBO/TRS standard operating procedure. They do not conduct "effective training and education" and do not respond at all times or "promptly to detected offenses and developing corrective action". Exhibit 22.

## SCHEME 1 OUTSOURCING AND HIPPA VIOLATIONS

153.    Medicare prohibits payments to off shore providers for health care benefits or services. However, payments for administrative functions, including plan administration, call centers or claims adjudication, as is defendants' practice are permitted, with limitations. See, CMS, State Medicaid Directors Letter #10-026, December 2010.

154.    Relators submit that if CMS and/or Medicaid were aware of MBO/TRS's outsourcing and without required controls and protections to governmental payors, the government would not approve claims submitted by MBO/TRS or their providers.

155.    Medicare and CMS guidelines permit the following regarding outsourcing of Administrative functions such as those performed by defendants MBO/TRS on behalf of their provider clients, including:

☐ enrolling eligible individuals,
☐ determining what benefits the Medicaid agency will cover,
☐ determining how much the Medicaid agency will pay for covered benefits and from whom it will purchase services (i.e., fee-for-service and managed care plans),
☐ having a system for processing claims from fee-for-service providers and making capitation payments to managed care plans,
☐ ensuring that State and Federal health care funds are not spent improperly or fraudulently,
☐ collecting program information and reporting it to CMS, and
☐ resolving grievances from applicants, beneficiaries, providers, and health plans

See DHHS OIG Memorandum Report: Offshore Outsourcing of Administrative Functions by State Medicaid Agencies, OEI-09-12-00530. Exhibit 22.

156.    Defendants MBO/TRS do not comply with the outsourcing requirements. They do not ensure "that State and Federal health care funds are not spent improperly or fraudulently.

They do not provide notice of outsourcing to CMS, Medicaid agencies or providers. Lastly, the outsourcing agents are not properly trained or credentialed in billing or collections.

157.    CMS and the OIG guidelines apply to outsourcing of Medicare administrative functions such as those performed by Defendants MBO/TRS and require as follows:

> a.  Medicare contractors or subcontractors must obtain written approval *prior to* performing system functions offshore.
>
> b. Covered entities and business associates must have BAAs. Covered entities are required to have BAAs for "downstream" outsourcing—i.e., when the original outsourcing contract is followed by one or more subcontracting arrangements. In such cases, BAAs must establish the conditions under which downstream contractors may use and disclose PHI and must include the required privacy safeguards. 45 CFR §§ 150.103 and 165.504(e). OIG Guidance, Fn. 9

158.    The contracts between defendants and the providers and the providers and CMS prohibit outsourcing of the billing functions unless approved. In actuality, defendants utilize and outsource work to third party agencies including offshore outsourcing to multiple agencies, including in India (Ajax, Elico and Gebb) and without notice to the providers. See, Exhibits 22 and 23.

159.    MBO/TRS receives a billing aging report at least monthly, showing outstanding claims for follow up and collection. See Exhibit 63. If a patient complains about billing errors, MBO/TRS either corrects and recodes the bill or sends it to India offshore outsourcers to rebill, code or recode. Defendant MBO/TRS's system is designed to overbill – the offshore billers are instructed to post insurance payments from the MBO/Trustmark system and not from actual EOBs, or electronic fund transfer payments or other accurate records.

160.    On or about October 19, 2016, Relator Sibley convened a meeting between management and CSR's, to discuss defendants' fraudulently billing and overcharging carriers

and patients, including Medicare and Medicaid and beneficiaries, and in addition, for falsifying

information to providers and payors on outsourcing. Relator Sibley prepared written Q & A's to

which defendants' management responded. Exhibit 62. Relator Lopez and Sibley asked: "we are

instructed to never mention outsourcing to any of our clients and/or patients if a patient ever asks

if all of our work done in house or not?"   In response, defendants MBO/TRS management

official Jaquelyn Bain instructed the CSR's to follow management's written script and lie to

patients, as follows:

- Outsourcing has a part in multiple pieces of the revenue cycle for all clients.
- We don't use the word outsourcing when speaking to the client because we don't want them to feel as we have moved their work off to the side for someone else to do. Essentially outsourcing is our extended office.
- We wouldn't have room to fit them all in our building and without them, we wouldn't be able to bring in new clients and grow our company. They help us keep costs down so we stay competitive in the industry.  They are often doing basic level tasks so that we can focus on the more complex issues in house

161.    Defendants MBO and Trustmark use three (3) overseas outsourcing: Gebb, *AJAX*

and *ELICO*, all located in India to remotely perform the billing, coding, pulling and reviewing

medical records, pre-collections, posting payments, and claim status follow up for over 90% of

MBO/TRS clients, including UIC, WWT, U of C, Community Hospital and for all of MBO

clients. See Gebb and Ajax invoices, Exhibits 61.

162.    Medicare providers and their agents MBO/TRS are required to inform and obtain

consent from CMS and all the providers for whom they perform billing, if they are using

contractors outside of the United States.  See U of I contracts. Exhibits 65, 69-70.

163.     The University of Illinois and Trustmark have entered into numerous contracts for billing and coding services. The 2015-2020 contract (Exhibit 70) provides in relevant part as follows:

- Article 1: the U of I contracting party is the Board of Trustees on behalf of the Patient Accounts Department at the U of I Hospital & Health Sciences System;
- 2:01: Services performed continues the prior 2006 contract;
- Article 7: The contractor must provide the names, addresses and amounts expected to be paid to a Subcontractor and describe the work which will be subcontracted.
- Article 8: Compensation includes all "secretarial, clerical, and similar incidental services", and reimbursement of reasonable expenses.
- Article 12.09:  Contractor (Trustmark) agrees to comply with non-discrimination and EEO laws
- Article 13.02:  Contractor and its subcontractors agree to comply with HIPAA
- Article 14: Contractor agrees to provide Medicare, HHS Access to books and records, and requires its subcontractor with a value or cost of $10,000 or more per year to provide for HHS access.
- Article 17.01: **Compliance with Laws:** Contractor, its agents or employees "agree to comply with all laws, statutes, regulations rulings, or enactments of any governmental authority"
- Article 17.02:  **Independent contractor**: "Contractor shall independently perform all services specified in this Contract, except as provided herein…"
- Article 17.03 **Covenant Against Contingent Fees:** "Contractor warrants that no person or selling agency has been employed or retained to solicit or secure this Contract upon a contract or understanding for a commission, percentage, brokerage or contingent fee excepting bona-fide employees or bona-fide establish ed commercial or selling agencies maintained by Contractor for purposes of securing Business".

164.     The WWT contract contains similar language regarding outsourcing. Exhibit 65.

165.     On or about November 15, 2016, the University of  Illinois Interim Director of Patient Accounts Jeff Means queried defendants Trustmark/MBOs: "[P]lease let me know if your firm is using any offshore resources to support your AR follow up".  See email chain, Exhibit 8.

166.     Defendant Manning responded as follows:

Universally, we utilize offshore resources for entry level activities…. At times, our offshore partner will perform an initial claims and report their findings to our employees

44

located in Munster, IN. All transactional activity on the accounts are performed by our internal resources…This work pattern has been in place through all iterations of our 10 year relationship with the University. Exhibit 8.

167. Defendant Manning's response to U of I (Exhibit 8) was intentionally false. MBO/TRS Defendants utilize off shore partners to perform full billing and collection, not just "initial claims". All transactional activity is *not* performed by internal resources, but rather, by the off shore billers and coders. Ajax and Gebb perform coding, Medical Billing, Review Medical Records & patients private financial information, post payments and adjustments and other tasks, as does Elico on the UIC account. See Exhibits 63-67.

168. Defendants have structured the billing protocols with Gebb, AJAX and ELICO such that by design, the OS companies move co-insurance and deductible balances to the patients for billing as "patient responsibility" and *without* reviewing an EOB or checking whether the patient owes the debt/balance or to verify if the patients' secondary insurance has already been billed, in addition to skipping 5-10 files at a time.

169. The OS companies have complete access to the defendant MBO/TRS' server because they are given current and former employees' logins and passwords.

45

## SCHEME 2 – DEFENDANTS' BILLING DUPLICATES, PAYMENTS NOT DUE AND FAIL TO APPLY CARRIER PAYMENTS OR "MISSING MONEY ACCOUNTS"

170.    In the course of her work as a CSR, Lopez has observed that the majority of the bills tendered to MBO by providers for collection  have incorrect balances or seek payment for bills paid or disallowed costs, by intentional design.  See, e.g., Group Exhibit 63.

171.    Due to the routine false billing, Relator Sibley instructed her staff to provide her with a Bad Debt Error Spreadsheet Report daily. In turn, Sibley tendered the error report to Manning and Zacharias.  See Lopez Bad Debt Error Spreadsheet Report, Exhibit 2.  For example, on many occasions in 2016, defendants' former Manager Theresa Florek instructed Lopez and the CSRs that if patients or carriers do not contest overcharges for Anesthesia services, do *not* update the bill and do *not* disclose the overcharges.  These instructions are consistent with MBO/TRS policy and directives from Defendants Manning and Zacharias.

172.    Under the Fair Credit Reporting Act, a billing company like Trustmark must issue multiple debt notices to a patient/debtor before a person is turned over to collection. In late 2016, defendant Manning told Relators Sibley and Collins that after one written notice, staff is to turn the patient over to collection because billing statements are $.07 per and that the company had spent $11,000 issuing statements to Community Hospital patients alone.

173.    On or about February 2, 2017, Relator Sibley attended a management meeting with VP Sandy VP Schade, owner Joseph Zacharias, CEO Justin Manning, and managers Jacquelyn Bain, Ameira and Donna Rodriguez.

    a.    Sibley reported that Defendants consistently send patients to bad debt for collection without billing them or their carriers, including Medicare and Medicaid. CEO

Manning responded that if the clients or provider wants you to send the patient to collection, you must do it.

b.      Sibley told defendants that patients and carriers, are being billed for debts they do not owe and that carrier EOBs and defendants' records are not consistent. In response, Manning said "Don't go there, don't follow EOB, go with what is in our system". Only follow and use the EOB's from the Zirmed Website.

174.     That day, on February 2, 2017, after the meeting, CEO Manning told Sibley that he was going to demote her, and she was to report Vice President Sandy VP Schade.  Within days, Relator Lopez was fired for protesting illegal billing and Sibley and Collin's termination shortly thereafter.

175.     In a regular management meeting on February 24, 2017, Sibley notified upper management that their "revised" organizational chart contained inaccurate staff titles and jobs. CEO Manning and Compliance Office Cheryl Chick told Sibley to alter Relator Collins' title to "supervisor" from "manager". Sibley protested. In response, VP Schade altered the personnel file and posted Collins' job via internal office email.

### CENTERS FOR PAIN MANAGEMENT

176.     CPC operates pain clinics throughout Northwest Indiana.

177.     CPC is billed in defendants' system with the Mnemonic of **MBOCP.**

178.     CPS is or was owned by defendant Dr. Chetan Puranik, an Illinois resident. His mother, defendant U.J. Puranik assists him in the operation of his facilities.

179.     Over 70% of the CPC patients are Medicare beneficiaries.

180.     CPC's fee schedule exceeds the Medicare fee schedule threefold or more. See Exhibit 34.

181.     On or about October 19, 2016, Sibley queried CEO Manning and billing manager Monica Luna in writing how defendants could justify the inflated billing. Sibley raised the same issue in a Revenue Cycle Overview meeting on about October 3, 2016. In response, Luna and Manning instructed Sibley as follows:

a.     "what do you care, Medicare will only pay what they will pay" and workers compensation insurances often pays at 100%."

b.     If the patient complains, the CSRs were to lie and say it was a billing error because the doctor was out of network.

c.     Manning told Relators Sibley and Lopez that "Double and triple billing often occurs when MBO/TRS submits claims and MBO/TRS clients and or other facilities their clients work for such as Community Hospital and Community Hospital Anesthesia also submits and bills claims for the same dates of service, same patients but with different charge amount for themselves in addition to MBO/TRS already doing so".

d.     Manning stated "....Community Hospital and Community Hospital Anesthesia shared tax ID situation and because of this situation patients will receive 2 bills/statements for any remaining patient balances or unpaid claims as a result of duplicate billing from MBO/TRS and the hospital. The hospital's charge also already includes the charge for the same anesthesia procedure (CRNA & MD Anesthesiologist).

e.     Manning stated that insofar as MBO/TRS bills claims for the anesthesia, he did not care, "as long as we get paid".

182.     In about mid-November, 2016, MBO/TRS defendants CEO Manning and owner Zacharias notified Relators and other staff that CPC was being audited and instructed the staff to "adjust and write off Accounts Receivables balances of $4m because of the audit". Because Trustmark removed the billing via an "adjustment," it passed the correction off as a "non-error". This is significant because the audit was conducted by Anthem Medicaid and as a result of the deletions, the illegal billing was concealed from the government auditors.

183.    Along with the owners of CPC and their assistants, MBO employees deleted the $4m from defendants' MBO/TRS's computerized system. Upon Relators' information and belief, the computerized backups were also deleted.

184.    In November 2016, MBO claims follow up manager Melanie Riggs told Relators Sibley and Lopez that defendants were deleting *all* the accounts receivable records.

185.    CPC and its owners operate additional billing scams. Defendants maintain a "bad debt report" listing patients who have been in collection for over 12 months and have not paid the bills. After 12 months of default, the carrier will pay CPC. Pursuant to instructions from CEO Manning in collusion with CPC owners, the CSRs were required to place CPC patients into collection, although they have not received statements. As a result, the CPC owners can submit the claims to their "Captive Insurance" for reimbursement on accounts they falsely stated had been place in collections with both MBO/TRS for at least the prior 12 months.

186.    Relator Sibley prepared the report for defendants Zacharias and U.J. Puranik listing of all CPC accounts placed in a bad debt work queue for at least the prior 12 months. See Exhibits 58-59. Defendant U.J. Puranik would then submit those claims to her carrier, (Captive) to pay while at the same time, MBO continued to pursue and collect payments from patients, thereby double-billing the accounts. See Exhibits 58-59.

**METHODIST HOSPITAL**

187.    Methodist Community Hospital is located at 600 Grant Street, Gary, Indiana, 46402; Southlake, Indiana and 8701 Broadway in Merrillville, Indiana, 46410. Recently, Methodist was acquired by Franciscan.

49

188.    Methodist Hospital (MH) and Trustmark entered into an additional one year

staffing, legal, coding and billing contract in July 2016. Exhibit 71.  It provides in relevant part

that Trustmark will provide the following services and agreement to terms:

- On site insurance follow-up, at Methodist's location using its software ("EPIC").
- Agrees to "observe and comply with all laws…regulations of the federal, state and local governments…" and that its services
- Agrees to "not discriminate against any worker, employee, or applicant or any member of the public, because of race, creed, color, sex, age or national origin, nor otherwise commit any unfair employment practice"
- Agrees to *not* assign the agreement "or any rights or duties" without Methodist's prior written consent.
- Fees and Costs: Trustmark is entitled to receive a commission of 17% of any amount collected pre-suit on the account and up to a maximum of $10,000 per account and 21% post instituting suit (pages 3 and 8)

189.    Methodist has its own billing department, administered by employees Angie

Zurich and Yolanda Jaime. The bed debt process with Methodist works as follows. Methodist

sends the files of patients to Trustmark to turn over to collection, the majority of who are

Medicare and Medicaid beneficiaries. Under Medicaid rules, hospitals, clinics and individual

providers/treaters are **not** permitted to bill the patients, except in limited situations for any

applicable Medicaid co-payments.

190.    By enrolling in the Medicaid program, a provider agrees to accept payment under

the Medicaid program as payment in full for services rendered. Private pay agreements with a

beneficiary are prohibited.

191.    Effective May 22, 2010 the Affordable Care Act (ACA) amended the Social

Security Act (SSA) to include a variety of Medicare and Medicaid program integrity provisions.

A new section under SSA, **§1128J (d)**, requires providers of Medicare or Medicaid services or

supplies to notify the program and return any inappropriate payments to the program(s) within sixty (60) days of identifying the overpayment.

192. Additionally, a provider who does not participate in Medicaid fee-for-service, but who has a contract with one or more managed care plans to serve Medicaid managed care or FHPlus members, **may not bill Medicaid fee-for-service** for any services. Nor may any provider bill a beneficiary for services that are covered by the beneficiary's Medicaid managed care or FHPlus contract, unless there is prior agreement with the beneficiary that they are being seen as a private pay patient as described previously. The provider must inform the beneficiary that the services may be obtained at no cost from a provider that participates in the beneficiary's managed care plan.

193. A Medicaid beneficiary, including a Medicaid managed care or FHPlus enrollee, **must not be referred to a collection agency** for collection of unpaid medical bills or otherwise billed, *except for applicable Medicaid co-payments,* when the provider has accepted the enrollee as a Medicaid or FHPlus patient. Providers may, however, use any legal means to collect applicable unpaid Medicaid co-payments.

194. The State of Indiana prohibits Medicaid practitioners and providers from charging Medicaid recipients for covered services. *405 IAC 1-1-3 (I)* states:

> "A Medicaid provider shall not collect from a Medicaid recipient or from the family of the Medicaid recipient any portion of his charge for a Medicaid covered service which is not reimbursed by the Indiana Medicaid Program, except for co-payment and any recipient liability payment as authorized by law.
> Indiana Medicaid Bulletin, 1999.

195.     Relator Collins worked on numerous accounts, including Methodist Hospital. Methodist routinely sends Medicaid insured patients to bad debt and collection *and* submits claims for payment to Medicaid after it has turned the patients over to Trustmark for collection.

196.     On or about January 10, 2017, after Sibley discovered that Trustmark was illegally pursuing Medicaid beneficiaries for bad debt and lawsuits by Attorney Rosen (via pre suit letter), Sibley issued cease and desist instructions to all collectors. In response, defendants Zacharias, Manning and Angie Zurich from Methodist, counter-manded Sibley and instructed her that if Methodist wanted to sue the patient, sue them.

197.     Trustmark's has paid Methodist Hospital staff with gifts and remuneration to induce Methodist to continue using Trustmark / MBO to bill their Medicare and Medicaid patients. For example, in 2016-17, Joseph Zacharias, Robert Zacharias, Debra Porter and Justin Manning provided Methodist staff with tickets to Bears, White Sox, Cubs and other sport games.

## SCHEME # 3 DUPLICATE BILLING  FOR ANESTHETIC SERVICES… COMMUNITY HOSPITALS…CENTERS FOR PAIN CONTROL AND OTHER PROVIDERS

198.     CMS and Medicare regulations provide in relevant part that the medical provider may bill for services and with a modifier if they are also billing for the anesthesiologist. Instead defendants bill for the MD and Anesthesiologist and secondly, a duplicate bill for the anesthesiologist only, for the same day of service.  Defendant MBO/TRS clients who overbill the government and patients for anesthesia services are Community Hospital (CH) and Lakeshore Anesthesia (MBOLA) Binal Anesthesia, St. Catherine Hospital and St. Mary Hospital.

199.     In a managers' meeting attended by Relator Sibley in late 2016, Defendant Manning instructed the managers that the hospital anesthesiologist, the CRNA and MBO are all

billing for the same service and it is proper because the insurance company processes both claims. He said he reviews the Medicare fee schedule with each of MBO & Trustmark Clients, and they are allowed to and do in fact bill the patients as much as they want and "up to $1 million if they want to and no one has a right to tell them otherwise."

200.    Community Hospital a/k/a Community Hospital Anesthesia or Munster Medical Research Foundation, Inc. located at 901 MacArthur Boulevard, Munster, IN 46321.

201.    The Community Hospital (CH) and Trustmark contract is attached as Exhibit 38.

202.    CH is billed in defendants' system with the Mnemonic of **MBOCH.**

203.    Defendant Zacharias prepared scripts that each CSR is mandated to use in talking with patients and beneficiaries. The scripts state as follows:

> "There appears to be a double billing on the statement you received or on your explanation of benefits you received from your insurance company but it really isn't. We have to bill the same exact charge (Typically between $1500 and $3160) But for example- > $3160 for both the MD Anesthesiologist and then bill another charge again (Typically around $3160) for the MD to supervise the CRNA the anesthesia services you received at the hospital. The total amount billed to you or your insurance in the amount of $6320.00 is an accurate charged and billed amount.   This is a requirement (MD Anesthesiologist supervision of the CRNA) for all patients that have anesthesia services of Community Hospital and in the State of Indiana for all hospitals providing this service".   Exhibit 126.

204.    Community Hospital at times, provides anesthesia to its patients during surgery, and at times uses an anesthesiologist or Certified Registered Nurse Assistant (CRNA). Defendants' billing schemes with CH include billing for services not rendered by the anesthesiologists; unlawful use of MD modifier when the MD did not supervise the CRNA; double and triple billing for the CRNA and/or MD on the same date of service.

205.    Pursuant to its contract with MBO, Community Hospital sometimes sends MBO and the off shore billers and coders a "ticket" showing what each patient owes.  Each ticket reflects a separate claim or charge.  For the one day of service, the patient gets 2 tickets and third bill from the hospital.  The patient is billed 2 or 3 times for anesthesia, even in cases when no anesthesia is provided or when anesthesia services are billed multiple times.  See examples, attached 93-99, 103-108 and 110.

206.    The patients or their private or governmental payors are billed the facility fee by the Hospital, under part A, the physician fee and the CRNA fee under Part B. The first billing ticket has the MD claim, and with a modifier for CRNA, Certified Nursing Assistant being present. Then they are separately billed for the CRNA and are also separately bill from the hospital in the name of the MD. A modifier is to be used to reflect that the anesthesiologist is in the room the entire time to monitor the CRNA.  See Exhibits 93-99, 103-108 and 110.

207.    When the patient calls to complain about double billing or billing for services of an anesthesiologist that they claim were not provided, per defendant Zacharias' script (Exhibit 126), the CSR's are required to lie to the patients and state as follows:

- "per community hospital policy when the patient is under anesthesia there has to be a MD and anesthesiologist in the room at all times and the MD performs the physician component". … or

- the anesthesiologist was in the room the entire surgery. …. Or

- "Technically you were not billed twice and under  the policy they split the bill in half you were going to be charged $5000 so we split each bill. If billed it together the insurance co would consider it global. …. or

- "I reviewed your superbill and if you have a problem have to talked to your insurance? I can only follow the EOBs per your insurance. Insurance says to charge you that amount."

- "they applied $75 to the co-insurance"

208.    On numerous occasions Lopez questioned Defendant Manning about defendants' overbilling. He told her that defendants follow the clients' directives and the staff is to do as they are instructed. In June 2016, Lopez complained to CSR Manager Theresa Florek that Community Hospital and MBO were double billing patients for anesthesiologists. She showed her evidence of claims where the patient was billed for the MD and coded with a modifier for the anesthesiologist and another for the same date of service for the CRNA and anesthesiologist with a modifier. The MD gets paid on the first bill along with the anesthesiologist. The Patient is billed out of network but the insurance company may or may not pay the second bill. See e.g., Exhibit 68.

209.    Patients of Defendant Community Hospital Anesthesia are billed and/or pay the double billing based upon the false scripts read to them by CSRs that the charge is $2500 and the MD is splitting the payment with the anesthesiologist. Additionally, the patients pay to avoid going into collection. On occasion, patients have told Relator Lopez that an anesthesiologist was not present during their surgery. Relator Lopez would accurately document in the account the patient complaints, although she and the other CSR's were instructed by MBO/TRS management to never write anything in the client notes.

210.    In 2016, patient Frank Vargo (FV) complained to Relator Lopez to dispute Community Hospital Anesthesia charges for a CRNA whom he said was not present during his

55

procedure. See Exhibit 12. Lopez escalated the complaint to a dispute. On October 7, 2016, Relator Lopez's supervisor overrode the dispute, without checking for accuracy of the complaint, contending that the patient does not know if "there is a CRNA and MD on the case" and or that is MBOCH Hospital policy.

211.     Patient Kathleen Schimmel (KS) is a Medicare Part B and Medicaid Indiana beneficiary. She complained to defendant MBO in December 2016 that she was erroneously billed by Centers for Pain Control for a CRNA and none was present. She was told she had to make the payment anyway. Additionally, although the superbill reflects that the patient owed nothing, she was billed and paid $35.03. See Exhibit 13.

212.     Jennifer Story (JS) further illustrates fraudulent billing practices by Community Hospital Anesthesia and the MBO /TRS defendants. See Exhibit 20. Story was admitted to CH and gave birth on February 18, 2016 in an "uncomplicated delivery". Anthem Insurance paid the $800.00 bill on behalf of Indiana Medicaid. Obstetrician Marcus performed the delivery and "No anesthesia was required." Exhibit 20, p. 3. Miraculously, Story gave birth to the same baby on the same day, but also, with a cesarean section, for which Medicaid was billed an additional $4,424.70. Medicaid also paid for anesthesiologist Stephen Goldberg and the anesthesia. Exhibit 20, p. 1. According to the notes of CRNA Farmer and Dr. Goldberg's record, an epidural anesthetic was used. Exhibit 20, p.2, 4. The patient was turned over to bad debt and called MBO/TRS to complain. She spoke with Relator Sibley and confirmed both that she had a normal vaginal delivery, not a cesarean section and no anesthesia.

213.     Pursuant to MBO/TRS's policy to bill whatever it or its client/providers want, Medicare patients are consistently overbilled. For example, Community Hospital Anesthesia, a

Medicare provider used defendant MBO/TRS's address and billed Medicare Patient Kelly Ha (KH) twice for the same overbill. Patient Kelly Ha paid the $399 "co-insurance" on ticket no. CH 3342863389, Exhibit 21. Relator Lopez reported to MBO/TRS management that the bill was improper and reflected that Anthem, on behalf of Medicare, paid the co-insurance amount. Medicare was billed and paid the provider. The Anthem EOB clearly states, "Contractual obligations. Kelly Ha and Indiana Medicaid were double billed by the MBO/TRS defendants and Community Hospital Anesthesia for $399 for services rendered on June 15, 2016 for a procedure. This was *after* Anthem Indiana Medicare HMO (Part C) paid the contractually agreed and reasonable and customary amount of the same $399 billed to Ha. As noted in the Anthem EOB the patient had no deductible or co-insurance, and "the patient may not be billed for this amount". Further, the charge exceeded the allowable fee schedule. As set forth on the EOB, the double billing was accomplished by creating two separate tickets, CH 039688 and CH 039687 for the same date of service and occurrence, one billed to Medicare and one billed to Anthem. The EOB and complaint from Relator Lopez was ignored by defendants MBO/TRS. See Exhibits 8 and 21.

214.    Laticia Roach (LR) and Indiana Medicaid were double billed by the MBO/TRS defendants and Community Hospital Anesthesia for $3160.50 for a procedure performed and $884.90 and $632.07 for anesthesia on November 18, 2016, for the physician Priti Chowdhury and the same charges for the CRNA, Dwight Farmer. Furthermore, although the EOB specifically coded a Code 45 that "the patient may not be billed for this amount", Roach was billed the $105.00 balance as the co-insurance amount. The EOB also noted that the "charge exceeds fee schedule/maximum allowable or contracted/legislated fee arrangement" Exhibit 37.

215.    In December, 2016, patient Wallace Richardson (WR) complained that he was billed for a Dr. Xenidis although he never saw her. See Exhibit 14. MBO confirmed that the patient was correct, but covered up the fraud. MBO states "this is a billing error", to apologize to the patient if it was paid "and hope the insurance company does not ask for notes." Exhibit 14.

216.    Centers for Pain Control patient Bob Hoffman (BH) was turned over to collection for allegedly owing $83.50 to the provider. Hoffman is a Medicare Part B Indiana beneficiary. The itemized bill reflects that Hoffman's bill was paid in full by Medicare and it appears a supplemental carrier Benistar also exists. The balances show that *nothing* is due. The bottom ribbon of the superbill however reflects a balance due of $11.89. However, the patient was billed and paid a debt he did not owe.

217.    Centers for Pain Control patient David Bolka (DB) was billed $1918.99 by MBO /TRS of which he paid $1660. Exhibit 96. His carrier was Medicaid and Anthem Indiana is the Medicaid fiscal intermediary. The bill reflects that no money was due from the Medicaid participant, yet he paid thousands of dollars. The bottom ribbon of the superbill however reflects a balance due of $258.99 from the Patient. Yet he was billed and paid over 8x that amount and did not owe the debt at all.

218.    As a matter of course, defendants' clients, including CH and CPC, bill and charge in excess of Medicare fee schedule tenfold or more, for anesthesia and other services. See Exhibits 32-34 (Ind. Medicare 2017 Fee Schedule; 2017 Med Fees from WPS Indiana; MBOCP 2017 Physician Fee Schedule). See also, Exhibits 35-36, Trilab Fee Schedules.

219.    In a staff meeting on October 26, 2016, Lopez asked Defendant MBO/TRS manager Melanie Griggs, "[h]ow can we explain to the patient why their insurance was billed

58

with two separate tickets for two providers for the same exact charge?" Griggs responded that CH patients and their insurance companies receive a double bill for the same services, one from the CRNA and one from the MD anesthesiologist, splitting the charge to $1500 per treater, or a total charge of $3000. Defendant Manning said MBO did not know what they were billing for.

## SCHEME 4 - UNIVERSITY OF ILLINOIS

220. The University of Illinois Hospital (U of I) & WWT has contracted with MBO/Trustmark for billing and collections.

221. Relator Collins worked on the U of I Hospitals bad debt collections contract for Trustmark. Employee of MBO/TRS (Mary Williams) is the only in house worker who works on this contract and along with, approximately 6 offshore employees.

222. U of I employs Trustmark/MBO administrator Mary Williams to contact private and governmental carriers to see if they have paid U of I, *before* turning the patients over to defendants for collection. Williams also bills and follow up on the status of the claims billed out by MBO/TRSs' offshore outsourcers. At the time U of I turns patients over to Trustmark for collection, they know and/or should have known that the balances were not due or alternatively, that payments were being held in the U of I multi-million dollar missing money queue.

223. U of I maintains thousands of accounts and dollars in a "missing money queue." These are accounts that have been paid by the patient's insurance however these payments are either not applied or timely applied to the patient's balance. If the patient or the patient's carrier calls in to complain only then does Trustmark research and update the file. If the payment is not found, then the account is sent to collection, resulting in false credit reporting by Trustmark and duplicate billing and payments. See Exhibit 113 (UIC Missing Money Charts).

224.    By letter dated June 29, 2016 regarding "misapplied cash" to its "outsource vendors" including defendants MBO and Trustmark, U of I Director of Patient Accounts, Jeff Means, acknowledged that U of I failed at times to credit payor payments to individual patients' accounts. See Exhibit 30. U of I turns over to Trustmark billing on patient /collections on accounts that are allegedly deficit. Although U of I was paid on many of the accounts by the carriers, it fails to credit the patient account and instead, the money is kept in a "missing money account" at U of I. The queue is a repository of millions of dollars in unapplied payments and insurance payments which are deleted by MBO offshore vendors eventually and intentionally at the request of UIC executives. Exhibit 113.

225.    U of I and Means' actual instructions to the MBO/TRS defendants was to maintain the money balances at U of I and *not* apply payments to the patient accounts. That same day, CEO Manning issued mirror instructions to Trustmark's Monica Luna, Outsourcing (Ajax and Gebb) and Debra Porter and employee Mary Williams to *not* apply U of I's missing money.

226.    Additionally, the outsource companies, Ajax and Gebb bill and code from patient medical records. See, e.g., Exhibit 61, Ajax Coding for NYX Medical Solutions for September 2016. Sibley has observed on numerous occasions that when coding and patients medical records are not available, MBO's India offshore vendor and defendants MBO/TRS's former in house coder Nancy Reed make up billing and coding.

227.    In about February – March 2016, CEO Manning implemented a new billing system such that charges and supporting documents are deleted from defendants' computers after 90 days. Approximately 2-3 months of uploaded charges were deleted… and instead, to bill, Manning had data entry people make up and enter dates of service and charges.

228.    On or about March 12, 2016, Relator Collins questioned defendants' former manager Tonya Rodgers as to why they were billing patients when the providers had collected money on the payments billed. Rodgers instructed Collins that it was not Trustmark's responsibility to check payments that was up to U of I.

229.    Trustmark is responsible by contract to follow up with the carriers who confirm if they have been paid. See Exhibit 70.

230.    UIC Confidentiality agreements are required to be signed and accompanied with a copy of the Trustmark employee's State ID or Driver's License. Employees of defendant MBO/TRS and their OS employees of Gebb, Ajax and Elico access patients' protected medical health and financial information, and without providing verified credentials. See Exhibit 114.

## SCHEME 5 - TRILAB BILLING

231.    Trilab is clinical medical laboratory located at 1089 North Salem Drive, Schaumburg, IL. 60194. Defendants have a contract with Trilab.

232.    Trilab is billed in defendants' system with the Mnemonic of **MBOTB.**

233.    Defendants MBO/TRS have established a system to bill carriers and patients 3x or more than the Medicare fee schedule. See Exhibits 35-36 (Clinical Lab Fee Schedule 2017, Il. Medicare 2016 Fee Schedule)

234.    Defendants bill and collect unpaid balances from patients who are referred by their physicians to Trilab for drug screening tests. In turn, Trilab pays physicians for referring their patients for the drug screenings. See list of referring physicians at Exhibit 40. The Trilab kickback scheme was openly detailed by defendants' owner Joseph Zacharias at a February 13, 2017 weekly Group Management meeting at Trustmark. Zacharias states:

Awaiting confirmation of numbers from Ameira [MBO's Claim Status Follow up Manager], to be able to give to Patrick owner of Trilab (MBOTB) client regarding real time correct expectation on acct. receivables/reimbursements, because Patrick works with the doctors that refers (sic) business to Trilab and Patrick has communicated to the doctors that they should be receiving somewhere around $600K a month and Joe wants to be able to update Patrick so he can tell Trilab's referring doctor partners a realistic reimbursement expectation amount if the amount is actually lower $200K-$600K on a monthly basis   (emphasis added)

235.    Pursuant to Trilab's contracts with various carriers, the EOBs further state that Trilab *cannot balance* bill a patient and/or bill a patient over the amount listed as the patient's responsibility on their EOB.  Instead, Trilab refers patients to Bad Debt Status collections to defendants, to collect an inflated bill in the routine charge amount of $3248, which is collected *unless* the patient complains.

236.    Trilab collaborates with hundreds of referring providers and facilities and bills hundreds of Medicare and Medicaid providers and their patients allegedly for "patient responsibility".

### HOW THE TRILAB BILLING WORKS

237.    Trilab signed a billing and collection contract with MBO under which carriers and patients are billed as much as 10x the Medicare fee schedule.  See Exhibits 115-118 (drug panel billing).

238.    Trilab patients are referred for drug screening. Trilab bills $248 for the actual office visit wherein the patient provides the sample in their MD's office. The provider then sends the samples to Trilab for analysis. In turn, Trilab bills the patient or carriers $3000 for testing for approximately 18 controlled substances.

239.    Most patients are referred to Trilab from **APAC,** the facility that administers the drug screening test.

240.    If a patient is "self-pay", per defendant MBO/TRS and Trilab's instructions, the bill is reduced from $3248 to $248, and *irrespective* of what the patients' EOB says.  However, defendants' practice is to ignore the EOB and to bill the patient for the full account balance.   In a group management meeting on February 13, 2017, defendant Manning instructed Sibley to not permit her staff to view EOBs from the carriers or patients which would reflect true balances. Instead, they were instructed to only assess patient balances in the MBO Zirmed system, which does not accurately record balances, and which can be freely edited by anyone.

241.    If insurance paid any amount and part of the charged was the deductible...or if the patient was uninsured the patient is billed $250.  Per instructions from CEO Justin Manning, Relator Lopez and the other CSR's were instructed to tell any patient that complained, "Just let them know it will be adjusted down to $250." See Trilab Wikipedia Instructions, Exhibit 29.

242.    As with Trilab, defendants operate the same scam with Centers for Pain Control. After the payment of insurance to the providers, the claim is sent to Trustmark/MBO by the providers, to bill the patient $3248.  In billing the patients for more than the $250 which is the maximum patient responsibility, defendants bill patients 8x the Medicare fee schedule. Contrary to the providers' Medicare contract and Medicare rules, defendants bill more. Defendants instruct the CSR's like Lopez that they must tell patients the billing is "mandated by Indiana law". This statement is false.

63

243.    CSR's like Relator Lopez, pursuant to defendants' instructions, advise patients "because you are receiving drugs for pain you have to be tested, the doctor has to make sure you are taking meds and you have to be charged whether they know or approve it or not."

244.    Defendant MBO/TRS Wikipedia page for Trilab states as follows: "when an insurance pays any residual remaining MBO will adjust down to 00" and "when an insurance does not pay but puts residual balance to a patient deductible MBO will adjust down to $2500 and bill the patient self pay…". Exhibit 29.

245.    Relator Lopez and CSR Sarah Lowe notified defendant MBO/TRS's management, including CEO Manning, Melanie Riggs and Monica Luna on October 29, 2016, that it is improper to bill the patient for the Trilab upcharge. In response, Riggs told Lopez there was no "self pay discount" applied, so reduce the bill to $250.  See Defendants' Trilab discount guidelines, Exhibit 29, Tip #10.

246.    Patient Ronald Cox for example, is an example of a patient billed the entirety of the drug screen, $248 and $3000 for a total of $3248.  Pursuant to defendant MBO/TRS and Trilab's agreement and policy, because the patient he did not complain, the bill was not adjusted. See Exhibit 98.

**SCHEME 6 – UNIVERSITY OF CHICAGO -- GHOST PAYROLL, KICKBACKS AND OVERBILLING**

247.    MBO/TRS and University of Chicago (U of C) have created and operate a ghost payroll scheme for which they bill government and other payors directly or via reimbursement on their cost reports.  On average, MBO has approximately six employees working on the U of C contract but invoices about 29 employees.  See Exhibit 79.

64

248.    As set forth above, Keith Sauter, defendant U of C's Director of Finance, receives kickbacks in the form of a regular payroll check from Trustmark for "Consultant Fees" as well as gifts. Defendant MBO/TRS's payments to Sauter are in exchange for securing and maintaining the contracts for MBO/TRS.  See Group Exhibit 39 -  Zacharias, Chick, Porter emails seeking Bears' tickets or gifts U of C and Sauter; Group Exhibit 78, 1/9/17 Email from MBS/TRS Porter to Compliance Officer Chick to mail $3852 check to Sauter; Sauter's 2001 checks.

249.    On or before September 10, 2014, MBO/TRS Manager Porter requested Bears' tickets and parking passes for U of C. If U of C was not able to use the tickets, Zacharias instructed Porter to tell Vanessa at U of C "we will send along our thanks in another form of gratitude; and I will have Cheryl purchase her +/-$200 in Lettuce Entertain You gift cards. You can let me know the exact dollar amount you think we should give her".  Two weeks later, Robert Zacharias tells Compliance Officer Chick, "No tickets left. Who asked for the tickets? If it is a high level executive, then I would purchase better tickets. If it is a regular level executive, then go on Craig's list or broker and purchase  2 tickets for a 300 or 400 level seats (equivalent to ours) for the game that is the least expensive".  Group Exhibit 39.

250.    Between September and November 2016, in training Sibley to take over her job, Porter explained the ghost payroll to Sibley and that she may need to continue the practice and to "add and remove people" from the U of C invoices.

251.    The Trustmark/MBO contracts are attached as Group Exhibit 84. Included is the Accelerated Cash Collection (ACC) Project Contract Amendment, effective September 1, 2016 and amending the master ACC U of C – MBO contract of 2004.  The initial contract provided for an annual payment of $1,249,499 to include the Full Time Employees consisting of 26

collectors, 2 support clerks and 1 manager were on the job. This is a false statement.  Pursuant to the amendment, staffing changes had to be "pre-approved in writing by UCH" for the following month. The rates were set as follows effective 2016 and as compared to original 2004 rates:

|  | 2016 | 2004 |
|---|---|---|
| • Billing/collection clerk | $4000/mo | ($3619)(26 employees) |
| • Billing/Support clerk | $3200/mo | $3250/mo (2 employees) |
| • Billing Manager | $6000/mo. | ($5000/mo)(2 persons) |

252.    Under the 2016 Amended contract for ACC, U of C paid MBO a total bonus of up to $150,000 for expedited collections of receivables. Exhibit 84.

*253.*    The U of C – ACC contract further provides that MBO "shall not discriminate against any worker, employee or applicant….because of race, creed, color, age, sex or national origin or otherwise commit any unfair employment practice." Exhibit 84, page 3. Furthermore, the contract provided that MBO could not assign the Agreement without UCH's prior consent. Exhibit 84, page 5.

254.    U of C also has its own internal billing department. U of C applies the CPT and other coding to the bill. Initially, U of C bills the patient's insurance and turns the follow up portion over to Trustmark/MBO to rebill, recode and collect the unpaid balance from the patients. However, the actual scheme between U of C and defendants is to bill patients for the entire bill, irrespective of insurance payments which the U of C intentionally does not post. These payments, also known as Chargebacks and as with the University of Illinois, are kept in a designated "missing money account", constituting pooled money received from carriers but not applied to the individual patient accounts. The Patient is credited if they complain or if the carriers demand refunds or credits.

66

255.    Additionally, U of C and MBO contracted for MBO to collect Medicare and Medicaid Legacy balances, including traditional and managed care accounts. See Exhibit 79.

256.    As part of the Medicare-Medicaid collection contract with U of C, MBO stipulated to its experience and case handling, including proper coding and compliance.  MBO agreed to conditions, including the following:

- ...[C]ompliance with all applicable state and federal laws and regulations...
- "Identify staff, including subcontractors, who will be assigned to the potential contract....The Agency must commit that staff identified in its proposal will actually perform the assigned work. Any staff substitution must have the prior approval of the agency."

257.    In April 2016, Trustmark lost its Third Party collection contract with U of C. Relator Collins was present when defendants Zacharias, Manning and manager Debra Porter discussed the contract loss.  Manning said "we are going to take a loss insofar as defendants had to dismiss all the garnishment accounts", i.e., garnishing patients' wages and assets to collect alleged patient debt. He said they could take the "hit" because "we will get it back down the line in the Medicare – Medicaid contract."

258.    Instead Sauter arranged for Trustmark to obtain an even more lucrative contract, approximately $500 million or more per year for Medicare and Medicaid billing. See contract Exhibit 84. Manning announced to the staff in meetings and via email that TRS was selected to collect on the U of C "100 million dollar Government Payor AR work down program".  He admitted that an additional 12 employees were to be hired to staff the contract. See Exhibit 78, Manning email dated May 19, 2016.  Subsequently in an email dated 7/26/16 to Sauter, he confirms that MBO added workstations for the "contracted services" for a leasing fee of $50 per month per workstation. Exhibit 84.

259. Manning, Zacharias and other top management at MBO/TRS, defendants MBO/TRS admit they had less staff than they billed and contracted for. For example, instead of 16 reps, they had 11. See Emails, Exhibit 84. Upon information and belief, these ghost payrolling charges were passed onto Medicare as "administrative costs" in defendant U of C's cost reports.

260. For example, MBO/TRS manager Zaragoza admits that one Natalie Toth just started working on 10/31/16 and was "not grasping it". Yet, as set forth in the chart below, defendant MBO/TRS billed Toth for the October monthly fee. Further, defendants admit that one employee Fulayter didn't even start working until a week *after* they billed U of C and Medicare for her services, allegedly rendered all the prior month. See chart below.

261. Defendant MBO bills U of C monthly for labor charges for labor who work 100% of their time on U of C contracts listed below. Some of those persons, as noted below, are *not* employed on the project or not exclusively. Some are not even employed at MBO/TRS. The overbilling including the following University of Chicago Hospitals contracts:

- *Medicare/Medicaid* Project
- ACC Project
- A/R Rundown Project
- Self-Pay Program Project
- Psych Program

262. See Exhibits 79-80, MBO-U of C invoices for October and December, 2016. MBO bills the U of C $4000 for each non-management, non-clerical employee; $6000 for each management employee and $3200 for each clerical employee per month they work on the noted U of C Project and exclusively. See Exhibit 84. In turn, upon information and belief, the U of C passes the labor expense onto Medicaid /Medicare and in its cost reports.

263.   The MBO/TRS invoices to U of C are separately billed by project and are broken down into 5 columns: Employee Name, Hire Date, Billing Rate, % Worked and Amount Due. The hire date is the date the employee allegedly began working on the U of C project. The billing rate is the monthly amount billed and paid by U of C to defendant MBO for that employee's labor and the % worked connotes the % of the employee's work time spent on that project. It is noteworthy that many of the employees start on the project at the end of the month or the last day, and yet, U of C is invoiced and pays 100% of the monthly charge for one day's work.

264.   Relator Sibley reviewed MBO/TRS invoices on the U of C contracts and observed ghost payrolling at least back to September 2016. For example, the following chart reflects which MBO/TRS employees actually worked on the contracts vs. the false invoicing for sample months of October and December as follows:

| Name of Employee MBO bills For working exclusively on U of C contract | % Worked On U of C contract per MBO invoice | Does Employee work at MBO or Trustmark, on the U of C contract at all, or 100% of the time or exclusively; |
|---|---|---|
| **October Invoice #2011170** | | |
| *Medicare/Medicaid Project Invoice No. 20114070* | | |
| Clay, Crystal | 100% | NO |
| Harrison, Cecilia | 100% | NO |
| Lewis, Tenee | 100% | NO allegedly worked on project starting 10/31/16 |
| Riggs, Melanie | 100% | NO allegedly worked on project starting 10/28/16 |
| Sibley, Kenya - $4000 | 100% | NO |
| Shine, Lufreda | 100% | NO allegedly worked on project starting 10/17/16 |
| Smith, Lanetta | 100% | NO allegedly worked on project starting 10/31/16 |
| | | |

| | | |
|---|---|---|
| Young, Harriet | 100% | NO |
| Ward, Julia | 100% | NO allegedly worked on project starting 10/31/16 |
| Zaltouski, Shannon | 100% | NO allegedly worked on project starting 10/31/16 |
| Courtney Odom, clerical | 100% | NO allegedly worked on project starting 10/15/16 |
| Rodriguez, Donna, Managerial | 100% | NO allegedly worked on project starting 10/31/16 |
| **TOTAL LABOR BILLED FOR MEDICARE / MEDICAID Contract, OCTOBER, 2016** | | $49,200.00 |
| Total amount billed to Medicare and Medicaid for October 2016 | | $49,200.00 plus an additional cost for 8 workstations @ $50 each ($400) and telephone ($2047) and supplies ($1311) = $3,358.94. |
| | | |
| ***ACC PROJECT Invoice No. 20111170*** | OCT 2016 | |
| Agrawal, Khyati | 100% | YES |
| Camarena, Mary | 90% | YES |
| Jarvis, Sherri | 100% | NO |
| Watson, Shelly | 100% | NO WORKS FOR JEFF ROSEN |
| Fulaytor, Elizabeth | 100% | HIRE DATE was 11/7/2016, not 10/31/16 – See Exh. 41C, Zaragoza email 11/11/16 |
| Luna, Monica | 100% | NO |
| Lopez, Jessica | 100% | NO |
| Durkin, Theresa | 100% | YES |
| Edmonds, Ashley | 95% | HIRE DATE was 11/7/2016, not 10/31/16 |
| Harding, Tracee | 100% | YES |
| Iacopetti, Barbara | 100% | No allegedly worked on project starting 10/25/16 |
| Infante, Ivy | 100% | YES |
| Martinez, Chris | 100% | YES |
| Greene, Tokia | 95% | NO |
| Neely, Tanya | 100% | NO Allegedly worked on project starting 10/31/16 |
| Perez, Melissa | 100% | YES |
| Stephanopoulous, Aleka | 100% | NO |

| | | |
|---|---|---|
| Toth, Natalie | 100% | NO allegedly worked on project starting 10/31/16 – this is her *first* day hired by MBO/TRS. See Exh. 41C, Zaragoza email 11/11/16 |
| West, Lori | 100% | NO |
| Williams, Mary | 90% | N0 |
| Williams, Charmira | 95% | NO Allegedly worked on project starting 10/31/2016 |
| Wooten, Ramon | 100% | |
| Agrawal, Ila, clerical | 100% | NO TRUSTMARK |
| Gutierrez, Bianca, Managerial | 100% | No |
| **TOTAL LABOR BILLED FOR UofC ACC Contract, OCTOBER . 2016** | | $107,800.00 |
| | | |
| ***Psych Program* October 2016 Invoice #2014070** | | |
| **Guterez, Arleta** | 100% | YES |
| | | |
| **TOTAL LABOR BILLED FOR October. 2016** | | $4000 |
| | | |
| ***Medicare/Medicaid Project*** | | |
| Clay, Crystal | 100% | NO |
| Harrison, Cecilia | 100% | NO |
| Lewis, Tenee | 100% | NO |
| Riggs, Melanie | 100% | NO |
| Sibley, Kenya | 100% | NO |
| Shine, Lufreda | 100% | NO |
| Smith, Lanetta | 100% | NO |
| | | |
| Young, Harriet | 100% | NO |
| Ward, Julia | 100% | NO |
| Zaltouski, Shannon | 100% | NO start date was 11/7/16 |
| Courtney Odom, clerical | 100% | NO |
| Rodriguez, Donna, Managerial | 100% | NO |
| **TOTAL LABOR BILLED FOR** | | $49,200.00 |

| OCT | | |
|---|---|---|
| | | plus an additional cost for workstations $800 and supplies $2,522.61 |
| **A/R Rundown Project** | | |
| Camarena, Mary | 95% | YES |
| Fulayter, Elizabeth | 100% | YES |
| Greene, Tokia | 95% | Not employed at MBO in Dec. 2016 |
| Jarvis, Sherry | 100% | YES |
| King, Bianca | 100% | YES |
| Lopez, Jessica | 100% | No WORKS FOR MBO |
| Luna, Monica | 100% | No DIRECTOR OF OPERATIONS DOESN'T WORK ON CONTRACT AT ALL MBO |
| Marshall, Tekeisia | 100% | YES |
| Mendoza, Marysa | 100% | YES |
| Toth, Natalie | 100% | Not employed at MBO in Dec. 2016 |
| Watson, Shelly | 100% | No WORKS FOR JEFF ROSEN LEGAL |
| Williams, Mary | 100% | NO WORKS FOR UIC |
| **TOTAL LABOR BILLED FOR DEC. 2016** | | $47,400 |
| | | |
| **Self pay Program Project** | | |
| Deany, Charity | 100% | YES |
| Golden, Jennifer | 100% | YES |
| Golden, LeTasha | 100% | YES |
| Halko, Lisa | 100% | NO. NO LONGER EMPLOYED |
| Jackson, Pamela | 100% | YES |
| Meglothen, Lee | 100% | YES |
| Murff, Sharri | 100% | NO. NO LONGR EMPLOYED |
| Robinson, Teresa | 100% | YES |
| Tankson, Marvia | 100% | YES |
| Wooten, Ramon | 100% | YES |
| **Managerial Staff** | | |
| Debra Porter | 100% | NO |
| **TOTAL LABOR BILLED FOR DEC. 2016** | | $46,000 |

| *Psych Program* | | |
|---|---|---|
| Guterez, Arleta | 100% | YES |
| | | |
| **TOTAL LABOR BILLED FOR DEC. 2016** | | $4000 |

| | % Worked On U of C contract per MBO invoice | Does Employee work on the U of C contract at all, or exclusively |
|---|---|---|
| **Medicare/Medicaid Project December 2016 Invoice # 2014072** | | |
| Clay, Crystal | 100% | NO |
| Harrison, Cecilia | 100% | NO |
| Lewis, Tenee | 100% | NO |
| Riggs, Melanie | 100% | NO |
| Sibley, Kenya | 100% | NO |
| Shine, Lufreda | 100% | NO' |
| Smith, Lanetta | 100% | NO |
| Young, Harriet | 100% | NO |
| Ward, Julia | 100% | NO |
| Zaltouski, Shannon | 100% | NO |
| Courtney Odom, clerical | 100% | NO |
| Rodriguez, Donna, Managerial | 100% | NO |
| **TOTAL LABOR BILLED FOR DEC. 2016** | | $49,200 Staff Plus work station cost $50/person x 16 ppl = $800 |
| | | |
| **ACC PROJECT** | | |
| Agrawal, Khyati | 100% | NO |
| Cruz, Erica | 100% | |
| Durkin, Theresa | 100% | |
| Edmonds, Ashley | 95% | |
| Harding, Tracee | 100% | |
| Iacopetti, Barbara | 100% | |
| Infante, Ivy | 100% | |
| Martinez, Chris | 100% | |

| | | |
|---|---|---|
| Nash-Haynes Tameka | 100% | |
| Neely, Tanya | 100% | Not employed at MBO in Dec. 2016 |
| Perez, Melissa | 100% | |
| Stephanopoulous, Aleka | 100% | |
| West, Lori | 100% | |
| Williams, Charmira | 95% | NO |
| Agrawal, Ha, clerical | | NO |
| Gutierrez, Bianca, Managerial | | |
| **TOTAL LABOR BILLED FOR DEC. 2016** | | $64,800 |
| | | |
| **A/R Rundown Project** | | |
| Camarena, Mary | 95% | |
| Fulayter, Elizabeth | 100% | |
| Greene, Tokia | 95% | Not employed at MBO in Dec. 2016 |
| Jarvis, Sherry | 100% | |
| King, Bianca | 100% | |
| Lopez, Jessica | 100% | NO |
| Luna, Monica | 100% | NO |
| Marshall, Tekeisia | 100% | |
| Mendoza, Marysa | 100% | |
| Toth, Natalie | 100% | Not employed at MBO in Dec. 2016 |
| Watson, Shelly | 100% | NO |
| Williams, Mary | 100% | NO |
| **TOTAL LABOR BILLED FOR DEC. 2016** | | $47,400 |
| | | |
| **Self pay Program Project** | | |
| Deany, Charity | | |
| Golden, Jennifer | | |
| Golden, LeTasha | | |
| Halko, Lisa | | |
| Jackson, Pamela | | |
| Meglothen, Lee | | |
| Murff, Sharri | | |
| Robinson, Teresa | | |
| Tankson, Marvia | | |
| Wooten, Ramon | | |

| Managerial Staff | | |
|---|---|---|
| Debra Porter | | NO |
| **TOTAL LABOR BILLED FOR DEC. 2016** | | $46,000 |
| | | |
| **Psych Program** | | |
| Guterez, Arleta | | |
| | | |
| **TOTAL LABOR BILLED FOR DEC. 2016** | | $4000 |

265.    On April 5, 2017, Donna Rodriguez, Trustmark Director of Accounts Receivables over the U of C, WWT and UIC departments only, corroborated that the U of C ghost payroll was still ongoing. She telephoned Relator Sibley.  Rodriguez said that she was going to be "taking all those old people off the invoice and by the time I leave, it is going to be legit".

266.    In addition to billing U of C for ghost payroll, defendants also bill U of C for miscellaneous supplies, telephone and utility bills. See e.g., December 2016 invoice. Exhibit 80.

267.    On or about December 29, 2016, Sibley met with defendant Manning to discuss the U of C ghost payroll.  She asked him, if he was aware they add people to the U of C payroll, who do not work on the account. Manning replied, "yes I am aware it". He also told her to not work on the U of C invoicing or accounts, because that was Debra Porter's job. Relator asked Manning why they bill for people who do not work on the contract? Manning replied, that defendants' do this because they took a "hit" on the  lost U of C Legal Accounts contract and Keith Sauter said "he would make up for it". He said Sauter was aware defendants were adding additional people who do not work at defendants, "to make up for the money we lost on the other contract".

### Overbilling and Chargebacks

268.     The U of C has an abundance of billing and coding mistakes, resulting in the patients and carrier paying more than they should. These mistakes are usually a result of missing modifiers often resulting in double billing and chargebacks or money owed to the patient. See Exhibit 90.

269.     U of C gets over 150 chargebacks daily, which defendant to refund these amounts to patients due to the overbilling, but they do not do so.  When asked why this occurred, Porter told Relator Sibley in about late October, 2016, "U of C hospital is not doing the billing right".

### SCHEME 7  - Trustmark & MBO are alter egos

270.     Trustmark and MBO share employees. All staff works in the same building, share work, management, equipment, software, accounts, website and online payment portals. Employees are paid out of the same account. Exhibit 51, 60, 85, 87 and 88.

271.     Trustmark employs Attorney Jeffrey Rosen as an independent contractor to operate its legal and legal collection "departments". He is admitted to practice law in Indiana and Illinois but does not own a collection license itself. Attorney Rosen is not a licensed collection agency. His clerks are not licensed collection agents.

272.     Rosen is paid $10,000 per month by Trustmark as an independent contractor to provide legal services for Trustmark and for MBO clients turned over to bad debt.

273.     Rosen is owner Joseph Zacharias' uncle.

274.     The legal department consists of two full-time clerks who are on the Trustmark payroll: Shelly Watson and Hannah Dubhue, and one part-time non-credentialed legal clerk

Katie Presco. Watson's salary is deducted from Rosen's $10,000 / month payments. These employees were supervised by Sibley until her termination.

275. When answering incoming calls, the employees state "Attorney Rosen's office" or "Legal Department of Trustmark Recovery". However, no such office exists.

276. The clerks routinely collect payments in court, via mail and over the phone from consumers; file and pursue collection foreign and non-foreign wage garnishments and routinely sign Rosen's name on collection letters.

277. MBO/TRS bill collectors Elizabeth Ryhal, Robert Odnas, Jansia Wilson, Bernadette Ganier handle Trustmark Bad debt collections. They are not employed in any "legal department". They send attorney validation debt and attorney letters to bad debt clients representing that the letters are being sent by Attorney Rosen's office. However, Rosen has no office nor are these accounts at that time with the "legal department" or a law firm. In fact, the accounts are still in collections and the patients may still make payment arrangements.

278. The form letters used by Attorney Rosen use the address of TRS. Exhibit 90.

279. Relators have observed the Trustmark bad debt collection process and staff. Rosen is rarely in the office, except to visit for a few minutes to sign collector-generated Attorney letters or court Affidavits or pleadings. The clerks send the collection letters without the involvement of Rosen and as such, are falsely representing that Rosen is involved in the collection process. As such, the collection letters claim to come from an attorney, Rosen, when TRS Bad Debt Collectors are the source and aside from his pro forma signature, Rosen is not involved, contrary to the FCRA. 15 U.S.C. §§1692e, 1692e(2), 1692e(3), 1692e(10), and 1692e(14). Furthermore, the form Affidavits of Debt used by Rosen attests that he is "a

77

designated full—time employee of TRUSTMARK RECOVERY SERVICES". Exhibit 89. This statement is false. Rosen is not an employee of TRS. He is an independent contractor. He is not full time, but rather, is an occasional visitor to execute documents.

## CLAIMS

### Count I
### Federal False Claims Act 31 U.S.C. §3729(a)(1)(A)

280.    Relators reallege the preceding paragraphs as if fully set forth herein.

281.    31 U.S.C. §3729(a)(1)(A) provides liability for any person who knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval.

282.    Defendants knowingly caused to be presented, directly or indirectly, false and fraudulent claims for payment or approval to the United States, including claims for services that were not performed and for services that were rendered as a result of an illegal kickback scheme in violation of the Stark Law and the AKS.

283.    Defendants knew these claims for payment were false or fraudulent.

284.    The Government was unaware of the falsity or fraudulent nature of the claims and the false or fraudulent records, statements, and omitted material facts that Defendants caused to be made or used.

285.    Defendants are jointly and severally liable to the United States for treble damages under the False Claims Act, in an amount to be determined at trial, plus a civil penalty of $5,500 to $10,000 for each false claim presented or caused to be presented by Defendants prior to

November 2, 2015, between $10,781 and $21,563 per false claim thereafter and between $10,957

and $21,916 for each false claim presented or caused to be presented after February 3, 2017.

286. By virtue of the misconduct described in this Count, the United States has suffered

damages and continues to be damaged in substantial amounts to be determined at trial.

**WHEREFORE**, for all the above reasons, Relators respectfully requests that this Court

enter judgment against the Defendants as follows:

1. Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729, *et seq*;
2. That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged in this complaint, as 31 U.S.C. § 3729, *et seq* provides;
3. That civil penalties of $5,000 to $10,000 be imposed for each and every false claim that the Defendants caused to be presented to the United States prior to November 2, 2015 and between $10,781 and $21,563 per false claim thereafter, and between $10,957 and $21,916 for each false claim presented or caused to be presented after February 3, 2017, and including treble damages.
4. Relators be awarded the maximum relator's share allowed pursuant to the False Claims Act, 31 U.S.C. § 3730(d);
5. Relators be awarded all costs of this action, including attorney's fees, costs, and expenses pursuant to 31 U.S.C. § 3730(d);
6. Defendants be enjoined from concealing, removing, encumbering, or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court; and
7. That this Court award the United States and the Relators such other relief that it deems just and proper.

### Count II
### Federal False Claims Act 31 U.S.C. §3729(a)(1)(B) - Kickbacks
(Defendants MBO/TRS, Zaccharias, Manning, Sauter, University of Chicago and Trilabs)

287. Relators reallege each of the preceding paragraphs as if fully set forth herein.

288. 31 U.S.C. §3729(a)(1)(B) provides liability for any person who knowingly makes,

uses, or causes to be made or used, a false record or statement material to get a false or

fraudulent claim paid or approved by the Government

289.    Section 2 further provides that in the event of a violation, such a person is liable

to the Unites States for a civil penalty of not less than $5,500 and not more than $11,000, plus 3

times the amount of damages which the United States sustains because of the act of that person.

A person violating this subsection (a) shall also be liable to the State for the costs of a civil

action brought to recover any such penalty or damages. The civil penalties for each violation

submitted after November 2, 2015 is increased to between $10,781 and $21,563 per false claim

and between $10,957 and $21,916 for each false claim presented or caused to be presented after

February 3, 2017, and including treble damages.

290.    The Medicare and Medicaid Patient Protection Act of 1987, 42 U.S.C. § 1320A-

7b(b)(1), also known as the Anti-Kickback Statute, states that:

(b) Illegal remunerations

> (1) whoever knowingly and willfully solicits or receives [or in subsection (2), offers or pays] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind –

>> (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

>> (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25.000 or imprisoned for not more than five years, or both.

291.    Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claims to Medicare and the United States and false records or statements to get false claims paid. Such false material records and statements include, but are not limited to, the false entries in the CMS Form 1500 submitted to CMS for reimbursement of services that were not performed and/or services that were provided as the result of kickback schemes that violated the Stark Law and the AKS.

292.    The AKS and Stark Law provide that it is a crime to knowingly offer, pay or solicit or receive any remuneration to induce a person to refer a person for the furnishing of any service covered under a federal healthcare program.

293.    Defendants knew these claims for payment were false or fraudulent.

294.    The provision and acceptance of remuneration by these Defendants in exchange for the referral of patients to as described above constitutes and illegal inducement under the AKS, the Stark Law and violates the FCA.

295.    Because of these false or fraudulent claims presented or caused to be presented by all Defendants, the United States has suffered damages.

296.    The above Defendants are jointly and severally liable to the United States for treble damages under the False Claims Act, in an amount to be determined at trial, plus a civil penalty of $5,500 to $10,000 for each false claim presented or caused to be presented by Defendants prior to November 2, 2015 and between $10,781 and $21,563 per false claim thereafter and including treble damages.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment against the Defendants as follows:

1. Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729, *et seq*;
2. That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged in this complaint, as 31 U.S.C. § 3729, *et seq.* provides;
3. That civil penalties of $5,500 to $10,000 be imposed for each and every false claim that the Defendants caused to be presented to the United States prior to November 2, 2015 and between $10,781 and $21,563 per false claim thereafter and including treble damages;
4. Relators be awarded the maximum relator's share allowed pursuant to the False Claims Act, 31 U.S.C. § 3730(d);
5. Relators be awarded all costs of this action, including attorney's fees, costs, and expenses pursuant to 31 U.S.C. § 3730(d);
6. Defendants be enjoined from concealing, removing, encumbering, or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court; and
7. That this Court award the United States and the Relators such other relief that it deems just and proper.

### Count III
### Violation of False Claims Act 31 U.S.C. §3729(a)(1)(C)

297.　Relators reallege the preceding paragraphs as if fully set forth herein.

298.　Prior to May 20, 2009, 31 U.S.C. § 3729(a) provided, in relevant part, liability for any person who conspires to defraud the Government by getting a false or fraudulent claim allowed or paid.

299.　Section 3 further provides that in the event of a violation, such a person is "liable to the Unites States for a civil penalty of not less than $5,500 and not more than $11,000, plus 3 times the amount of damages which the United States sustains because of the act of that person. A person violating this subsection (a) shall also be liable to the State for the costs of a civil action brought to recover any such penalty or damages."

82

300. On May 20, 2009, 31 U.S.C. §3729(a)(1)(C) was amended to provide liability for (1) any person who(c)conspires to commit a violation of subparagraph s(A)- (B), (D)-(G).

301. Defendants knowingly conspired to commit violations of 31 U.S.C. §3729(a)(1)(A)-(B) and (D)-(G),by presenting or causing to be presented, directly or indirectly, false or fraudulent claims for payment or approval to Medicare, and knowingly making, using, or causing to be made or used, a false record or statement material to false or fraudulent claims, including claims for services that were not actually provided and/or services that were provided as a result of a kickback scheme in violation of the AKS and the Stark Law.

302. At all times relevant herein, Defendants, and each of them, knowingly conspired to make, used, or cause to be make or use, false records or statements material to false or fraudulent claims to the United States and false records or statements to get false claims paid. Such false material records and statements include, but are not limited to, the false entries in the CMS Form 1500 submitted to CMS for reimbursement of procedures that were not actually performed, double or improperly billed, and/or services that were provided as a result of an illegal kickback scheme that violated the AKS and Stark Law.

303. As described above, Defendants knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the Government in violation of 31 U.S.C. § 3729(a)(1)(G).

304. Defendants knew that they had received overpayments by Medicare and Medicaid, but did not repay the Government.

305. By virtue of the misconduct described in this Count, the United States has suffered damages and continues to be damaged in substantial amounts to be determined at trial.

306.    Defendants are jointly and severally liable to the United States and Relators for

treble damages under the False Claims Act, in an amount to be determined at trial, plus a civil

**WHEREFORE**, Relators respectfully requests that this Court enter judgment against the

Defendants as follows:

1.    Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729, *et seq*.;

2.    That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged in this complaint, as 31 U.S.C. § 3729, *et seq*. provides;

3.    That civil penalties of $5,000 to $10,000 be imposed for each and every false    claim that the Defendants caused to be presented to the United States prior to November 2, 2015 and between $10,781 and $21,563 per false claim thereafter  and including treble damages;

4.    Relators be awarded the maximum relator's share allowed   pursuant to the False   Claims Act, 31 U.S.C. § 3730(d);

5.    Relators be awarded all costs of this action, including attorney's fees, costs, and expenses pursuant to 31 U.S.C. § 3730(d);

6.    Defendants be enjoined from concealing, removing, encumbering, or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court; and

7.    That this Court award the United States and Relators such other relief that it deems just and proper.

### Count IV
### Illinois False Claims Act
### 740 Ill. Comp. Stat. Ann. 175/3(a)(1)(A), (B), (C), (G)

307.    Relators reallege the preceding paragraphs as if fully set forth herein.

308.    Relators bring this action on behalf of the State of Illinois to recover treble

damages and civil penalties under the Illinois False Claims Act, 740 ILCS 175, *et  seq*.

309.    The Illinois False Claims Act statute in effect from January 1, 2008 to July 26,

2010, provided liability for any person who:

(1)    knowingly presents, or causes to be presented, to an officer or employee

84

of the State of a member of the Guard a false or fraudulent claim for payment or approval;

(2)     knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;

(3)     conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

. . . .

(7)     knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the State.

740 ILCS 175/3(a) (eff. Jan. 1, 2008).

310.    As amended, the Illinois False Claims Act statute likewise imposes liability on any person who:

(A)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C)     conspires to commit a violation of subparagraph (A)-(B) or (D)-(G);

. . . .

(G)     knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State,

740 Ill. Comp. Stat. Ann. 175/3(a)(1) (eff. July 27, 2010).

311.    Defendants knowingly presented or caused to be presented, directly or indirectly, false or fraudulent claims to the Government for payment or approval by the Medicare and Medicaid programs and knowingly made, used, or caused to be made or used false or fraudulent

85

records and statements and omitted material facts, to induce the Government to approve and pay such false or fraudulent claims.

312.     Defendants knew that these claims for payment and these records, statements, and omitted material facts were false or fraudulent.

313.     The State of Illinois was unaware of the falsity or fraudulent nature of the claims and the false or fraudulent records, statements, and omitted material facts that Defendants caused to be made or used.

314.     The false or fraudulent claims, and the false or fraudulent records, statements, and omitted facts were material to the State of Illinois's decision to pay, and the State of Illinois paid for claims that would not have been paid but for Defendants' misconduct described in this Count.

315.     As described above, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government.

316.     As described above, Defendants knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the Government in violation of 740 Ill. Comp. Stat. Ann. 175/3(a)(1)(G).

317.     Defendants knew and concealed that they had received overpayments by Medicaid, but did not repay the Government.

318.     In addition, the Individual Defendants conspired to defraud the Government for the purpose of obtaining and by getting false or fraudulent Medicaid claims allowed or paid,

and/or conspired to commit a violation of 740 Ill. Comp. Stat. Ann. 175/3(a)(1)(A), (B), or

(G), in violation of 740 Ill. Comp. Stat. Ann. 175/3(a)(1)(C), as described herein.

319. The State of Illinois, by and through the Illinois Medicaid program, and unaware of Defendants' conduct, paid the claims submitted by Defendants for services purportedly provided.

320. Had the State of Illinois, by and through Medicaid, known that claims had been submitted for reimbursement of services provided to patients referred by physicians to whom Defendants had given kickbacks and remunerations, it would not have paid the claims. submitted by Defendants in connection with its conduct.

321. As a result of Defendants' violations of 740 ILCS 175/3(a), the State of Illinois has suffered damages and continues to be damaged in substantial amounts to be determined at trial.

322. Defendants are jointly and severally liable to the State of Illinois for treble damages and an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each false claim presented or caused to be presented by Defendants, as well as costs and other relief, as set forth below.

323. Relators request that this Court accept jurisdiction over this related state claim as it is predicated upon the same facts as the federal claim, and merely asserts separate damages to the State of Illinois in the operation of its Medicaid program.

**WHEREFORE,** Relator prays for judgment against the Defendants as follows:

To the United States:

1. Three times the amount of damages the United States has sustained because of Defendants' actions;

2. A civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;
3. Attorney's fees and costs;
4. Such further relief as this Court deems just.

To the State of Illinois:

1. Three times the amount of actual damages which the State of Illinois has sustained as a result of Defendants' conduct;
2. A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Illinois;
3. Prejudgment interest;
4. All fees and costs incurred in bringing this action; and,
5. Such further relief as this Court deems just.

To Relators:

1. The maximum amount allowed pursuant to 31 U.S.C. § 3730(d) and 740 ILCS 175/4(d) and/or any other applicable provision of law;
2. Reimbursement for all costs and expenses which Relator incurred in connection with this action;
3. An award of reasonable attorneys' fees and costs; and,
4. Such further relief as this Court deems equitable and just.

**Count V**
**Violations of False Claims Act – Retaliation 31 U.S.C. §3730(h)**
**(Against Defendants MBO, Trustmark, Zaccharias and Manning)**

324. Relators reallege the preceding paragraphs as if fully set forth herein.

325. Relators took lawful actions in furtherance of False Claims Act actions, including investigation for, initiation of, or assistance in an action and, as such, engaged in protected activity under the FCA.

326. As a result of protesting and bringing defendants' false and fraudulent conduct to light, Relators were subjected to retaliation, harassment, intimidation and termination.

327. Defendants' conduct in terminating the Relators as a result of their complaints about the unlawful conduct is in violation of the FCA, 31 U.S.C. § 3730(h).

328. As a result of Defendants' actions, Relators have suffered damages including, but not limited to, loss of their job and income, loss of career opportunities, and humiliation.

**WHEREFORE**, the Relators respectfully requests that this Court enter judgment against Defendants as follows:

a. Relators be awarded the maximum damages allowed pursuant to 31 U.S.C. § 3730(h), including such relief to make her whole for the damages and financial losses suffered, including, but not limited to, two times the amount of back pay, pre- and post-judgment interest, reinstatement, punitive and compensatory damages, and all litigation costs and reasonable attorneys' fees and costs; and

b. Award the Relators such other and further relief as it deems just and proper.

### Count VI
### Violations of Illinois Whistleblower Act 740 ILCS 174/1 *et seq.*
### (Against Defendants MBO, Trustmark, Zaccharias and Manning)

329. Relators reallege the preceding paragraphs as if fully set forth herein.

330. As a result of Relators' actions, they were subjected to retaliation and termination by these Defendants, in violation of the Illinois Whistleblower Act, 740 ILCS 174/1 et seq.

331. Relators have suffered damages including, but not limited to, loss of their jobs and income, loss of career opportunities, and humiliation.

**WHEREFORE**, Relators respectfully request that this Court award the following damages to the following parties and against Defendants:

a. A declaration that Defendants violated the Illinois Whistleblower Act;
b. An award of damages in the amount of Relators' lost pay and future salary, supplemental compensation and benefit.
c. An award of attorneys' fees, costs, and expenses pursuant to the Illinois Whistleblower Act, 740 ILCS 174/30; and

89

    d.      An award for any other and further relief that the Court deems equitable, just and proper.

## Count VII
## Common Law Retaliatory Discharge
### (Against Defendants MBO, Trustmark, Zaccharias and Manning)

332.    Relators reallege the preceding paragraphs as if fully set forth herein.

333.    Relators were terminated by Defendants in retaliation for their protected activities.

334.    Defendants' discharge of Relators violates the public policy of the State of Illinois.

335.    As a proximate result of the unlawful discharge, Relators have suffered damages.

**WHEREFORE**, the Relators request all damages available under the law, including an award of compensatory and punitive damages.

## COUNT VIII
## INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT

336.    Relators reallege the preceding paragraphs as if fully set forth herein.

337.    On behalf of the State of Indiana, Relators seek to recover treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, Indiana Code 5-11-5.5 et seq. provides:

Sec. 2.(b) A person who knowingly or intentionally:

(1) presents a false claim to the state for payment or approval;
(2) makes or uses a false record or statement to obtain payment or approval of a false claim from the state;
(3) with intent to defraud the state, delivers less money or property to the state than the amount recorded on the certificate or receipt the person receives from the state;
(4) with intent to defraud the state, authorizes issuance of a receipt without knowing that the information on the receipt is true;

(5) receives public property as a pledge of an obligation on a debt from an employee who is not lawfully authorized to sell or pledge the property;

(6) makes or uses a false record or statement to avoid an obligation to pay or transmit property to the state;

(7) conspires with another person to perform an act described in subdivisions (1) through (6); or

(8) causes or induces another person to perform an act described in subdivisions (1) through (6)

338. Defendants violated Indiana Code 5-11-5.5 et seq. and knowingly caused false claims to be made, used and presented to the State of Indiana as alleged above.

339. The State of Indiana, by and through the Indiana Medicaid program was unaware of Defendants' conduct, and paid the claims submitted by them.

340. Had the State of Indiana known that defendants' submitted false claims, it would not have paid the claims.

341. As a result of Defendants' violations of Indiana Code 5-11-5.5 et seq., the State of Indiana has been damaged.

342. Relators request that this Court accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of Indiana in the operation of its Medicaid program.

**WHEREFORE**, Relator respectfully requests that this Court award the following damages to the following parties and against Defendants:

To the State of Indiana:

(1) Three times the amount of actual damages which the State of Indiana has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 for each false claim which Defendants caused to be presented to the State of Indiana;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

91

To Relator:

    (1)    The maximum amount allowed pursuant to Indiana Code 5-11-5.5 et seq. and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

    (3)    An award of reasonable attorneys' fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

## REQUEST FOR LEAVE TO REDACT PHI PRE UNSEALING

Relators respectfully request leave to redact any confidential personal health or medical information contained in this sealed Complaint if and when the Complaint is ordered unsealed, to prevent any PHI from being entered into the public record.

## DEMAND FOR JURY TRIAL

Relators demand a jury trial on all claims alleged herein.

Respectfully submitted,

_Robin Potter_

Robin Potter

Robin Potter, Esq.
Charles Klein III, Esq.
POTTER & BOLAÑOS, P.C.
111 East Wacker Drive, Suite 2600
Chicago, Illinois 60601
312-861-1800
robin@potterlaw.org
mason@potterlaw.org

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing Complaint was filed **under seal** and that she served a hard copy of the Complaint with an electronic copy of the Complaint and all exhibits upon the following parties on June 13, 2017, as indicated below:

Jeff Sessions, Esq.
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, N.W., Room 4400
Washington, D.C. 20530-0001
**By Certified Mail 7012 2210 0001 5008 7084**

Linda Wawzenski, Esq.
Assistant U. S. Attorney and Deputy Chief
Office of the U.S. Attorney
219 South Dearborn Street - Room 500
Chicago, IL 60604
linda.wawzenski@usdoj.gov
**By Delivery**

Matthew Whitmire, Esq.
Director, Indiana Medicaid Fraud Control Unit
Office of the Attorney General
8005 Castleway Dr.
Indianapolis, IN 46250
Matthew.whitmire@atg.in.gov
**By First Class Mail**

Frederick Crystal, Esq. - Bureau Chief
Heather Tullio D'Orazio, Esq. - Deputy Bureau Chief
Medicaid Fraud Bureau
Illinois Attorney General's Office
100 W. Randolph Street, 13th Floor
Chicago, IL 60601
fcrystal@atg.state.il.us
hdorazio@atg.state.il.us
**By Delivery**

_Robin Potter_
Robin Potter

93