**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** *ex rel.* | ) | **Civil Action No: 17 CV 4457** |
| **KENYA SIBLEY, JASMEKA COLLINS** | ) | |
| **and JESSICA LOPEZ** | ) | **JUDGE HARRY D. LEINENWEBER** |
| | ) | |
| **Relators,** | ) | **FIRST AMENDED COMPLAINT** |
| | ) | **VIOLATION OF THE FEDERAL FALSE** |
| **v.** | ) | **CLAIMS ACT [31 U.S.C. Section 3729 et** |
| | ) | **seq.] AND FOR MONEY DAMAGES** |
| **UNIVERSITY OF CHICAGO** | ) | |
| **MEDICAL CENTER** | ) | |
| **c/o David S. Rosenbloom** | ) | **JURY TRIAL DEMANDED** |
| **McDermott Will & Emery LLP** | ) | |
| **444 West Lake Street Suite 4000** | ) | |
| **Chicago, IL 60606-0029** | ) | |
| | ) | |
| **MEDICAL BUSINESS OFFICE CORP** | ) | |
| **833 West Lincoln Hwy, Suite 200W** | ) | |
| **Schererville, IN 46375** | ) | |
| | ) | |
| **TRUSTMARK RECOVERY** | ) | |
| **SERVICES, INC** | ) | |
| **833 West Lincoln Hwy, Suite 200W** | ) | |
| **Schererville, IN 46375** | ) | |
| | ) | |
| **Respondents.** | ) | |

Relators sue to recover damages and civil penalties for the United States Government

(the "United States" or the "Government") arising from false and/or fraudulent statements,

records, and claims made and caused to be made by the Respondents and/or their agents and

employees in violation of the federal False Claims Act, 31 U.S.C. § 3729 et seq., as amended

("the FCA" or "the Act").

## INTRODUCTION

1.        Medical Business Office Corp ("MBO"), Trustmark Recovery Services, Inc.

("Trustmark"), and University of Chicago Medical Center ("UCMC") knowingly executed

these fraudulent schemes to cause the Government to pay false claims:

   A. **Ghost Payroll Scheme** – MBO and Trustmark knowingly operate a fraud scheme
      falsely inflating collection costs to UCMC for billing and collection services, which
      UCMC knowingly passes on to Government for reimbursement through falsified
      costs reports.

   B. **Medicare Bad Debt Scheme** – MBO knowingly operates a fraud scheme whereby it
      writes off Medicare bad debt in violation of 42 CFR Section 413.89(e), which their
      clients pass on to Government for reimbursement through falsified costs reports.

2.        MBO and Trustmark also violated 31 U.S.C. § 3730(h) by terminating the

employment of Relators Kenya Sibley, Jessica Lopez, and Jasmika Collins in retaliation for

their protests and refusals to execute the fraudulent schemes. Further, MBO and Trustmark

violated the Americans with Disabilities Act (ADA) by failing to provide Relator Kenya

Sibley with the reasonable accommodation of temporary medical leave.

## PARTIES

3.        MBO is a medical billing company with a principal place of business at 833 West

Lincoln Hwy, Suite 200W, Schererville, IN 46375

4.        Trustmark is a medical debt collection agency with a principal place of business

at 833 West Lincoln Hwy, Suite 200W, Schererville, IN 46375.

5.        MBO and Trustmark are owned by Joseph Zacharias and managed by Chief

Executive Officer (CEO) Justin Manning. MBO operates and handles a customer service call

center, front office virtualization services, and medical claims billing for hospitals and

physician groups. Trustmark operates and handles MBO's bad debt collections, third party

collections, legal department, data entry, and payment processing/posting.

6.     UCMC is a nationally ranked academic medical center which operates hospitals and outpatient facilities throughout the Chicago metropolitan area. UCMC participates in Medicare Part A and Part B, so it receives annual reimbursement from CMS for allowable costs and bad debt. Keith Sauter is UCMC's Director of Finance and Patient Financial Services Director.

7.     Relator Kenya Sibley was employed by MBO and Trustmark as a customer service manager and then as the Director of Trustmark from September 6, 2016 until March 3, 2017.

8.     Relator Jessica Lopez was employed by MBO and Trustmark as a customer service representative from April 5, 2015 until February 9, 2017.

9.     Relator Jasmika Collins was employed by MBO and Trustmark as the Trustmark bad debt collections and legal department manager from January 19, 2016 until April 4, 2017.

## JURISDICTION AND VENUE

10.     This court has jurisdiction under 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

11.     Although no longer jurisdictional under the 2010 amendments to the FCA, to Relators' knowledge, there has been no statutorily relevant public disclosure of the "allegations or transactions" as those concepts are used in 31 U.S.C. § 3730(e). If a public disclosure has occurred, Relators qualify as "original sources" of the allegations. Before suing, Relators voluntarily disclosed and provided to the Government the information on which the allegations or transactions in this action are based. Additionally, Relators' knowledge of the misconduct is independent of, and would materially add to, any publicly disclosed allegations or transactions.

12.     This court has personal jurisdiction over Respondents under 31 U.S.C. § 3732(a). Respondents can be found in and transact substantial business in the District including business related to Respondents' false claims.

13.     Venue is proper in the Northern District of Illinois under 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a) because Respondents made false claims as alleged herein. Venue is also proper in this District because the Respondents can be found in and transact business in this District.

## THE FALSE CLAIMS ACT

14.     The FCA was originally enacted during the Civil War.  Congress substantially amended the Act in 1986, 2009, and 2010 to enhance the ability of the United States Government to recover losses sustained due to false claims.

15.     The Act was amended in 1986 because Congress found pervasive fraud in federal programs and the Act, which Congress characterized as the primary tool for combating fraud against the federal Government, needed modernization.

16.     Likewise, the 2009 and 2010 amendments were introduced to fill gaps in the coverage of the Act, to correct ambiguities in the drafting, and correct judicial misinterpretations that occurred in the years since the 1986 amendments.

17.     The Act imposes liability upon any person who: (A) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment of approval" or (B) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729 (a)(1)(A)(B).

18.     "Claim" is defined as "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money

or property, that – (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government – (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A).

19.     A violation occurs when any person ". . . knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).

20.     Obligation" is defined to include: "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3).

21.     Any person who violates the Act is liable for a civil penalty of between $5,500 and $11,000 for each false or fraudulent claim on or before November 2, 2015; and $10,781 and $21,563 for each false or fraudulent claim after November 2, 2015; plus, three times the damages sustained by the United States.

22.     Under 31 U.S.C. § 3730(h) there is a specific cause of action for employees, contractors, or agents disciplined for their efforts to stop violations of the False Claims Act. Under 31 U.S.C. § 3730(h), a relator who is retaliated against is entitled to reinstatement, two (2) times back pay, interest on the back pay, and compensation for any special damages sustained because of the retaliation, including litigation costs and reasonable attorney's fees.

## ALLEGATIONS REGARDING FALSE CLAIMS

23.     Respondents MBO, Trustmark, and UCMC knowingly collaborated and mutually benefited from false claims as follows:

## A. MBO, TRUSTMARK, & UCMC'S GHOST PAYROLL SCHEME

### Medicare Administrative Costs Reimbursement

24.     The Medicare program consists of multiple parts administered by the Centers for Medicare & Medicaid Services (CMS). Medicare Part A covers inpatient care in a hospital, skilled nursing facility care, inpatient care in a skilled nursing facility, hospice care, and home health care. Medicare Part B covers outpatient care, preventive services, ambulance services, and durable medical equipment.

25.     Under 42 CFR Section 417.534, Medicare must reimburse Medicare Part A and Part B providers the direct and indirect costs that are proper and necessary for efficient delivery of needed health care services. These are called allowable costs.

26.     Under 42 CFR Section 413.89, Medicare must reimburse Medicare Part A and Part B providers the deductible and coinsurance amounts for Medicare beneficiaries that remain unpaid after the provider has made a reasonable effort to collect. These are called bad debts.

27.     According to Chapter 3, Section 310 of the CMS published Provider Reimbursement Manual, a provider may use a collection agency to collect bad debt. If a collection agency is used, the fees the collection agency charges the provider are recognized as an allowable administrative cost of the provider. Each provider must accurately report their allowable administrative costs to CMS in an annual cost report to receive their allowable costs and bad debt reimbursement.

28.     Under the inpatient prospective payment system for hospitals, Medicare Part A pays hospital costs at predetermined, diagnosis-related rates for patient discharges. CMS calculates prospective payments by using the wage index applicable to the area in which each hospital is located. Hospitals must accurately report wage data for CMS to determine the equitable distribution of payments and ensure the appropriate level of funding to cover hospital costs.

29.     The wage index affects Medicare payments to hospitals. Hospitals' inclusion of millions of dollars of unallowable costs in their wage data results in inflated wage indexes for those hospitals and inequitable distribution of Medicare payments to those hospitals and to all other hospitals. Generally, hospitals that overstate wage data will receive higher Medicare reimbursement at the expense of hospitals that report accurate or understated wage data.

**How the Ghost Payroll Fraud Scheme Operated**

30.     On July 1, 2004, MBO and Trustmark contracted with UCMC to provide collection services for its billing including Medicare deductible and coinsurance billing. A 2016 amendment to the contract stated UCMC would reimburse MBO and Trustmark for the time certain employees devoted to collecting UCMC's bad debts at these rates and number of employees. Ex. 1.

| Employee | Reimbursement per Employee | Max # of Employees |
|---|---|---|
| Billing/Collection Clerk | $ 4,000 per month | 26 |
| Billing/Support Clerk | $ 3,200 per month | 2 |
| Billing Manager | $ 6,000 per month | 2 |

31.     MBO and Trustmark invoice UCMC monthly based on the number of employees who worked a percentage of their time on UCMC collections. The invoices are separated by the following "projects": Medicare/Medicaid Project, the ACC Project, the Self-Pay Program

Project, and the Psych Program. Each invoice contains 5 columns: employee name, hire date, billing rate, % worked, and amount due.

32.     Since 2004, MBO and Trustmark have regularly falsely invoiced UCMC for employees who they claim work on UCMC's collections when they worked on other client's collections. MBO and Trustmark also falsely report employees worked on UCMC collections before hiring or after firing.

33.     Due to MBO's and Trustmark's fraudulent scheme, UCMC pays MBO and Trustmark the amounts on the falsely inflated invoices. UCMC in turn reports these inflated costs as overstated administrative & general wages to CMS on their annual cost reports. UCMC overstating administrative & general wages on their cost reports results in UCMC receiving higher Medicare reimbursement at the expense of hospitals that report accurate or understated wage data.

**Representative Example of Ghost Payroll Fraud Scheme**

34.     Since September 6, 2016, Relator Sibley worked for MBO and Trustmark as a manager. She initially reported directly to CEO Manning, but in 2017 she reported to Vice President (VP) Schade with authority over all MBO's and Trustmark's departments. In Relator Sibley's management role, she personally knew of which employees were hired and fired at given times and who worked on UCMC billing.

35.     On or about November 3, 2016, Sibley observed that, along with other employees, she was listed on MBO's and Trustmark's invoices to UCMC even though she did no work on UCMC billing. Since then Relator Sibley reviewed MBO's and Trustmark's invoices to UCMC and observed her name and multiple employees who did no work on UCMC billing in the invoices.

8

36.    For example, on November 1, 2016, MBO falsely invoiced UCMC for these employees work in October 2016:

i.    Medicare/Medicaid Project - Invoice No. 20114070. Ex. 2.

| Employee | % Invoice Worked | Falsification | Amount Invoice Billed | Correct Amount |
|---|---|---|---|---|
| Clay, Crystal | 100% | Never worked on UCMC billing | $ 4,000 | $ 0 |
| Harrison, Cecilia | 100% | Never worked on UCMC billing | $ 4,000 | $ 0 |
| Lewis, Tenee | 100% | Invoices states she started at end of October | $ 4,000 | $ 0 |
| Riggs, Melanie | 100% | Invoices states she started at end of October | $ 4,000 | $ 0 |
| Sibley, Kenya | 100% | Never worked on UCMC billing | $ 4,000 | $ 0 |
| Shine, Lufreda | 100% | Invoice states she started mid-October | $ 4,000 | $ 2,000 |
| Smith, Lanetta | 100% | Invoices states she started at end of October | $ 4,000 | $ 0 |
| Young. Harriet | 100% | Never worked on UCMC billing | $ 4,000 | $ 0 |
| Ward, Julia | 100% | Invoices states she started at end of October | $ 4,000 | $ 0 |
| Zaltouski, Shannon | 100% | Invoices states she started at end of October | $ 4,000 | $ 0 |
| Courtney Odom | 100% | Invoice states she started mid-October | $ 3,200 | $ 2,000 |
| Rodriguez, Donna | 100% | Invoices states she started at end of October | $ 6,000 | $ 0 |
| Equipment – Workstation Cost | | | $ 400 | $ 400 |
| Total Amount MBO Invoiced for Invoice 20114070 | | | $ 41,600 | |
| Total Amount False | | | $ 37,200 | |

ii.    ACC Project - Invoice No. 20111070. Ex. 3.

| Employee | Invoice % Worked | Falsifications | Amount Invoice Billed | Correct Amount |
|---|---|---|---|---|
| Agrawal, Khyati | 100% | No Falsifications | $ 4,000 | $ 4,000 |
| Camarena, Mary | 90% | No Falsifications | $ 3,600 | $ 3,600 |
| Jarvis, Sherri | 100% | Never worked on this project | $ 4,000 | $ 0 |
| Watson, Shelly | 100% | Never worked on UCMC billing | $ 4,000 | $ 0 |
| Fulaytor, Elizabeth | 100% | Invoice hire date false, started in mid-November | $ 4,000 | $ 0 |
| Luna, Monica | 100% | Never worked on UCMC billing | $ 4,000 | $ 0 |
| Lopez, Jessica | 100% | Never worked on UCMC billing | $ 4,000 | $ 0 |
| Durkin, Theresa | 100% | No Falsifications | $ 4,000 | $ 4,000 |
| Edmonds, Ashley | 95% | Invoice hire date false, started in mid-November | $ 3,800 | $ 0 |
| Hardine. Tracee | 100% | No Falsifications | $ 4,000 | $ 0 |
| Iacopetti, Barbara | 100% | Invoices states she started at late October | $ 4,000 | $ 1,000 |
| Infante, Ivy | 100% | No Falsifications | $ 4,000 | $ 4,000 |
| Martinez, Chris | 100% | No Falsifications | $ 4,000 | $ 4,000 |
| Greene, Tokia | 95% | Never worked on UCMC billing | $ 3,800 | $ 0 |
| Neely, Tanya | 100% | Invoices states she started at end of October | $ 4,000 | $ 0 |
| Perez, Melissa | 100% | No Falsifications | $ 4,000 | $ 4,000 |
| Stephanopoulous, Aleka | 100% | Never worked on UCMC billing | $ 4,000 | $ 0 |
| Toth, Natalie | 100% | Invoices states she started at end of October | $ 4,000 | $ 0 |
| West, Lori | 100% | Never worked on UCMC billing | $ 4,000 | $ 0 |
| Williams, Mary | 90% | Never worked on UCMC billing | $ 3,600 | $ 0 |
| Williams, Charmira | 95% | Invoices states he started at end of October | $ 3,800 | $ 0 |
| Wooten, Ramon | 100% | No Falsifications | $ 4,000 | $ 4,000 |
| Aqrawal, Ila, | 100% | Never worked on UCMC billing | $ 4,000 | $ 0 |

| Gutierrez, Bianca | 100% | Never worked on UCMC billing | $ 4,000 | $ 0 |
|---|---|---|---|---|
| | Monthly telephone and supply costs | | $ 3,358.94 | $ 3,358.94 |
| | Total Amount MBO Invoiced | | $ 103,158.94 | |
| | Total Amount False | | $ 71,200 | |

    iii.   Self-Pay Program Project - Invoice No. 20112070. Ex. 4.

| Employee | % Invoice Worked | Falsification | Amount Invoice Billed | Correct Amount |
|---|---|---|---|---|
| Cruz, Erica | 100% | No Falsifications | $ 4,000 | $ 4,000 |
| Deany, Charity | 100% | No Falsifications | $ 4,000 | $ 4,000 |
| Golden, Jennifer | 90% | No Falsifications | $ 3,600 | $ 3,600 |
| Golden, LeTasha | 100% | No Falsifications | $ 4,000 | $ 4,000 |
| Halko, Lisa | 100% | Position terminated before October | $ 4,000 | $ 0 |
| Jackson, Pamela | 100% | No Falsifications | $ 4,000 | $ 4,000 |
| Mcglothen Lee, F. | 100% | No Falsifications | $ 4,000 | $ 4,000 |
| Murff, Sharri | 100% | Position terminated before October | $ 4,000 | $ 0 |
| Robinson, Teresa | 100% | No Falsifications | $ 4,000 | $ 4,000 |
| Tankson, Marvia | 100% | No Falsifications | $ 4,000 | $ 4,000 |
| Porter, Debra | 100% | Never worked on UCMC billing | $ 6,000 | $ 0 |
| Total Amount MBO Invoiced for Invoice 20112070 | | | $ 45,600 | |
| Total Amount False | | | $ 14,000 | |

    iv.  Psych Program in Invoice No. 20113070. Ex. 5.

| Employee | % Invoice Worked | Falsification | Amount Invoice Billed | Correct Amount |
|---|---|---|---|---|
| Guterez, Arleta | 100% | No Falsifications | $ 4,000 | $ 4,000 |
| Total Amount MBO Invoiced for Invoice 20112070 | | | $ 4,000 | |
| Total Amount False | | | $ 4,000 | |

37.    On December 6, 2016, UCMC paid MBO and Trustmark $210,758.99, which represents the amount MBO invoiced UCMC for the October invoices 20111070, 20112070, 20113070, and 20114070 Ex. 6). Approximately $122,400.00 of that $210,758.99 payment is false. Thus, UCMC falsely paid MBO and Trustmark approximately $1,468,800 a year for a ghost payroll.

38.    In 2017, UCMC submitted a cost report to CMS for time period of July 1, 2016 to June 30, 2017 Ex. 7). In this cost report, UCMC states its administrative & general wage costs equal $101,524,010. MBO and Trustmark's fraud resulted in UCMC overstating its administrative & general wage index by 1.5% from July 1, 2016 to June 30, 2017.

39.     Generally, hospitals that overstate wage data will receive higher Medicare reimbursement at the expense of hospitals that report accurate or understated wage data. MBO and Trustmark caused UCMC to report overstated administrative & general wages, so UCMC received greater reimbursement from CMS than it is entitled through the Medicare Part A inpatient prospective payment system. Thus, the Government is damaged by MBO's and Trustmark's falsified invoices.

**MBO's, Trustmark's, and UCMC's Knowledge of Ghost Payroll Scheme**

40.     CEO Manning knew of the ghost payroll scheme. On or about December 29, 2016, Relator Sibley met with Manning to discuss the ghost payroll. She asked him, if he was aware MBO and Trustmark added employees to the UCMC payroll, who did not work on the account. Manning replied, "yes I am aware it".

41.     Relator Sibley then asked Manning why they bill for people who do not work on the contract? Manning replied, that MBO and Trustmark do this because they took a "hit" on a different UCMC contract and UCMC's Financial Director, Keith Sauter, told Manning "he would make up for it".

42.     Manning said Sauter was aware MBO and Trustmark were adding additional people "to make up for the money we lost on the other contract." Manning insured Relator Sibley that Sauter would not report the fraudulent scheme because MBO and Trustmark have been paying him "consultant fees" on a monthly basis for years. This was done by adding him to Trustmark's payroll, so he would receive a check on the 30th of every month.  Ex. 8.

43.     For example, Trustmark sent Sauter a check for $2,115.77 on November 11, 2013. Ex. 9.  When the check was rejected by the bank on November 25, 2013, Sauter sent MBO and Trustmark owner Joseph Zacharias an email stating in the subject "Check returned

by the bank." Zacharias asked for more detail on the check returned, so he could immediately overnight him a replacement. Sauter replied with a picture of the check.

## B. MBO'S AND TRUSTMARK'S MEDICARE BAD DEBT SCHEME

**Medicare Bad Debt Requirements for Reimbursement**

44.     Under 42 CFR Section 413.89, Medicare is to reimburse deductible and coinsurance amounts for Medicare beneficiaries that remain unpaid after the provider has made a reasonable effort to collect. For hospital entities, the Medicare bad debt reimbursement is calculated at approximately 65 percent of the uncollectible amount.

45.     According to C.F.R. 413.89(e), Medicare bad debt must meet these criteria to be allowable:

    i.   The debt must be related to covered services and derived from deductible and coinsurance amounts.

    ii.  The provider must be able to establish that reasonable collection efforts were made.

    iii. The debt was actually uncollectible when claimed as worthless.

    iv.  Sound business judgment established that there was no likelihood of recovery at any time in the future.

46.     According to C.F.R. 413.89(f), once the criteria of reasonable collection efforts have been met and the bad debt is either returned from the collection agency or otherwise deemed uncollectible, the provider must charge off the bad debts to a general ledger account specifically noted as bad debts. In the period this determination is made and recorded, the provider may claim the bad debts for reimbursement on the Medicare cost report.

47.     To be considered a reasonable collection effort, a provider's effort to collect Medicare deductible and coinsurance amounts must be similar to the effort the provider puts forth to collect comparable amounts from non-Medicare patients.  It must involve the

issuance of a bill on or shortly after discharge or death of the beneficiary to the party responsible for the patient's personal financial obligations. It also includes other actions such as subsequent billings, collection letters and telephone calls or personal contacts with this party which constitute a genuine, rather than a token, collection effort. If after reasonable and customary attempts to collect a bill, the debt remains unpaid over 120 days from the date the first bill is mailed to the beneficiary, the debt may be deemed uncollectible.

48. A provider's collection effort may include use of a collection agency in addition to or in lieu of subsequent billings, follow-up letters telephone and personal contacts. CMS policy is that when an account is in collection, a provider cannot have determined the debt to be uncollectible and cannot have established there is no likelihood of recovery found at C.F.R. 413.89(e). Until a provider's reasonable collection effort (including the use of a collection agency and in-house efforts) has been completed, a Medicare bad debt may not be deemed uncollectible.

**How the Medicare Bad Debt Scheme Operated**

49. Every Monday, Relator Sibley would receive a list of outstanding debts including Medicare beneficiary debts from CEO Manning called the Bad Debt Write Off Report. Relator Sibley and the customer service team had to review the list of outstanding debts for compliance with C.F.R. 413.89(e) and the Fair Debt Collection Act. Ex. 10. Once the outstanding debts list was approved, all the outstanding debts would be written off as bad debt and reported as such to MBO's clients by MBO's IT department.

50. In late September 2016, MBO's management instructed Relator Sibley and the customer service team that it was mandatory policy of MBO to bypass individualized review of every outstanding debt. Instead they were instructed to skip review of 5 to 10 files at a

time and to automatically approve unreviewed bad debt write-offs. A large amount of these unreviewed outstanding debts included Medicare beneficiary debt.

51.     Due to MBO's lack of review of outstanding debt, much Medicare beneficiary debt was written off as Medicare bad debt in violation of C.F.R. 413.89(e). MBO would regularly write-off Medicare bad debts for amounts a Medicare beneficiary owed without conducting a reasonable collection effort, or when Medicare beneficiaries were still paying on debts, or when Medicare beneficiaries did not actually owe the debt.

52.     Once the Medicare bad debt is written off and reported to the client as Medicare bad debt, MBO will then send the bad debt to Trustmark or a third-party collection agency for further collection efforts Ex. 10). This practice violated C.F.R. 413.89(e) as well, because Medicare bad debt cannot be declared uncollectable until collection efforts cease, including third party collection agency efforts.

**Representative Examples of Medicare Bad Debt Scheme**

53.     MBO would regularly write-off Medicare bad debts for amounts a Medicare beneficiary owed well before the debt remained unpaid for over 120 days from the date the first bill was mailed to the beneficiary.

54.     For example, a Bad Debt Write Off Report for MBO client Lakeshore Anesthesia dated October 10, 2016, shows:

      i.  MBO wrote off a $44.28 deductible to Medicare bad debt for United Healthcare – Medicare beneficiary J.A., despite Medicare paying the bill on August 2, 2016 (69 days before write-off) and the date of service taking place on July 19, 2016 (83 days before write-off). Ex. 12.

ii.  MBO wrote off a $26.72 deductible to Medicare bad debt for Medicare Part B beneficiary R.M., despite Medicare paying the bill on July 27, 2016 (75 days before write-off) and the date of service taking place on July 8, 2016 (94 days before write-off). Ex. 13.

iii.  MBO wrote off a $62.76 deductible to Medicare bad debt for Medicare Part B beneficiary J.C., despite Medicare paying the bill on July 27, 2016 (75 days before write-off) and the date of service taking place on July 6, 2016 (96 days before write-off). Ex. 14.

55.  For example, a Bad Debt Write Off Report for MBO client Community Hospital dated September 26, 2016 shows:

i.  MBO wrote off a $21.76 deductible to Medicare bad debt for Medicare Part B beneficiary S.S., despite Medicare paying the bill on July 11, 2016 (77 days before write-off) and the date of service taking place on June 20, 2016 (98 days before write-off). Ex. 15.

ii.  MBO wrote off a $41.34 deductible to Medicare bad debt for Medicare Part B beneficiary A.O., despite Medicare paying the bill on July 5, 2016 (82 days before write-off) and the date of service taking place on June 15, 2016 (103 days before write-off).  Ex. 16.

iii.  MBO wrote off a $37.84 deductible to Medicare bad debt for Humana Medicare beneficiary D.L., despite Medicare paying the bill on July 4, 2016 (83 days before write-off) and the date of service taking place on June 16, 2016 (102 days before write-off). Ex. 17.

56.     If a bill is deemed uncollectable before 120 days from the date the first bill is mailed to the beneficiary, then the collector could not have used reasonable efforts to collect the bill. For the representative examples above, MBO could not have conducted a reasonable collection effort since the Medicare bad debt was written off within 120 days of the date of service, let alone the first bill. This practice violates C.F.R. 413.89(e).

57.     According to MBO policy, Lakeshore Anesthesia (MBOLA) bad debt is sent to Trustmark for collections and Community Hospital (MBOCH) is sent to Komyatte & Casbon, P.C. for collections. Ex. 11. So, the above representative examples were reported to Lakeshore Anesthesia and Community Hospitals as Medicare bad debt, even though a collection agency was still attempting to collect the Medicare bad debt. This practice violates C.F.R. 413.89(e).

58.     In the representative examples above, MBO falsely reported $133.76 and $100.94 in Medicare bad debt to its clients Lakeshore Anesthesia and Community Hospitals respectively. Lakeshore Anesthesia and Community Hospitals would then overstate their Medicare bad debt in their cost report and CMS would falsely reimburse them approximately $86.94 (65% of $133.76) and $65.61 (65% of $100.94) respectively. Thus, these representative false claims caused the Government approximately $ 152.55 in damages.

59.     These examples are representative of thousands of non-compliant Medicare bad debt write-offs.

**MBO's and Trustmark's Knowledge of Medicare Bad Debt Scheme**

60.     CEO Manning knew of the Medicare bad debt scheme. Relator Sibley noticed a large amount of uncompliant bad debt write offs due to lack of review. She instructed her staff to conduct reviews of bad debt write offs and compile them in Bad Debt Error

Spreadsheets. Ex. 18. Relator Sibley tendered these error reports to Manning via email until he told her to do it in person. After a month of delivering them in person, he told her to stop entirely. The Bad Debt Error Spreadsheet Reports describe these reasons some bad debt write offs were uncompliant:

   i. "Patient did not receive statement" – reasonable collection impossible because bill never issued to beneficiary.

   ii. "Patient is making monthly payments" – impossible to call debt uncollectable if beneficiary is making payments on it.

   iii. "Patient did not receive two statements" - reasonable collection impossible because beneficiary is not given 120 days to pay debt.

  61. Manning also knew of patients being billed for debts they did not owe, and those debts being eventually written off as Medicare bad debt. For example, CEO Manning knew MBO had a problem with over $463,590 of "UIC Missing Payments" where an outsourcing company they used to post payments failed to attribute insurance payments to patient's accounts Ex. 19). This resulted in patients being billed amounts their insurance already paid. If the patients were Medicare beneficiaries and did not pay, then that debt would be falsely written off as Medicare bad debt.

  62. Manning also knew that Medicare bad debt was being written off and reported to clients as such even though Trustmark was continuing collection. This practice was built into the policies and business model of MBO and Trustmark. Ex. 10 & 11.

## ALLEGATIONS REGARDING EMPLOYMENT RETAILIATION

## A. MBO'S AND TRUSTMARK'S TERMINATION OF RELATOR KENYA SIBLEY

63.     On September 6, 2016, Relator Sibley began working at MBO as a Call Center Customer Service Manager supervising approximately 6 employees. By mid-October 2016, Relator Sibley became the Director of Trustmark, and assumed responsibility for directing approximately 12 Trustmark employees. Relator Sibley also managed MBO's call center operations, customer service, data entry clerks, legal, collections and bad debt departments. Relators Lopez and Collins were here direct subordinates.

64.     Relator Sibley reported directly to CEO Manning until February 7, 2017 when he instructed her to report to Vice President Schade, who managed all departments of MBO and Trustmark.

65.     On or about November 3, 2016, Relator Sibley observed that along with other employees, she was falsely listed on the false invoices to UCMC as performing work on their account 100% of her time when she never worked on the UCMC account. Relator Sibley asked Manning to remove her name from the invoice. Manning got upset and reluctantly agreed to remove her name, but never did so.

66.     Relator Sibley continued to complain to Manning and Schade about the false invoices to UCMC and the uncompliant Medicare bad debt write-offs through Bad Debt Error Spreadsheets. Ex. 18. Eventually, Schade grew suspicious of Relator Sibley and investigated her background. She discovered Relator Sibley was a relator in a case against a prior employer (USA et al. v. A Plus Physicians Billing, et al., Case No. 13 C 7733, N.D. IL.) and she wrote a book about medical fraud titled "Doctors The New Face of Drug Dealers."

67.     On February 27, 2017, Relator Sibley suffered a Transient Ischemic Attack (TIA) otherwise called a mini stroke at work due to the hostile work environment Schade and Manning created in reaction to her complaints. Ex. 20. This mini stroke has since caused her acute chronic pain, loss of mobility, and impaired judgment. She had to undergo physical and speech therapy to recover.

68.     On February 27, 2017, Relator Sibley and her physician filled out an AFLAC Initial Disability Claim Form, so Relator Sibley could claim lost wages against her supplemental insurance for time she needed off to recover and undergo physical therapy. Ex. 21.

69.     On March 1, 2017, Relator Sibley's mother sent MBO's human resources officer the following email on Relator Sibley's behalf:

> It is my understanding that my daughter reached out to you yesterday giving you her permission for you and I to be able to talk and interact on her behalf. Due to her current state and the condition Kenya is in, she will not be returning back to work for quite a while, at the very least a month or longer but I will confirm with her doctor between today and tomorrow and let you know. I will be picking up her paperwork from her doctor before the week is over. Once I pick up the paperwork, I'll head your way to have you to please complete a portion of her Aflac paperwork so she can submit it to them for coverage of short term disability while she's out. Upon Kenya's recovery she has every intention on returning back to work and maintaining her same positions as both a manager and director. Kenya has also asked for me to pick up a copy of the requested employee file that she emailed Gina and asked her for over this past weekend. I believe she was also trying to explain to me that she asked you for a copy as well. I will need to pick that up when I bring her other paperwork for you to complete no later than tomorrow before 3 pm please. Ex. 22).

70.     On March 3, 2017, Schade terminated Relator Sibley's employment with MBO and Trustmark. MBO's human resource officer filled out the AFLAC form on the same day, stating March 3, 2017 was Relator Sibley's last day of employment. Ex. 21.

71.     On November 15, 2019, the U.S Equal Employment Opportunity Commission (EEOC) found "reasonable cause to believe MBO and Trustmark failed to provide Relator

Sibley leave as a reasonable accommodation which led to her discharge, in violation of the Americans with Disabilities Act of 1990." Ex. 23. The EEOC conciliation process failed. On February 1, 2020, the EEOC issued a right to sue letter to Relator Sibley, giving her authority to sue MBO and Trustmark for violating the ADA. Ex. 24.

72.     Schade terminated Relator Sibley's employment with MBO and Trustmark because Relator Sibley actively resisted MBO and Trustmark's fraudulent activities and Schade feared Relator Sibley would file a *qui tam* action against MBO and Trustmark; or because Relator Sibley properly took temporary medical leave of absence due to suffering a TIA.

## B.  MBO AND TRUSTMARK'S TERMINATION OF RELATOR JESSICA LOPEZ

73.     On April 4, 2015, Relator Lopez began work for MBO as a customer service representative. Her job was to obtain payments from patients, including Medicare beneficiaries, who owed MBO or Trustmark clients for medical services. Relator Lopez would follow mandated scripts or instructions prepared and approved by MBO management to answer customer questions.

74.     On or about October 26, 2016, Relator Lopez voiced concerns about MBO's billing practices and described patient complaints of double billing to Manning. On December 18, 2016, Manning told Relator to come up with a reason to fire Relator Lopez, but Relator Sibley refused to do so.

75.     On February 7, 2017, Schade asked Relator Lopez to document issues she and other customer service representatives were having. Relator Lopez and Relator Sibley then collected patient documents detailing what they believed were illegal billing practices.

76. On February 9, 2017, Relator Lopez presented her findings to Schade. Immediately following this presentation, Schade told Relator Sibley to terminate Relator Lopez and wrote Relator Lopez up for using the word "illegal" and accusing MBO and Trustmark of illegal billing practices. Later that day, MBO's human resources representative terminated Relator Lopez because her use of the words "illegal" and "unethical" were corrupting other employees.

## C. MBO AND TRUSTMARK'S TERMINATION OF RELATOR JASMIKA COLLINS

77. On January 19, 2016, Relator Collins began working as a manager at Trustmark's bad debt collections and legal department, where she managed staff in both departments. Relator Collins managed Trustmark's collections on behalf of hospital providers and physicians.

78. On or about March 29, 2017, Schade instructed Relator Collins to write off debts to Medicare to bad debt before they received required debt notices and bills. Relator Collins protested and told Schade the practice was illegal. Schade instructed Relator Collins that Schade was in charge, the rules were mandatory and must be followed. Further, Schade told Relator Collins she was prohibited from using the term "illegal" on the job or to the staff.

79. After Schade terminated Relator Sibley, she demoted Relator Collins from manager to supervisor for her protests. On April 4, 2017, Schade fired Relator Collins on the spot when she refused to accept the demotion.

## COUNT I:

## GHOST PAYROLL FALSE CLAIMS ACT VIOLATIONS

80. The allegations in the preceding paragraphs are incorporated by reference.

81.     MBO, Trustmark and UCMC knowingly presented or caused to be presented numerous falsified cost reports to the United States in violation of 31 U.S.C. § 3729.

82.     Each of the falsified cost reports submitted as set forth above constitutes a "false claim" within the meaning of 31 U.S.C. § 3729, because MBO and Trustmark wrongfully inflated their invoices to UCMC, who then knowingly passed it in the form of overstated administrative costs to the Government in their annual cost reports.

83.     In submitting or causing to be submitted falsified cost reports, MBO, Trustmark and UCMC acted "knowingly," as defined in 31 U.S.C. § 3729 because they acted in at least deliberate ignorance or in reckless disregard of the truth or falsity of the information submitted in connection with the claims.

84.     Because of MBO's, Trustmark's, and UCMC's violations of 31 U.S.C. § 3729, the United States has suffered damages in an amount to be determined at trial.

WHEREFORE, Relators, on behalf of themselves and the United States, prays:

(a) That the Court enter judgment against MBO, Trustmark, and UCMC in an amount equal to three times the amount of damages the United States has sustained because of their actions, plus a civil penalty of between $10,781 and $21,563 for each violation of 31 U.S.C. § 3729;

(b) That Relators be awarded the maximum amount allowed under §3730(d) of the False Claims Act and the False Claims Act;

(c) That Relators be awarded all costs and expenses incurred, including reasonable attorneys' fees; and

(d) That the Court order such other relief as is appropriate.

## COUNT II:

## MEDICARE BAD DEBT FALSE CLAIMS ACT VIOLATIONS

85.     The allegations in the preceding paragraphs are incorporated by reference.

86.     MBO and Trustmark knowingly caused its clients to present numerous falsified cost reports to the United States in violation of 31 U.S.C. § 3729.

87.     Each of the falsified cost reports submitted as set forth above constitutes a "false claim" within the meaning of 31 U.S.C. § 3729, because MBO and Trustmark wrongfully reported Medicare bad debts in violation of C.F.R. 413.89(e) to its clients, who then passed it on in the form of overstated Medicare bad debt to the Government in their annual cost reports.

88.     In submitting or causing to be submitted falsified cost reports MBO and Trustmark acted "knowingly," as that term is defined in 31 U.S.C. § 3729 because they acted in at least deliberate ignorance or in reckless disregard of the truth or falsity of the information submitted in connection with the claims.

89.     Because of MBO's and Trustmark's violations of 31 U.S.C. § 3729, the United States has suffered damages in an amount to be determined at trial.

WHEREFORE, Relator, on behalf of herself and the United States, prays:

(a) That the Court enter judgment against MBO and Trustmark in an amount equal to three times the amount of damages the United States has sustained because of their actions, plus a civil penalty of between $10,781 and $21,563 for each violation of 31 U.S.C. § 3729;

(b) That Relators be awarded the maximum amount allowed under §3730(d) of the False Claims Act and the False Claims Act;

(c) That Relators be awarded all costs and expenses incurred, including reasonable attorneys' fees; and

(d) That the Court order such other relief as is appropriate.

## COUNT III:

## MBO & TRUSTMARK RETALIATION AGAINST RELATOR KENYA SIBLEY

90.     The allegations in the preceding paragraphs are incorporated by reference.

91.     Under 31 U.S.C. § 3730(h) there is a specific cause of action for employees, contractors, or agents disciplined for their efforts to stop violations of the False Claims Act.

92.    Relator Kenya Sibley attempted to stop violations of the False Claims Act by protesting and refusing to execute the fraudulent schemes.

93.    Respondents MBO and Trustmark terminated Relator Kenya Sibley's employment because of her protesting and refusal to execute the fraudulent schemes and her prior whistleblower activity against a former employer.

94.    Under 31 U.S.C. § 3730(h), Relator Kenya Sibley is entitled to reinstatement, two (2) times back pay, interest on the back pay, and compensation for any special damages sustained because of the retaliation, including litigation costs and reasonable attorney's fees.

WHEREFORE, Relator Kenya Sibley prays for judgment against Respondent MBO and Trustmark as follows:

(a)    That Respondents cease and desist from violating 31 U.S.C. § 3729 et seq;
(b)    That this Court enter judgment against Respondents MBO and Trustmark in an amount equal to two (2) times back pay, interest on the back pay, and compensation for any special damages sustained because of the retaliation;
(c)    That this Court order Respondents MBO and Trustmark to reinstate Relator Kenya Sibley to her former position, pay, and seniority;
(d)    That Relators be awarded all costs of this action, including attorneys' fees and expenses; and
(e)    That the United States and Relators recover such other and further relief the Court deems just and proper.

## COUNT IV:

## MBO & TRUSTMARK RETALIATION AGAINST RELATOR JESSICA LOPEZ

95.    The allegations in the preceding paragraphs are incorporated by reference.

96.    Under 31 U.S.C. § 3730(h) there is a specific cause of action for employees, contractors, or agents disciplined for their efforts to stop violations of the False Claims Act.

97.    Relator Jessica Lopez attempted to stop violations of the False Claims Act by protesting and refusing to execute the fraudulent schemes.

98.     Respondents MBO and Trustmark terminated Relator Jessica Lopez's employment because of her protesting and refusal to execute the fraudulent schemes.

99.     Under 31 U.S.C. § 3730(h), Relator Jessica Lopez is entitled to reinstatement, two (2) times back pay, interest on the back pay, and compensation for any special damages sustained because of the retaliation, including litigation costs and reasonable attorney's fees.

WHEREFORE, Relator Jessica Lopez prays for judgment against Respondent MBO and Trustmark as follows:

(a) That this Court enter judgment against Respondents MBO and Trustmark in an amount equal to two (2) times back pay, interest on the back pay, and compensation for any special damages sustained because of the retaliation;
(b) That this Court order Respondents MBO and Trustmark to reinstate Relator Jessica Lopez to her former position, pay, and seniority;
(c) That Relators be awarded all costs of this action, including attorneys' fees and expenses; and
(d) That the United States and Relators recover such other and further relief the Court deems just and proper.

## COUNT V:

## MBO & TRUSTMARK RETALIATION AGAINST RELATOR JASMIKA COLLINS

100.    The allegations in the preceding paragraphs are incorporated by reference.

101.    Under 31 U.S.C. § 3730(h) there is a specific cause of action for employees, contractors, or agents disciplined for their efforts to stop violations of the False Claims Act.

102.    Relator Jasmika Collins attempted to stop violations of the False Claims Act by protesting and refusing to execute the fraudulent schemes.

103.    Respondents MBO and Trustmark terminated Relator Jasmika Collins' employment because of her protesting and refusing to execute the fraudulent schemes.

104. Under 31 U.S.C. § 3730(h), Relator Jasmika Collins is entitled to reinstatement, two (2) times back pay, interest on the back pay, and compensation for any special damages sustained because of the retaliation, including litigation costs and reasonable attorney's fees.

WHEREFORE, Relator Jasmika Collins prays for judgment against Respondent MBO and Trustmark as follows:

(a) That this Court enter judgment against Respondents MBO and Trustmark in an amount equal to two (2) times back pay, interest on the back pay, and compensation for any special damages sustained because of the retaliation;
(b) That this Court order Respondents MBO and Trustmark to reinstate Relator Jasmika Collins to her former position, pay, and seniority;
(c) That Relators be awarded all costs of this action, including attorneys' fees and expenses; and
(d) That the United States and Relators recover such other and further relief the Court deems just and proper.

## COUNT VI:

## MBO & TRUSTMARK AMERICAN DISABILITIES ACT VIOLATIONS

105. The allegations in the preceding paragraphs are incorporated by reference.

106. The Americans with Disabilities Act of 1990 (ADA) (42 U.S.C.A. §§ 12101 et seq.) prohibits discrimination against qualified individuals with a disability.

107. Realtor Sibley is a "qualified individual with a disability" as that term is defined in ADA § 101(8) (42 U.S.C.A. § 12111(8)).

108. MBO and Trustmark have discriminated against Relator Sibley as a qualified individual with a disability by refusing to provide her with a reasonable accommodation of temporary medical leave to recover from a TIA she suffered at work.

109. Under ADA § 107(a) (42 U.S.C.A. § 12117(a)), Relator Sibley is entitled to reinstatement, back pay, and attorney's fees for the prosecution of this action and for her damages and costs.

WHEREFORE, Relator Kenya Sibley prays for judgment against Respondent MBO and

Trustmark as follows:

(a) That this Court enter judgment against Respondents MBO and Trustmark in an amount equal to her back pay, interest on the back pay, and compensation for any special damages sustained because of the discrimination;
(b) That this Court order Respondents MBO and Trustmark to reinstate Relator Kenya Sibley to her former position, pay, and seniority;
(c) That Relators be awarded all costs of this action, including attorneys' fees and expenses; and
(d) That the United States and Relators recover such other and further relief the Court deems just and proper.

Respectfully submitted,


*/s/Warner Mendenhall*
WARNER MENDENHALL, 0070165
Law Offices of Warner Mendenhall, Inc.
190 N. Union St., Ste. 201
Akron, OH  44304
(330) 535-9160; fax (330) 762-9743
warner@warnermendenhall.com
*Attorney for Relators*

# **JURY DEMAND**

Relators demand a trial by Jury under R. 38 of the Federal Rules of Civil Procedure.

/s/Warner Mendenhall
WARNER MENDENHALL, 0070165
*Attorney for Relators*

<u>CERTIFICATE OF SERVICE</u>

I certify a true copy of the foregoing Amended Complaint has been served on all parties who have appeared via their counsel of record through the ECF system this the 3rd day of March 2020. Additionally, all parties will be promptly served with a Summons or Waiver of Summons.

*/s/ Warner Mendenhall*
Warner Mendenhall (0070165)
