0IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.*, KENYA SIBLEY, JASMEKA COLLINS, and JESSICA LOPEZ, | |
| Relators, | |
| v. | Case No. 17 C 4457 |
| | Judge Harry D. Leinenweber |
| UNIVERSITY OF CHICAGO MEDICAL CENTER; MEDICAL BUSINESS OFFICE CORP.; and TRUSTMARK RECOVERY SERVICES, INC., | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Defendants Medical Business Office, Trustmark Recovery Services, and University of Chicago Medical Center move to dismiss Relators' First Amended Complaint (Dkt. No. 48) for failure to state a claim. (Dkt. Nos. 58 & 61.) For the reasons stated herein, the Court grants the Motions and dismisses the Amended Complaint.

## I. BACKGROUND

The Centers for Medicare & Medicaid Services ("CMS") administer the Medicare program in two parts. (Am. Compl. ¶ 24.) Generally, Part A covers inpatient care and Part B covers outpatient care. (*Id.*) Medicare reimburses providers' allowable costs, meaning "the direct and indirect costs . . . that are proper and necessary for efficient delivery of needed health care

services." (*Id.* ¶ 25 (citing 42 C.F.R. § 417.534).) Medicare also reimburses providers' allowable bad debt or "the deductible and coinsurance amounts for Medicare beneficiaries that remain unpaid after the provider has made a reasonable effort to collect." (Am. Compl. ¶ 26 (citing 42 C.F.R. § 413.89).) Medicare permits providers to use a collection agency to collect bad debt, and the collection agency fees are recognized as an allowable cost for the provider. (Am. Compl. ¶ 27.) Providers must report their allowable costs to CMS in an annual cost report to receive reimbursement. (*Id.*)

Under CMS's inpatient prospective payment system for hospitals, Medicare "pays hospital costs at predetermined, diagnosis-related rates for patient discharges." (*Id.* ¶ 28.) CMS calculates prospective payments via a wage index, and "[h]ospitals must accurately report wage data for CMS to determine the equitable distribution of payments and ensure the appropriate level of funding to cover hospital costs." (*Id.*) "Generally, hospitals that overstate wage data will receive higher Medicare reimbursement at the expense of hospitals that report accurate or understated wage data." (*Id.* ¶ 29.)

Medical Business Office ("MBO") is a medical billing company that assists medical providers, like University of Chicago Medical Center ("UCMC"), with collecting payments from patients, including patients on Medicare. (*Id.* ¶¶ 3 & 5.) "MBO operates and handles a

customer service call center, front office virtualization services, and medical claims billing for hospitals and physician groups." (*Id.* ¶ 5.) Trustmark Recovery Services ("Trustmark") is a medical debt collection agency that "operates and handles MBO's bad debt collections, third party collections, legal department, data entry, and payment processing/posting." (*Id.* ¶¶ 4–5.) MBO and Trustmark are both owned by Joseph Zacharias and managed by Chief Executive Officer ("CEO") Justin Manning. (*Id.* ¶ 5.)

On July 1, 2004, MBO and Trustmark agreed to provide debt collection services to UCMC for its billing, including Medicare deductible and coinsurance billing. (*Id.* ¶ 30.) The 2004 agreement with the 2016 amendment, attached to the Amended Complaint, is between MBO and UCMC. (ACC Project Contract, Am. Compl., Ex. 1, Dkt. No. 48-1.) As its title indicates, the agreement relates to the "ACC Project." (*Id.*) Under the ACC Project Contract, the parties agreed to "determine overall staff needed on a monthly go forward basis based on workable portfolio size; currently 26 collectors, 2 support clerks, 1 manager." (*Id.* ¶ 1a.) And UCMC agreed to pay MBO at flat monthly rates specified by employee type. (*Id.* ¶ 4.)

The Amended Complaint also attaches four invoices presumably from MBO to UCMC dated November 1, 2016, one for each of the following "projects": the Medicare/Medicaid Project, the ACC Project, the Self-Pay Program Project, and the Psych Program

- 3 -

Project. (Am. Compl. ¶ 31; *see* Invoices, Am. Compl, Exs. 2–5, Dkt. Nos. 48-2-48-5.) The invoices include charts containing the following information: employee name, hire date, billing rate, percentage time worked, and amount due. (Am. Compl. ¶ 31.)

With the ACC Project Contract and invoices as the foundation, Relators allege two schemes in violation of the False Claims Act ("FCA"): 1) a "ghost payroll" scheme against MBO, Trustmark, and UCMC; and 2) a Medicare "bad debt" scheme against MBO and Trustmark.

### A.  Count One: The "Ghost Payroll" Scheme

Relators allege that MBO and Trustmark regularly falsified UCMC invoices, listing employees who did no work on UCMC collections and including time charges from people who were not employees. (*Id.* ¶ 32.) Relator Kenya Sibley ("Sibley"), a former MBO and Trustmark customer service manager, alleges that in November 2016 she saw herself listed on an UCMC invoice even though she did no work on UCMC collections. (*Id.* ¶¶ 7 & 35.) Sibley also claims to have seen the names of multiple other employees on invoices who did not work on UCMC collections. (*Id.*) The Amended Complaint provides four charts listing these employees and other alleged falsities from certain invoices. (*Id.* ¶ 36.)

UCMC paid the invoices and submitted an annual cost report to CMS to receive its allowable costs and bad debt reimbursement under Medicare. (*Id.* ¶¶ 37–38.) The Amended Complaint attaches what it

- 4 -

alleges is UCMC's cost report for July 1, 2016 to June 30, 2017. (Cost Report, Am. Compl., Ex. 7, Dkt. No. 48-7.) But the bottom of the document is stamped as follows: "This is not an actual CMS cost report. Use of this report is subject to notice, disclaimers, terms and conditions on www.CostReportData.com." (*Id.*) This purported cost report states UCMC's "administrative & general wage costs equal[s] $101,524,010." (Am. Compl. ¶ 38.) Thus, the Amended Complaint alleges, "MBO and Trustmark's fraud resulted in UCMC overstating its administrative & general wage index by 1.5% from July 1, 2016 to June 30, 2017." (*Id.*) Relators allege the falsified invoices damaged the Government because MBO and Trustmark caused UCMC to report overstated wages, triggering UCMC's receipt of a larger reimbursement from CMS than it was entitled through Medicare. (*Id.* ¶ 39.)

Relators also allege that MBO, Trustmark, and UCMC knew about the "ghost payroll" scheme. Specifically, Relators allege that, in December 2016, Sibley asked MBO and Trustmark's CEO, Justin Manning ("Manning"), whether he was aware that MBO and Trustmark added employees to the UCMC payroll who did not work on the account, and he replied, "yes I am aware of it." (*Id.* ¶ 40.) When Sibley asked Manning why they would bill for people who did not work on UCMC collections, Manning said that MBO and Trustmark had taken a "hit" on a different UCMC contract and UCMC's Financial Director, Keith Sauter ("Sauter"), told Manning "he would make up for it." (*Id.*

¶ 41.) According to Manning, Sauter was aware that MBO and Trustmark were adding people to the invoices "to make up for the money [they] lost on the other contract." (*Id.* ¶ 42.) Manning assured Sibley that Sauter would not report the scheme because MBO and Trustmark had been paying him monthly "consultant fees" for years. (*Id.; see, e.g.*, 11/11/2013 Sauter Check, Am. Compl, Ex. 9, Dkt. No. 48-9.)

### B. Count Two: The Medicare "Bad Debt" Scheme

Every Monday, Sibley reviewed a list of outstanding debts, including Medicare beneficiary debts, provided by Manning. (Am. Compl. ¶ 49.) This list was called the "Bad Debt Write Off Report." (*Id.*) Sibley and the customer service team would then review the list for compliance with the criteria for allowable bad debt under 42 C.F.R. § 413.89(e) and the Fair Debt Collection Act. (*Id.*) Once approved, the outstanding debts on the list would be written off as bad debt and reported as such to clients. (*Id.*)

In September 2016, MBO's management instructed Sibley and the customer service team that it was mandatory policy "to bypass individualized review of every outstanding debt." (*Id.* ¶ 50.) Management instructed them to skip review of five to ten files at a time and to "automatically approve unreviewed bad debt write-offs." (*Id.*) Many of these unreviewed outstanding debts included Medicare beneficiary debt. (*Id.*) Relators allege that "MBO would regularly write-off Medicare bad debts for amounts a Medicare

beneficiary owed without conducting a reasonable collection effort, when Medicare beneficiaries were still paying on debts, or when Medicare beneficiaries did not actually owe a debt." (*Id.* ¶ 51.) MBO would then send the bad debt to Trustmark or another third-party collection agency for further collection efforts. (*Id.* ¶ 52.) The Amended Complaint contains examples of bad debt write off reports to Lakeshore Anesthesia and Community Hospital that Relators allege "are representative of thousands of non-compliant Medicare bad debt write-offs." (*Id.* ¶¶ 54–55 & 59.)

Relators allege MBO and Trustmark CEO Justin Manning knew of the Medicare bad debt scheme because Sibley coordinated the compilation of "a large amount of uncompliant bad debt write offs due to lack of review" into spreadsheets that she would send to Manning until he asked her to stop. (*Id.* ¶ 60; *see* Sibley Error Spreadsheets, Am. Compl., Ex. 18, Dkt. No. 48-18.) Relators allege that Manning also knew patients were billed for debts they did not owe, citing an example where an outsourcing company used to post payments apparently failed to attribute insurance payments to patient accounts. (Am. Compl. ¶ 61; *see* 1/15/2016 Manning Email, Am. Compl., Ex. 19, Dkt. No. 48-19.) This resulted in bills to patients for amounts insurance had already paid, and if the patients were Medicare beneficiaries that did not pay, "that debt would be falsely written off as Medicare bad debt." (Am. Compl. ¶ 61.) MBO and Trustmark's policies promoted writing off bad debt

and reporting to clients even while Trustmark continued collection. (*Id.* ¶ 62; *see* MBO Bad Debt Policies, Am. Compl., Exs. 10 & 11, Dkt. Nos. 48-10 & 48-11.)

### C. Counts Three Through Six: Individual Claims

In addition to the FCA allegations, Relators allege individual retaliation claims against MBO and Trustmark. Relator Sibley also alleges that her termination violates the Americans with Disabilities Act ("ADA").

#### 1. *Relator Kenya Sibley*

Sibley worked as an MBO and Trustmark customer service manager from September 6, 2016 to March 3, 2017, and Relators' FCA claims largely arise from Sibley's observations and experiences. (Am. Compl. ¶ 7.) In November 2016, Sibley observed that she and others were falsely listed on UCMC invoices as performing collection work on UCMC's account. (*Id.* ¶ 65.) Sibley alleges that she asked Manning to remove her name, and Manning "got upset and reluctantly agreed to remove her name, but never did so." (*Id.*)

After her December 2016 discussion with Manning about the UCMC invoices described in Count One, Sibley alleges that she continued to complain to Manning and MBO's vice president about the invoices and the bad debt write offs. (*Id.* ¶¶ 40-41 & 66.) As detailed in Count Two, Sibley and her staff created spreadsheets of outstanding amounts believed to be reported in error and provided them to Manning until he told her to stop. (*Id.* ¶¶ 60 &

66.) Sibley alleges that MBO's vice president eventually "grew suspicious" of her, investigated her background, and discovered that she had been a relator in a *qui tam* case against a prior employer and was the author of a book about medical fraud entitled "'DOCTORS' the New Face of Drug Dealers." (*Id.* ¶ 66.)

On February 27, 2017, Sibley had a Transient Ischemic Attack ("TIA") that she alleges was due to the "hostile work environment." (*Id.* ¶ 67.) Shortly thereafter, on March 1, 2017, Sibley's mother contacted MBO human resources via email. (*Id.* ¶ 69.) Sibley's mother stated that Sibley "will not be returning to work for quite a while, at the very least a month or longer but I will confirm with her doctor between today and tomorrow and let you know." (3/1/17 Letter, Am. Compl., Ex. 22, Dkt. No. 48-22.) Sibley's mother indicated she would pick up paperwork from the doctor "before the week is over" and that, upon recovery, Sibley "has every intention on returning back to work and maintaining her same positions as both a manager and director." (*Id.*) Two days later, on March 3, 2017, MBO's vice president terminated Sibley's employment. (Am. Compl. ¶ 70.)

In November 2019, Sibley filed a complaint with the U.S. Equal Employment Opportunity Commission ("EEOC"), but the reconciliation process failed and the EEOC issued a right to sue letter in February 2020. (*Id.* ¶ 71.) Sibley alleges she was terminated for her resistance against MBO's and Trustmark's "fraudulent

- 9 -

activities" and because MBO's vice president feared she would file a *qui tam* action or because she took temporary medical leave for her TIA. (*Id.* ¶ 72.)

### 2. Relator Jessica Lopez

Relator Jessica Lopez ("Lopez") worked as an MBO customer service representative from April 5, 2015 to February 9, 2017. (*Id.* ¶ 8.) Lopez alleges that, in October 2016, she "voiced concerns about MBO's billing practices and described patient complaints of double billing to Manning." (*Id.* ¶ 73.) Lopez reported to Sibley, and in December 2016, Manning allegedly told Sibley "to come up with a reason to fire" Lopez. (*Id.* ¶ 74.) Sibley "refused to do so." (*Id.*)

In February 2017, MBO's vice president asked Lopez to document issues she and other customer service representatives were having. (*Id.* ¶ 75.) Lopez and Sibley then collected documents "detailing what they believed were illegal billing practices" and presented those findings to MBO's vice president. (*Id.* ¶¶ 75–76.) After the presentation, the vice president told Sibley to terminate Lopez, and he wrote her up for accusing MBO and Trustmark of illegal billing practices. (*Id.* ¶ 76.) Later, an MBO human resources representative terminated Lopez "because her use of the words 'illegal' and 'unethical' were corrupting other employees." (*Id.*)

### 3. *Relator Jasmeka Collins*

Relator Jasmeka Collins ("Collins") worked as a Trustmark bad debt collections and legal department manager from January 19, 2016 to April 4, 2017. (*Id.* ¶ 9.) In March 2017, Collins alleges that MBO's vice president instructed her to write off Medicare debts as bad debt "before they received required debt notices and bills." (*Id.* ¶ 78.) When Collins protested that this was "illegal," MBO's vice president forbade Collins from using the term "illegal," told her he was "in charge," and informed her that "the rules were mandatory." (*Id.*) Collins was later demoted "from manager to supervisor for her protests." (*Id.* ¶ 78.) In April 2017, MBO's vice president terminated Collins when she refused to accept the demotion. (*Id.* ¶ 79.)

### D. Procedural Posture

Relators filed their original Complaint under seal in June 2017. After nearly two years and several sets of counsel for Relators, the Government declined to intervene on March 6, 2019 and left Relators to pursue the action themselves. On March 3, 2020, Relators filed their First Amended Complaint. On June 8, 2020, MBO and Trustmark filed a Motion to Dismiss. Shortly thereafter, UCMC filed its own Motion to Dismiss. The Court resolves both Motions as follows.

## II.  LEGAL STANDARD

A Rule 12(b)(6) motion challenges the legal sufficiency of the complaint. To survive a Rule 12(b)(6) motion, the allegations in the complaint must meet a standard of "plausibility." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 564 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[T]he plausibility determination is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 676 (7th Cir. 2016) (quotation and citation omitted). The Court construes the Amended Complaint in the light most favorable to the Relators, accepting as true all well-pleaded facts alleged and drawing all possible inferences in their favor. *See Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## III.  DISCUSSION

### A.  FCA Claims: Counts One and Two

Under the FCA, private individuals known as relators may file *qui tam* civil actions on behalf of the United States. To establish civil liability under the FCA, relators must satisfy the heightened

pleading requirements of Fed. R. Civ. P. 9(b). *See, e.g.*, *U.S. ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 376–78 (7th Cir. 2003) (analyzing FCA allegations under Rules 8 and 9(b)). Rule 9(b) requires that a plaintiff "state with particularity the circumstances constituting fraud or mistake," meaning "the who, what, when, where, and how." *United States ex rel. Hanna v. City of Chicago*, 834 F.3d 775, 779 (7th Cir. 2016) (citations omitted). "That includes the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Id.* (citation and quotation omitted).

The FCA imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the United States government, or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. §§ 3729(a)(1)(A) & (B). To establish civil liability for an FCA violation a relator must show that: "(1) the defendant made a statement in order to receive money from the government; (2) the statement was false; (3) the defendant knew the statement was false; and (4) the false statement was material to the government's decision to pay or approve the false claim." *United States ex rel. Uhlig v. Fluor Corp.*, 839 F.3d 628, 633 (7th Cir. 2016).

"False claim allegations must relate to actual money that was or might have been doled out by the government based upon actual and particularly-identified false representations." *United States ex rel. Gross v. AIDS Research Alliance-Chicago*, 415 F.3d 601, 605 (7th Cir. 2005). Regulatory violations are not synonymous with the presentment of a false claim, which requires a defendant to make a false certification of compliance with a regulatory provision. *United States ex rel. Grenadyor v. Ukrainian Vill. Pharm., Inc.*, 772 F.3d 1102, 1107 (7th Cir. 2014).

### 1. Count One: *"Ghost Payroll" Scheme Against UCMC, MBO, and Trustmark*

Relators' Amended Complaint laid out a wage index theory to explain how the "ghost payroll" scheme resulted in false claims to the Government. The wage index theory posited that, because MBO and Trustmark billed UCMC for work that was never performed, UCMC overstated its fees paid information to CMS in its annual cost report. This resulted in UCMC's receipt of a higher Medicare reimbursement and an improper increase in UCMC's Medicare wage index at the expense of other hospitals. In their response, Relators abandon this wage index theory and opt for a new one—the UCMC bad debt theory.

Now, Relators argue that MBO failed to conduct reasonable collection efforts on UCMC's debt because MBO "lacked adequate staffing to do so." (Resp. at 13, Dkt. No. 71.) In support,

Relators cite the "Medicare/Medicaid Project" invoice, claiming that the invoice lists twelve employees but only two employees worked part-time on collecting the debt. (*Id.* at 9.) Relators argue that MBO falsified "its invoices to UCMC to make it seem like it was providing adequate staffing," inflating the bad debt amounts in UCMC's annual cost report. (*Id.*) Relators point to the cost report showing $4,369,842 in Medicare bad debt, of which the Government reimbursed $2,840,397, expressing doubt that two part-time MBO employees could have reasonably billed and collected "over $4 million" under the applicable regulations. (*Id.*) Because Relators abandon the Amended Complaint's wage index theory, the Court addresses only the new UCMC bad debt theory.

It is an "axiomatic rule that a plaintiff may not amend his complaint in his response brief." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 442 (7th Cir. 2011). A plaintiff may certainly "elaborate on his factual allegations" in an opposition brief, but any such elaborations must be "consistent with the pleadings." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). Instead of elaborating on existing factual allegations, Relators response brief presents a new theory devoid of factual support.

To state an FCA claim, Relators must allege with particularity a false statement that is material to the Government's decision to pay. *United States ex rel. Uhlig v. Fluor Corp.*, 839 F.3d 628, 633

(7th Cir. 2016); *see also* FED. R. CIV. P. 8 & 9(b). The Amended Complaint does not establish this and fails to lay a foundation upon which Relators could build their new theory. First, Relators fail to identify a false statement. Relators do identify a regulation that may have been violated, 42 C.F.R. § 413.89, but that alone is not enough. *See Grenadyor*, 772 F.3d at 1107 ("Violating a regulation is not synonymous with filing a false claim."). Filing a false claim also requires that a Defendant certify compliance with a regulation in connection with a claim for reimbursement from the Government. The Amended Complaint does not allege that any Defendant certified compliance with any regulation. Second, there are no allegations establishing that MBO's and Trustmark's purported efforts were material to the Government's decision to pay UCMC for any bad debt. These failures alone doom Count One.

But there is more. Whether a provider's bad debt collection efforts are "reasonable" turns on several regulatory requirements. *See* CMS, Medicare Provider Reimbursement Manual §§ 310 & 312. The Amended Complaint alleges no facts related to any of these requirements. Indeed, nowhere does the Amended Complaint establish that MBO and Trustmark even conducted bad debt collection efforts for UCMC. The Amended Complaint also does not allege that the amount of bad debt reported in UCMC's cost reports was false nor that UCMC received reimbursements for bad debt that were improper.

- 16 -

The Amended Complaint also fails to establish sufficiently UCMC's knowledge. *United States v. One Parcel of Land Located at 7326 Highway 45 N., Three Lakes, Oneida Cty., Wis.*, 965 F.2d 311, 316 (7th Cir. 1992) (noting that, to impute knowledge of employee to company, employee must acquire knowledge while "acting within the scope of [his] employment" and "with intent to benefit [his] employer"). Rather, the Amended Complaint suggests that UCMC was a victim of fraud when a rogue employee, acting in concert with MBO and Trustmark, acted to benefit himself. (*See* Am. Compl. ¶ 42 ("Sauter would not report the fraudulent scheme because MBO and Trustmark have been paying him 'consultant fees' on a monthly basis for years.").) Allegations that an employee knew of the scheme and accepted payments to keep quiet plainly fails to establish UCMC's knowledge of the same.

The Amended Complaint's Count One allegations solely relate to the abandoned wage index theory. (*See* Am. Compl. ¶ 38 (alleging that UCMC reported inflated "administrative & general wage costs," resulting in a "greater reimbursement from CMS than it is entitled").) But even if the wage index theory were still viable and Relators resolved the many deficiencies outlined above, general allegations about inflation in a cost report or improper charges on invoices do not supply sufficiently specific information to support an FCA claim. *See United States ex rel. Roycroft v. GEO Grp., Inc.*, 722 Fed. App'x 404, 407–08 (6th Cir.

- 17 -

2018) (finding claim examples of alleged fraudulent billing scheme deficient because the allegations did not specify what in the claim examples was false and what portion of the invoices were "improperly billed in the identified claims" to Medicaid); *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 512–13 (6th Cir. 2007) (affirming district court's finding that allegations about inflated cost report submissions must identify how much they were inflated). If Relators sought to amend their complaint a second time, they should have filed for leave to amend. *See* Fed. R. Civ. P. 15(a)(2). For its many deficiencies, the Court dismisses Count One.

### 2. Count Two: The Medicare "Bad Debt" Scheme Against MBO and Trustmark

Relators next allege that MBO and Trustmark operated another bad debt scheme. Here, Relators allege that MBO and Trustmark failed to conduct reasonable collection efforts and wrote off bad debt within 120 days of the date of service or while collection attempts were still in process for two clients providing services under Medicare Part B: Lakeshore Anesthesia and Community Hospital. But because Relators fail sufficiently to plead the first foundational element of an FCA claim—that MBO and Trustmark or their clients made false statements to obtain money from the Government—Count Two suffers the same fate as Count One. *See United States ex rel. Lisitza v. Par Pharm. Cos.*, 276 F. Supp. 3d 779,

792 (N.D. Ill. 2016) ("the starting point for proof of an FCA violation is the existence of a false statement used to obtain money from the government").

Allegations related to MBO's and Trustmark's bad debt reports to clients cannot satisfy Rule 9(b)'s heightened requirements to show that MBO and Trustmark or its clients submitted improper claims for bad debt reimbursements to the Government. Count Two is even more deficient than Count One because it fails to identify any specific statement, claim, or report wherein a false claim for payment from the Government could have been made. (*See* Am. Compl. ¶ 58 (speculating that clients "would then overstate their Medicare bad debt in their cost report and CMS would falsely reimburse them . . .").) As with Count One, the Amended Complaint alleges violations of a regulation, 42 C.F.R. § 413.89(e). But that is not enough. *See Grenadyor*, 772 F.3d at 1107 (stating, "it is not enough to allege, or even prove, that the pharmacy engaged in a practice that violated a federal regulation"). To sufficiently plead their claim, Relators must establish that MBO, Trustmark, or a client falsely and materially certified compliance with a regulation to seek reimbursement from the Government. That does not happen here. On its face, Count Two is deficient.

The parties quibble about whether CMS reimburses Medicare Part B providers and if the regulation requiring reasonable collection efforts, 42 C.F.R. § 413.89(e), contains a 120-day

requirement. Yet, even if both these things were true, Count Two is still lacking. Relators argue that: (1) its examples of bad debt write offs before 120 days; (2) its exhibits containing the Medicare debt beneficiary name, amount due, date of service, and date MBO reported it to be a bad debt write off to clients; and (3) Sibley's allegations that MBO and Trustmark reported bad debt to clients provide the requisite who, what, when, where, and how required by Rule 9(b). Not so.

Relators fundamentally misunderstand Rule 9(b)'s particularity requirements. "[T]he who, what, when, where, and how . . . includes the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Hanna*, 834 F.3d at 779. In this context, plaintiff means the Government, not MBO's and Trustmark's clients. Just because a "provider client can now report it as Medicare bad debt on their cost report" does not mean that they did. (Resp. at 11.) Relators' allegations require the Court to assume, without basis, that MBO's and Trustmark's clients incorporated the allegedly problematic bad debt reports into cost reports or other statements to the Government and that the Government relied on those statements to reimburse the clients. The Court will not make such unsupported assumptions. Thus, the Court dismisses Count Two.

## B.  Counts Three to Five: Individual Retaliation Claims

Relators allege MBO and Trustmark terminated them in violation of 31 U.S.C. § 3730(h) for "attempt[ing] to stop violations of the [FCA] by protesting and refusing to execute fraudulent schemes." (Am. Compl. ¶¶ 91–92, 96–97, & 101–02.) "To determine whether an employee's conduct [is] protected [by the FCA], we look at whether (1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government." *Uhlig*, 839 F.3d at 635 (citation and quotations omitted). In this context, reasonableness requires the court to examine "the facts known to the employee at the time of the alleged protected activity." *Id.* Further, the person making the termination decision within the company must have known about the alleged protected activity to maintain a retaliation claim. *See Halasa v. ITT Educ. Servs.*, 690 F.3d 844, 848 (7th Cir. 2012) (finding former employee must show "he was fired 'because of' his protected conduct").

All three Relators fail to establish that, at the time they acted, a reasonable employee in their positions would have believed MBO and Trustmark were defrauding the Government. Thus, their activity was not protected such that it could give rise to retaliation claims. *See Uhlig*, 839 F.3d at 635 (finding relator's belief unreasonable because he lacked firsthand knowledge of

contractual obligations to the Army and knowledge that reports to the Government violated those contractual obligations at the time of the alleged protected activity); *Lang v. Nw. Univ.*, 472 F.3d 493, 494 (7th Cir. 2006) (finding that former employee did not know "about any concrete false statement made to the Federal Reserve or any other federal agency").

The Amended Complaint's allegations establish only complaints about internal processes, not external claims activity. *See United States v. Pfizer Inc.*, No. 16-CV-7142, 2019 WL 1200753, at *9 (N.D. Ill. Mar. 14, 2019) (finding a reasonable employee in similar circumstances might believe company had quality control problems and violated regulations, but that does not mean a reasonable employee might believe those things "constitute *fraudulent claim* activity—particularly when Relator fails to allege he made any complaints relating to government claims or payment"). The Amended Complaint alleges that, when Relators complained about the legality of or issues with internal processes, they believed MBO and Trustmark were submitting false information to clients. (Am. Compl. ¶¶ 65-66 (alleging that Sibley complained about falsities on UCMC invoices and non-compliant bad debt write off reports to clients), ¶¶ 74-76 (alleging that Lopez "voiced concerns about MBO's billing practices and described patient complaints of double billing" and collected and reported "findings" regarding patient documents with Sibley showing what they believed were "illegal

billing practices"), & ¶ 78 (alleging that Collins protested about instructions "to write off debts to Medicare to bad debt [on client reports] before they received required debt notices and bills").) Beyond speculating that clients would incorporate such information into Government-directed cost reports, the Amended Complaint fails to establish that Relators knew of any false claims that were in fact incorporated into cost reports or submitted to the Government. In fact, no Relator alleges she complained about FCA violations or fraudulent claims made to the Government.

The one item the Amended Complaint alleges was submitted to the Government—a UCMC cost report for the period of July 1, 2016 through June 30, 2017—was submitted well after each Relators' last day on the job. (Am. Compl. ¶ 38; see also id. ¶ 7 (listing Sibley's employment range from September 2016 to March 2017), ¶ 8 (listing Lopez's employment range from April 2015 to February 2017), & ¶ 9 (listing Collins's employment range from January 2016 to April 2017).) It is thus unsurprising that no Relator alleges she was aware of this cost report or any other report made to the Government. Although the Amended Complaint may establish personal knowledge of internal regulatory violations or even fraud against MBO's and Trustmark's clients, it fails to establish personal knowledge of fraud against the Government.

Beyond allegations of internal complaints, Sibley also alleges that MBO's vice president terminated her because he "grew

suspicious" and investigated her background, discovering that: (1) she was a relator in a lawsuit against a former employer; and (2) wrote a book about medical fraud entitled "'DOCTORS' the New Face of Drug Dealers." (Am. Compl. ¶ 66.) Yet, Sibley alleges no facts to support her bare assumptions that the vice president investigated, discovered this information, and terminated her because of it. Without more, Rule 8's plausibility pleading standard precludes such naked assertions. *See Iqbal*, 556 U.S. at 678–81; *Twombly*, 550 U.S. at 555 n.3.

MBO and Trustmark also argue that neither activity is protected by the FCA. The Amended Complaint does not allege any particulars about Sibley's book other than its topic, medical fraud, and title, "'DOCTORS' the New Face of Drug Dealers." Neither of these details signal a connection to *qui tam* actions or the FCA, and the fact that Sibley wrote it cannot be considered protected activity. *See Uhlig*, 839 F.3d at 635 (providing test to determine whether conduct is protected). It is a more interesting question whether Sibley could maintain an FCA retaliation claim against MBO and Trustmark for terminating her because of her participation as a relator in a *qui tam* action against a different company. Nevertheless, because Sibley fails plausibly to plead the claim in the first instance, it is one the Court need not answer here. For these reasons, the Court dismisses Counts Three, Four, and Five.

### C. Count Six: Sibley's ADA Claim

To state an ADA claim, Sibley must allege that she: (1) is disabled within the meaning of the ADA; (2) qualified to perform the essential functions of the job, either with or without a reasonable accommodation; and (3) suffered from an adverse employment action because of her disability. *Povey v. City of Jeffersonville, Ind.*, 697 F.3d 619, 622 (7th Cir. 2012). MBO and Trustmark do not dispute that Sibley suffered an adverse employment action. The parties, however, do dispute whether Sibley is a qualified individual with a disability.

"The ADA makes it unlawful for an employer to discriminate against a 'qualified individual on the basis of disability.'" *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 480 (7th Cir. 2017) (citing 21 U.S.C. § 12112(a)). To be a "qualified individual," the employee must show that she could perform the essential functions of her job with or without reasonable accommodation. *Severson*, 872 F.3d at 480. As such, "'reasonable accommodation' is expressly limited to those measures that will enable the employee to work." *Id.* at 479. "An employee who needs long-term medical leave *cannot* work and thus is not a 'qualified individual' under the ADA." *Id.* (citing *Byrne v. Avon Prods., Inc.*, 328 F.3d 379, 381 (7th Cir. 2003)). The Seventh Circuit has said that:

> Intermittent time off or a short leave of absence—say,
> a couple of days or even a couple of weeks—may, in
> appropriate circumstances, be analogous to a part-time
> or modified work schedule, two of the examples listed in
> § 12111(9). But a medical leave spanning multiple months
> does not permit the employee to perform the essential
> functions of his job. To the contrary, the '[i]nability
> to work for a multi-month period removes a person from
> the class protected by the ADA.'

*Id.* at 481 (citing § 12111(9)).

The Amended Complaint alleges that Sibley suffered a TIA on February 27, 2017. (Am. Compl. ¶ 67.) Two days later, on March 1, 2017, Sibley sought leave when her mother told MBO human resources that Sibley "will not be returning to work for quite a while, at the very least a month or longer but I will confirm with her doctor between today and tomorrow and let you know." (*Id.* ¶ 69.) Sibley's mother indicated she would pick up paperwork from the doctor "before the week is over" and that, upon recovery, Sibley "has every intention on returning back to work and maintaining her same positions as both a manager and director." (*Id.*) Two days later, on March 3, 2017, MBO's vice president terminated Sibley's employment. (*Id.* ¶ 70.)

MBO and Trustmark argue that Sibley requested indefinite leave and is therefore ineligible for ADA relief. MBO and Trustmark also note that neither Sibley nor her mother provided a doctor's note confirming Sibley's disability or stating that she needed an accommodation. Sibley argues that she did not request indefinite

or multi-month leave but sought "a month-long leave of absence to recover and determine her ability to return to work" because "her stroke was sudden, and her recovery time was unclear." (Resp. at 19.) Sibley also mentions that MBO terminated her only four days after her TIA and two days after her request for leave, during which she was using her allotted sick days. (*Id.*)

Sibley's ability to work determines her ADA eligibility. Ability to work "is examined as of the time of the adverse employment decision at issue." *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1037 (7th Cir. 2013). MBO terminated Sibley four days after her mini stroke and two days after her request for leave. In her request for leave, Sibley indicated that she would be out of work "for quite a while, at the very least a month or longer." (Am. Compl. ¶ 69.) It is unclear from the email's text whether Sibley sought a short, multi-month, or indefinite leave. Viewing the facts in the light most favorable to Sibley, this could have meant she would be out for a month or twenty-eight days considering the month of February had just ended. Therefore, at the uncertain time of her termination, Sibley could have been ADA eligible.

But any ADA rights Sibley may have had never actually accrued. The doctor's note attached to the Amended Complaint establishes that Sibley was not ADA eligible because she was not able to work at all and would not be able to work for almost three months. (Sibley Doctor's Note, Am. Compl., Ex. 20, Dkt. No. 48-20.)

Sibley's doctor wrote that she "was released to return to work on 5/18/2017" but suffers from "major lifestyle changes" that include: limited use of limbs, limited mobility without the use of a wheelchair 85% of the time, impaired judgment—at times in a state of confusion, constant anxiety, depression, loss of hope, sadness, and chronic pain. (*Id.*) Thus, despite any intentions or uncertainties, Sibley was not able to return to work in any capacity until May 18, 2017—78 days or almost three months after her mother requested leave on her behalf.

"The ADA is an antidiscrimination statute, not a medical-leave entitlement." *Severson*, 872 F.3d at 479. It only protects disabled people who are able to work. Thus, the relevant standard is whether Sibley was able "to perform the job's essential functions" with or without a reasonable accommodation. *Byrne*, 328 F.3d at 381 ("Inability to work for a multi-month period removes a person from the class protected by the ADA."). The ADA does not cover the type of leave Sibley ultimately required. *See, e.g.*, *Severson*, 872 F.3d at 481 (finding two to three month leave unreasonable); *Hamm v. Exxon Mobil Corp.*, 2007 WL 1353985, at *1– *3 (7th Cir. May 9, 2007) (finding one month leave after extended leave unreasonable); *Byrne*, 328 F.3d at 380–81 (finding two month leave unreasonable); *cf. Haschmann v. Time Warner Ent. Co.*, 151 F.3d 591, 601 (7th Cir. 1998) (finding a reasonable jury could conclude that a two- to four-week leave was a reasonable

accommodation for plaintiff's lupus). Consequently, Sibley is not a qualified individual under the ADA.

The Court is sympathetic to Sibley's situation. Sibley's mother was still in the process of gathering paperwork and conferring with doctors about the recovery care plan when MBO fired her daughter. MBO wasted no time. It terminated Sibley four days after she suffered a mini stroke and two days after she requested leave. The Court does not condone MBO's seemingly rash decision and encourages companies to practice compassion and empathy when employees experience health-related challenges. At the time of termination, MBO could not have known that the ADA would not apply. While it is now clear that the ADA does not cover the leave Sibley required, that was far from certain in March 2017. Alas, the ADA simply does not apply here, and Sibley is not a qualified individual eligible for ADA relief. Accordingly, the Court grants MBO's and Trustmark's Motion to dismiss the ADA claim.

### IV. <u>CONCLUSION</u>

For the foregoing reasons, the Court grants the Defendants' Motions and dismisses the Amended Complaint.

**IT IS SO ORDERED.**

 

_____
Harry D. Leinenweber, Judge
United States District Court

Dated: 9/14/2020

- 29 -