IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,
ex rel. KENYA SIBLEY, JASMEKA
COLLINS, and JESSICA LOPEZ,

                       Relators,

         v.

UNIVERSITY OF CHICAGO MEDICAL
CENTER; MEDICAL BUSINESS
OFFICE CORP.; and TRUSTMARK
RECOVERY SERVICES, INC.,

                Defendants.

Case No. 17 C 4457

Judge Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

For the reasons stated herein, the Court grants Defendants' Motions to Dismiss (Dkt. Nos. 78, 81). The Second Amended Complaint (Dkt. No. 75) is dismissed with prejudice, except that Counts I-III are dismissed without prejudice as to the United States.

## I.  BACKGROUND

This case arises out of two alleged schemes by medical billing company Medical Business Office ("MBO") and debt collection company Trustmark Recovery Services, Inc. ("Trustmark") to defraud the United States of Medicare funds. The University of Chicago Medical Center ("UCMC"), an academic medical center, contracts with MBO to receive medical debt collection services. (SAC ¶¶ 7,11, Dkt. No. 75.) For certain clients, MBO works with its sister

company, Trustmark, on the client's bad debt collections. (*Id.* ¶¶ 9, 64.) Relators Kenya Sibley, Jasmeka Collins, and Jessica Lopez ("Relators") are former employees of MBO and Trustmark who allege they discovered the schemes while employed and who were later fired for vocalizing their concerns. Following dismissal of their First Amended Complaint ("FAC"), Relators filed the Second Amended Complaint ("SAC"), alleging three violations of the False Claims Act, 31 U.S.C. § 3729 ("FCA").

Relators allege that the Defendants violated the FCA when: (1) MBO caused UCMC to submit false statements to the Government in violation of 31 U.S.C. §§ 3729(a)(1)(A) & (B) (Count I); (2) UCMC retained and converted federal funds premised on false claims in violation of 31 U.S.C. § 3729(a)(1)(G) (Count II); and (3) Trustmark caused its hospital clients to submit false statements to the Government in violation of 31 U.S.C. §§ 3729(a)(1)(A) & (B) (Count III). Relators also allege individual retaliation claims, in violation of 31 U.S.C. § 3730(h) (Counts IV-VI). (*Id.* ¶ 6.)

Relators' FCA claims center on the collection of outstanding balances from Medicare patients. Under 42 C.F.R. § 417.534, Medicare reimburses providers for allowable costs, defined as the "direct and indirect costs . . . that are proper and necessary for efficient delivery of needed health care services." 42 C.F.R. § 417.534. Medicare also reimburses healthcare providers for bad debt arising from unpaid deductible and coinsurance amounts. 42

C.F.R. § 413.89. Outstanding balances may be characterized as bad debt after remaining unpaid for 120 days. *Id.* § 413.89(e)(2)(A)(5)(ii). To be eligible for reimbursement after 120 days, healthcare providers must have undertaken reasonable collection efforts of the bad debt. *Id.* § 413.89(e)(2). To demonstrate that a reasonable collection effort has been made, a bill must be sent to the beneficiary, followed by other modes of collection which may include continued billings, personal contacts with the beneficiary through telephone calls, emails, texts, or letters. *Id.* § 413.89(e)(2)(A). If ineffective to secure the debt amount, providers are eligible to receive reimbursement by reporting the bad debt amounts in their annual cost reports to the Government. *Id.* § 413.89 (2020).

Relators allege two bad debt collection schemes which they claim violated the FCA as well as individual claims for retaliation. The Court explains each alleged scheme below.

### A. MBO and UCMC Medicare Bad Debt Scheme

In July 2004, MBO contracted with UCMC to provide debt collection services. (SAC ¶ 34.) Under the terms of the parties' agreement, MBO collected debt on behalf of UCMC from patients with private insurance plans and patients with Medicare and Medicaid. (*Id.*) In exchange for these services, UCMC paid MBO a monthly rate based on the number of MBO employees working full time pursuing UCMC's collections. (*Id.*) Under the terms of their agreement,

Trustmark did not provide collection services for UCMC. (*Id.* ¶ 64.) To facilitate MBO's efforts, UCMC provides MBO employees with access to the hospital's internal software system. (*Id.* ¶ 34.)

On September 1, 2016, MBO and UCMC amended their initial agreement and increased the number of accounts MBO would be responsible for on UCMC's behalf. (ACC Project Contract, SAC, Ex. 1, Dkt. No 75-1.) Relators allege that, due to the increased account volume, MBO and UCMC separated Medicare and Medicaid collections into a separate project. (SAC ¶ 36.) Collections for Government-insured patient debt was referred to the "Medicare/Medicaid Project." (*Id.*)

Following the contract amendment, UCMC authorized MBO to have up to nine employees working on the Medicare/Medicaid Project. (*Id.* ¶ 41.) MBO assigned Lufreda Shine and Harriet Young to work on UCMC's government collections. (*Id.* ¶ 39.) Despite assigning just two staff members, MBO's invoices showed nine full time employees working on this project (*Id.*) According to Relators, the additional employees listed on the UCMC invoices only worked on collecting Medicare debt on a sporadic basis. (*Id.* ¶ 50.) Relators then conclude that MBO's purported efforts to collect bad debt did not comply with the federal regulations regarding reasonable collections, because the two employees actually working on the Medicare/Medicaid Project could not have complied with federal regulations for each of the balances characterized as bad debt.

(*Id.* ¶¶ 58, 60.) According to Relators, any outstanding balances that MBO characterized as bad debt were entered directly into UCMC's internal software which is used to prepare submissions for reimbursement to the Government. (*Id.* ¶ 57.) Relators thus conclude that MBO caused UCMC to submit false claims for bad debt reimbursement in violation of 31 U.S.C. § 3729. (*Id.* ¶ 62.)

According to Relators, in 2017 UCMC initiated an internal audit of its MBO invoices. The UCMC audit spanned November 2016 to September 2017 and compared all MBO invoices to data from productivity reports generated from UCMC's systems, which recorded how much time a clerk actually spent in the UCMC database working on a UCMC account. (*Id.* ¶¶ 45, 47.) The audit revealed that MBO's invoices were inconsistent with UCMC's productivity reports and MBO overbilled UCMC by $787,225. (UCMC Letter to MBO, SAC, Ex. 3, Dkt. No. 75-3.) Of that amount, approximately $270,276 was related to the work done on the Medicare and Medicaid collections. (SAC ¶ 46.)

According to Relators, because of the audit, UCMC became aware that MBO did not undertake reasonable collection efforts for some portion of UCMC's Medicare bad debt. (*Id.* ¶ 51.) Relators excerpt a UCMC Cost Report submitted in 2017 covering the period from July 1, 2016 to June 30, 2017 where UCMC reported $1,160,095 in reimbursable bad debt, which was eventually reimbursed by the Government. (*Id.* ¶ 56.) This Cost Report was certified

electronically, but unsigned, certifying compliance with the "laws and regulations regarding provision of health care services." (*Id.* ¶ 62.) According to Relators, UCMC took no efforts to determine if the balances characterized as bad debt during the audit period — November 2016 to August 2017 — received reasonable collection efforts. (*Id.* ¶ 51.) Relators allege that as a result of the audit, UCMC became aware they submitted false claims because of MBO's conduct. Relators further allege that UCMC was required to report the overpayments to Medicare and reimburse the Government for those overpayments, which UCMC failed to do in violation of 31 U.S.C. § 3729(a)(1)(G).

## B.   Trustmark Medicare Bad Debt Scheme

Relators' second alleged scheme arises out of Trustmark's services as a licensed debt collection agency. (*Id.* ¶ 64.) Trustmark is a medical debt collection agency that "handles MBO's bad debt collections, third party collections, legal department, data entry, and payment processing/posting." (*Id.* ¶¶ 8, 9.) Trustmark provided collection efforts for hospital clients, excluding UCMC. (*Id.* ¶ 66.) Like MBO, Trustmark had access to the internal software systems of their clients and would make changes to the classification of debts pursuant to their collection efforts. (*Id.* ¶ 73.) Relators allege that Trustmark's collection efforts failed to comply with the standards set forth in 42 C.F.R. § 413.89(e). Specifically, Relators allege that Trustmark declared

- 6 -

debt uncollectable less than 120 days after a statement was billed, failed to send multiple statements of bills, and skipped regulatory review of debts before reporting them as uncollectable. (SAC ¶ 64.)

According to the SAC, Relator Kenya Sibley ("Sibley") and her team would be assigned to work on Trustmark client teams. (*Id.* ¶ 65.) Certain team members were tasked with pursuing collections. (*Id.*) If these efforts were unsuccessful, the Trustmark employees would characterize the outstanding balance as bad debt. (*Id.*) Other team members, including Sibley, would review anything tagged as a bad debt for compliance with 42 C.F.R. § 413.89(e). (*Id.*) Pursuant to Trustmark company procedures, Sibley would record anything she believed to be improperly tagged. (*Id.*) For each potentially mischaracterized debt she identified, Sibley included a rationale for the error, such as "patient did not receive statement," "patient is making monthly payments," or "patient did not receive two statements." (Bad Debt Turnover Error Spreadsheets, SAC., Ex. 6, Dkt. No. 75-6.) This record was then delivered by email and reviewed by Trustmark's CEO, Justin Manning ("Manning"). (SAC ¶ 66.) According to Relators, Manning told Sibley to stop sending the spreadsheets through email and requested that she hand deliver them. (*Id.*) A month later Manning told Sibley to stop creating and delivering these reports all together. (*Id.*) Relators allege that through the spreadsheets Sibley delivered, Manning had knowledge

that reasonable collection efforts were not conducted, and he refused to stop it. (*Id.* ¶ 69.)

Relators allege that in September 2016, Sibley was informed that Trustmark's policy was to "skip review of 5 to 10 files at a time and to automatically approve unreviewed bad debt write-offs." (*Id.* ¶ 68.) According to Relators, Trustmark's failure to review its bad debt designations caused its clients to improperly classify unpaid balances well before the conclusion of the 120-day collection period, in violation of 42 C.F.R. § 413.89(e). (*Id.* ¶ 72.) In support of this allegation, Relators provide three examples from a September 26, 2016, Bad Debt Report sent to Trustmark client Community Hospital. (*Id.* ¶ 71.) The three patients in the examples received services rendered by Medicare or Medicaid providers in June 2016. (*Id.*) By September 26, 2016, well before 120 days had passed, Trustmark had classified the unpaid balances associated with these services as bad debt. (*Id.*)

According to Relators, once Trustmark approved characterizing an unpaid balance as bad debt, this change would automatically be made in their client's systems. (*Id.* at 73.) The clients relied on these software systems to fill out their Medicare cost reports. (*Id.*) For example, Relators allege Trustmark entered information into the database of their client, Community Hospital, who generated their cost reports based on this information (*Id.*) Relators allege that their three examples were thus incorporated

- 8 -

in Community Hospital's 2017 Cost Report from the period July 1, 2016, to June 30, 2017. (*Id.* ¶ 74.) In the Cost Report, Community Hospital reported $539,100 in reimbursable Medicare bad debt which was ultimately reimbursed by the Government. (*Id.* ¶¶ 76, 78.) This report was electronically certified, but unsigned, indicating compliance with "such laws and regulations regarding the provision of health care services." (Community Hospital Cost Report 7.1.2016 to 6.30.2017, SAC, Ex. 11, Dkt. No 75-11.) Relators allege that because Community Hospital's systems automatically incorporated Trustmark's improper bad debt classifications into their cost reports, Trustmark caused their clients to submit false claims to the Government in violation of 31 U.S.C. § 3729. (SAC ¶¶ 80, 109.)

### C. Retaliation Claims

In addition to the FCA allegations, Relators allege individual retaliation claims against MBO and Trustmark. The Court summarizes each below.

#### 1. *Termination of Relator Kenya Sibley*

Sibley was employed by MBO and Trustmark from September 6, 2016, to March 3, 2017. (*Id.* ¶ 12.) In October 2016, Sibley was promoted from MBO Call Center Customer Service Manager to the Director of Trustmark. (*Id.* ¶ 81.) In her new role, Sibley

supervised twelve employees including Relators Jessica Lopez and Jasmeka Collins. (*Id.*)

Relators allege that in November 2016, Sibley noticed her name was listed on invoices to UCMC despite her never working on any of their accounts. (*Id.* ¶ 83.) This observation led to Sibley's investigation and discovery that only Shine and Young were consistently working on Medicare and Medicaid debts for UCMC. (*Id.*) Sibley informed Manning of the inaccuracies she observed in the invoices, but he did not remove Sibley's name or the names of others that did not work on the UCMC "Medicare/Medicaid Project." (*Id.* ¶ 85.) According to Relators, Manning also refused to accept the bad debt classification errors Sibley identified and compiled into spreadsheets. (*Id.* ¶ 87.)

Relators further allege that Manning, along with Trustmark Vice President Schade, created a hostile work environment. (*Id.* ¶ 88.) Relators allege that this work environment caused Sibley to suffer a transient ischemic attack, or a mini stroke, on February 27, 2017, while at work. (*Id.* ¶ 89.) Ultimately, Sibley was let go from her position on March 3, 2017. (*Id.* ¶ 12.) Relators allege that Schade used Sibley's medical emergency as an opportunity to put an end to her efforts against MBO and Trustmark's practices. (*Id.* ¶ 89.)

### 2. *Termination of Relator Jasmeka Collins*

Collins was a manager in Trustmark's bad debt collections and legal department from January 19, 2016 to April 4, 2017. (*Id.* ¶¶ 90, 93.) Relators allege that in March 2017 Collins was instructed by Schade to mark balances as bad debt prior the expiration of the required 120-day collection period and before sending multiple statements to the patient. (*Id.* ¶ 92.) Relators allege Collins protested these practices, informing Schade this was a violation of federal regulations, to which Schade instructed Collins that he was "in charge, the rules were mandatory" and she was forbidden from using the word "illegal" on the job. (*Id.*) Following this interaction, Collins was demoted from manager to supervisor. (*Id.* ¶ 93.) Relators allege that Collins was terminated on April 4, 2017, when she did not accept the demotion. (*Id.* ¶ 93.)

### 3. *Termination of Relator Jessica Lopez*

Relator Lopez worked as an MBO customer service representative from April 4, 2015 to February 9, 2017. (*Id.* ¶¶ 94, 97.) Around October 26, 2016, Lopez "voiced concerns about MBO's billing practices and described patient complaints of double billing to CEO Manning." (*Id.* ¶ 95.) Relators allege that Manning instructed Sibley to "come up with a reason to fire" Lopez, which Sibley refused. (*Id.*) On February 7, 2017, Schade requested Lopez document the issues customer service representatives were having, leading to Lopez and Sibley documenting what they believed to be

illegal practices. (*Id.* ¶ 96.) Relators allege that on February 9, 2017, Lopez was fired following her presentation of these findings for "using the word illegal" and accusing MBO of illegal billing practices. (*Id.* ¶ 97.)

### D.  **Procedural Posture**

Relators filed their original Complaint under seal in June 2017. (Dkt. No. 1.) The Government declined to intervene on March 6, 2019, leaving Relators to pursue the action themselves. (Dkt. No. 31.) On March 3, 2020, Relators filed their First Amended Complaint. (Dkt. No. 48.) On June 8, 2020, MBO and Trustmark filed a Motion to Dismiss, and UCMC filed a separate Motion to Dismiss shortly thereafter. (Dkt. Nos. 58, 61.) The Court granted both Motions without prejudice on September 14, 2020. (Dkt. No. 74.) Relators filed their Second Amended Complaint on October 14, 2020. (Dkt. No. 75.) MBO and Trustmark filed a Motion to Dismiss on December 4, 2020, followed again by UCMC. (Dkt. Nos. 78, 81.) The Court now decides the motions.

### II.  **LEGAL STANDARD**

A Federal Rule of Civil Procedure 12(b)(6) motion to dismiss tests the legal sufficiency of the complaint. *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990). To survive a Rule 12(b)(6) motion, the allegations in the complaint must meet a standard of "plausibility," rising above a mere "speculative" right to relief. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555,

564 (2007). A claim is factually plausible "when the plaintiff pleads factual content that allows the court to draw reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). The Court may "draw on its judicial experience and common sense" to determine if it is plausible that the defendant is liable for the misconduct that has been alleged. *W. Bend Mut. Ins. Co. v. Schumacher,* 844 F.3d 670, 676 (7th Cir. 2016) (quotation and citation omitted). The Court construes the SAC in the light most favorable to the Relators, accepting as true all well-pleaded facts and drawing all possible inferences in the Relators' favor. *See Tamayo v. Blagojevich,* 526 F.3d 1074, 1081 (7th Cir. 2008); *McCullah v. Gadert,* 344 F.3d 655 (7th Cir. 2003). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678. This means legal conclusions are disregarded from consideration of the complaint. *McCauley v. City of Chicago,* 671 F.3d 611, 617 (7th Cir. 2010).

The FCA is an anti-fraud statute and therefore subject to the heightened pleading requirements of FED. R. CIV. P. 9(b). *See, e.g., U.S. ex rel. Garst v. Lockheed-Martin Corp.,* 328 F.3d 374, 376–78 (7th Cir. 2003) (analyzing FCA allegations under Rules 8 and 9(b)). Rule 9(b) requires that a plaintiff "state with particularity the circumstances constituting fraud or mistake," meaning "the who, what, when, where, and how: the first paragraph of any newspaper

story." *United States ex rel. Hanna v. City of Chicago,* 834 F.3d 775, 779 (7th Cir. 2016) (quotation marks omitted). To meet the Rule 9(b) standard, Relators must plead each of their claims "at the individual transaction level" and include "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *United States ex rel. Fowler v. Caremark RX, L.L.C.,* 496 F.3d 730, 742 (7th Cir. 2007), *overruled on other grounds by Glaser v. Wound Care Consultants, Inc.,* 570 F.3d 907 (7th Cir. 2009).

### III. **DISCUSSION**

### A. **FCA Claims: Counts I, II and III**

Relators allege violations of the following Section 3729(a)(1) subsections of the FCA. The FCA imposes liability on any person who:

**(A)** knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

**(B)** knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

. . .

**(G)** knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

- 14 -

31 U.S.C. § 3729(a)(1).

To survive a motion to dismiss, Relators must at minimum plead transaction-level details evidencing violations of each of the foregoing subsections. *See Caremark,* 496 F.3d at 742. In its prior Order and Opinion dismissing the FAC, the Court set forth a detailed explanation of the Rule 9 pleading standard, the necessary components of an FCA claim, and the deficiencies in the FAC. (Op., Dkt. No. 74.) Despite this guidance, Relators claims remain deficient. Specifically, Relator has once again failed to set forth allegations evidencing violations of the FCA with the specificity required by Rule 9. For the reasons set out below, the FCA claims in the SAC are dismissed with prejudice.

### 1. *Bad Debt Collection (Counts I and III)*

Counts I and III allege variations of the same misconduct: MBO and Trustmark failed to comply with federal regulations governing the characterization of outstanding Medicare balances as bad debt. As a result, MBO and Trustmark allegedly caused their clients to submit false claims for reimbursement to the Government in violation of 31 U.S.C. §§ 3279(a)(1)(A), (B). To establish civil liability for a FCA violation, Relators must show "(1) a false or fraudulent claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval; (3) with the knowledge that the claim was false" *Caremark,* 496 F.3d at 741. Additionally, Relators must show "(4)

- 15 -

the false statement was material to the government's decision to pay or approve the false claim." *United States ex rel. Uhlig v. Fluor Corp.,* 839 F.3d 628, 633 (7th Cir. 2016).

Relators must, at a minimum, allege the submission of a false statement to the Government for payment. *See Mason v. Medline Indus., Inc.,* 2009 WL 1438096, at *4 (N.D. Ill. May 2009) ("The *sine qua non* of a False Claims Act violation is the submission of a fraudulent claim"). In Count I, Relators allege that MBO's misrepresentations to UCMC regarding staffing levels on the Medicare/Medicaid Project evidence that they could not have complied with federal regulations governing the collection of bad debt, which in turn caused UCMC to submit false claims for reimbursement to the Government. In Count III, Relators allege that Trustmark designated certain outstanding Medicare balances as bad debt in violation of federal regulations (*i.e.,* prior to the expiration of the required 120-day collection period), which caused Trustmark clients to submit false claims for reimbursement to the Government. But these allegations are not linked to a single example of a false statement made in connection with Medicare reimbursements, which necessarily dooms both Counts I and III.

In Count I, Relators allege that MBO failed to conduct reasonable collection efforts on UCMC's Medicare/Medicaid Project because they failed to "assign sufficient collection clerks" to the assignment. (SAC ¶¶ 36, 38.) In support of this allegation,

- 16 -

Relators excerpt MBO's December 2016 invoices which list nine full time employees working on UCMC's account, but Relators allege only two staff members actually worked on the account. (*Id.* ¶¶ 39, 48.) From these facts, Relators draw the conclusion that MBO did have sufficient staffing to review all UCMC outstanding balances and must have characterized certain outstanding balances as bad debt without complying with the federal regulations regarding collection efforts. Relators further conclude that because MBO designated balances as bad debt in the same computer system UCMC used to submit its claims for Medicare reimbursement, MBO caused UCMC to submit false claims for reimbursement to the Government. (*Id.* ¶ 62.)

To survive a motion to dismiss Relators must allege the specific false claims for which UCMC sought reimbursement as a result of MBO's conduct. *See Caremark,* 496 F.3d at 742. Relators attempt to plead this level of particularity by pointing to the UCMC Cost Report from July 1, 2016 to June 30, 2017. (SAC ¶¶ 52–56.) In the July 1, 2016 to June 30, 2017 cost report, UCMC sought reimbursement for $1,160,095 in Medicare bad debt. (*Id.* ¶ 56) But Relators do not allege that UCMC had no bad debt, such that the entire cost report is false. Instead, Relators allege that there must be a falsity somewhere in the cost report based on their prior conclusion that MBO failed to comply with federal regulations, prior to designating certain unpaid balances as bad debt. This

falls far short of the transaction level detail required under Rule 9. *See United States ex rel. Lanahan v. Cty. Of Cook,* No. 17 C 5829, 2020 WL 6894395, at *11 (N.D. Ill. Nov. 24, 2020) (Leinenweber, J.) (dismissing with prejudice where relator's second amended complaint failed to connect claim of wrongdoing to specific details in the cost report including what portion was improper). Absent of the ability to show a specific falsity in a cost report, or any document submitted to the government, Count I fails.

In Count III, Relators allege that Trustmark routinely failed to comply with federal regulations regarding the collection of Medicare bad debt. In support of this allegation, Relators point to a report Trustmark prepared for Community Hospital, in which Trustmark characterized three unpaid balances as bad debt, prior to the expiration of the requisite 120-day collections period. (SAC ¶ 71.) Relators conclude that because Trustmark also designated these balances as bad debt in the same computer system Community Hospital used to submit its claims for Medicare reimbursement, Trustmark caused the hospital to submit false claims for reimbursement to the Government (*Id.* ¶¶ 73-74.)

As with Count I, the allegations in Count III fail to meet the particularity requirements necessary to survive a motion to dismiss. While the SAC attaches and cites to a Community Hospital Cost Report that was submitted to the Government, Relators do not

allege that Community Hospital had no bad debt, thereby rendering the entire submission fraudulent. Nor do the Relators identify individual unpaid balances for which Community Hospital sought reimbursement in violation of federal regulations. Instead, Relators again ask the Court to assume there is a false submission somewhere in the report. Because these allegations fail to identify the specific false claims for which Community Hospital sought reimbursement, Count III must fail. *See Caremark*, 496 F.3d at 742.

### 2. UCMC Audit (Count II)

Count II alleges a reverse false claim, that UCMC avoided an obligation to repay the Government in violation of 31 U.S.C. § 3279(a)(1)(G). A reverse false claim "requires Relator to allege that defendant has an existing, legal obligation to pay or transmit money or property to the government and that the defendant submitted false statements or records to conceal, avoid, or decrease that obligation." *United States, ex rel. Besancon v. UChicago Argonne, LLC,* No. 12 C 7309, 2014 WL 4783056, at *4 (N.D. Ill. Sept. 24, 2014) (internal citations omitted). For the reasons set forth below, Relators' Count II allegations do not include any facts supporting a reverse false claim and UCMC's motion to dismiss is granted.

To survive a motion to dismiss, Relators must allege that UCMC became aware that it received an overpayment of Government funds. The SAC makes no such allegations. Relators rely on the

fact that UCMC conducted an internal audit of MBO's invoices as evidence that the hospital identified overpayments to the Government. This conclusion is without support. The audit had nothing to do with UCMC's submissions to the Government. Indeed, the audit only concluded that MBO breached its contract with UCMC. Without more, Relators have failed to state any kind of FCA violation, let alone a reverse false claim. *See Universal Health Servs., Inc. v. United States ex rel. Escobar,* 136 S.Ct. 1989, 2003 (2016) (concluding breach of contract does not automatically lead to false claims). Relators' failure to identify any point where UCMC recognized overpayment by the Government dooms Count II.

### B. Counts IV - VI: Individual Retaliation Claims

The FCA protects employees from discriminatory actions taken because of their efforts to report violations of the statute. Relators allege they were terminated because they reported MBO and Trustmark's FCA-violating misconduct, in further violation of 31 U.S.C. § 3730(h). "To determine whether an employee's conduct [is] protected [by the FCA], we look at whether (1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government." *United States ex rel. Uhlig v. Fluor Corp.,* 839 F.3d 628, 635 (7th Cir. 2016) (citation and quotations omitted). The reasonableness requirement compels

this Court to examine "the facts known to the employee at the time of the alleged protected activity" to determine if an objective, reasonable employee could come to the same conclusion. *Id.* Additionally, the termination must be due to the protected activity, and the person making the termination decision must have known of this activity. *Halasa v. ITT Educ. Servs.,* 690 F.3d 844, 848 (7th Cir. 2012).

The SAC's retaliation claims suffer from the same deficiencies warranting the dismissal of these claims in the FAC. Specifically, Relators once again cannot show that a reasonable employee in their position, with the information they had, would have believed MBO and Trustmark were causing false claims to be filed with the Government. Relators only allege they had insight into and access to MBO and Trustmark's internal processes. Relators did not have, nor do not allege that as a service provider they had, any insight into or role in preparing their clients' Medicare reimbursement claims. This gap in knowledge fails to establish a plausible connection between Relators' workplace observations and their conclusion that MBO and Trustmark were causing their clients to knowingly submit false claims to the Government. Absent this showing, their activity cannot be protected under the FCA. See *Uhlig,* 839 F.3d at 635 (concluding a relator's belief is unreasonable without firsthand knowledge); *U.S. ex rel. Crews v. NCH Healthcare of Illinois, Inc.,* 460 F.3d 853, 856 (7th Cir. 2006)

- 21 -

(concluding knowledge of internal processes alone fails to meet standard under FCA); *United States v. Pfizer Inc.,* 2019 WL 1200753, at *9 (N.D. Ill. Mar. 14, 2019) (concluding a reasonable employee in the same position may believe there was regulatory violations or internal quality control problems, but this does not lend itself to a reasonable employee believing that fraudulent claims were submitted). Because Relators' activity was not protected, their claims necessarily fail to show that the person terminating them knew of the protected activity and fired them because of it. *Halasa,* 690 F.3d at 848 (concluding that termination must be caused by protected activity which the terminator was aware of). For these reasons, Counts IV-VI are dismissed.

### C. Dismissal with Prejudice

"Despite receiving express directions about what they had to do, counsel did not do it. At some point the train of opportunities ends." *Guaranty Nat'l Title Co. v. J.E.G. Assocs.,* 101 F.3d 57, 59 (7th Cir.1996) (citation omitted). Relators have had two opportunities to amend their Complaint, the second time with the benefit of the Court's prior opinion explaining the FAC's deficiencies. Even with this guidance, the SAC fails to address these deficiencies in their claims. Upon review of the SAC and the briefings submitted, it is clear that Relators do not have the ability to address these deficiencies and properly state a claim. *See, e.g., U.S. ex rel. Grant v. Thorek Hosp.,* 2008 WL 1883454, at

*1 (N.D. Ill. Apr. 25, 2008) (dismissing the second amended complaint where it was "clear that [Relator] cannot correct the deficiencies in her claims").

Relators are former employees of third-party service providers. They do not allege they had any role in generating their clients' reimbursement submissions. Lack of any firsthand knowledge of the disputed claims submitted to the Government is permanently fatal to an FCA claim. In addition, even if Relators could cure this deficiency, all three were terminated in early 2017. This is well before UCMC and Trustmark submitted the cost reports which allegedly include false claims. Thus, even if Relators pled some knowledge of their clients' internal processes, they would still be unable to connect their observed regulatory violations to their clients' submissions for Government reimbursement. The same is true regarding UCMC's internal audit. Relators have no firsthand knowledge of UCMC's process, findings, or next steps. Further amendments simply cannot cure these deficiencies and save their Section 3729(a) claims.

Relators' gaps in knowledge also make it unreasonable for them to have concluded that based on their workplace observations, MBO and Trustmark were causing their clients to submit false claims to the Government. This is a necessary element of a Section 3730(h) retaliation claim. For the same reasons discussed above, further

amendments cannot cure this deficiency and save Relators' retaliation claims.

For these reasons, the Court concludes that further amendments are futile, and the SAC is dismissed with prejudice.

### IV.  CONCLUSION

For the reasons stated herein, Defendants' Motions to Dismiss (Dkt. Nos. 78, 81) are granted.  The Second Amended Complaint (Dkt. No. 75) is dismissed with prejudice, except that Counts I-III are dismissed without prejudice as to the United States.

**IT IS SO ORDERED.**

_____

Harry D. Leinenweber, Judge
United States District Court

Dated: 8/2/2021

- 24 -