


**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

United States ex rel. Jasmeka Collins, Relator,

v.

Trustmark Recovery Services; Medical Business Office, Defendants.

Case No. 17-cv-04457
01/02/2025

## AFFIDAVIT OF JASMEKA COLLINS

I, Jasmeka Collins, having been duly sworn, swear, and affirm:

1. Trustmark Recovery Services, Inc. ("Trustmark") and Medical Business Office ("MBO") are companies specializing in medical billing and revenue cycle management for hospitals, clinics, and laboratories in the Midwest. Trustmark/MBO serve more than **(Exhibit1)** 28 clients, managing critical revenue functions, including Medicare bad debt Part B collections. Trustmark/MBO managed Medicare bad debt accounts for several hospital systems, including University of Chicago Chicago Ilinois, St Catherine, Community Hospital in Munster, Indiana; Methodist Hospitals, Inc. in Gary, Indiana; University of Illinois Hospital System in Chicago, Illinois; and St. Mary Medical Center in Hobart, Indiana. These hospitals relied on Trustmark/MBO to ensure compliance with Medicare regulations.

### Employment Background

2. Starting on January 19, 2016, Trustmark Recovery Services, Inc. ("Trustmark") employed me as the manager of the bad debt collections and legal department at Trustmark where I managed Trustmark's collections on behalf of hospital providers and physician groups. My salary was $42,000 per year. My responsibilities included overseeing several contracts for services, including but not limited to managing bad debt collections, handling customer complaints related to overbilling and credit/debit memos, and serving as a contract liaison. These duties required me to track productivity and ensure that accounts were handled in compliance with contractual and regulatory requirements.

**Observations of Noncompliance**

3. I worked extensively with several systems, including AS400, Artivia, Cerner, Epic, Microsoft SharePoint, and Zoho. Through these systems, I managed and monitored account activities. Specifically, with the AS400 system, I could track the number of accounts in a queue and determine the last time an account had a work code present. When new accounts were received from a client, a Allen Rawling (IT Tech) uploaded the accounts, and I was responsible for verifying that the quantity of accounts and dollar amounts matched the client's records. I also ran weekly system reports to monitor account flow and productivity.
4. I observed all queues containing Medicare bad debt accounts were not being worked. **Exhibit 2** contains an annual Zoho report showing a total queue balance of $201,279,000 sitting in Medicare Part B bad debt for all Trustmark/MBO clients across 1,041 task queues, with a total task count of 216,509.00. I first noticed these accounts during month-end tallies when it was time to compile totals and send out invoices. The accounts in these queues were simply written off to bad debt without being worked. **Exhibit 3** is a productivity report showing accounts not being worked.
5. I directly witnessed Medicare bad debt accounts handled by Trustmark/MBO not being worked from the time they were presented to the system until they were written off. Collectors had no access to these accounts, **no billing letters were sent to patients**, and **no follow-up calls were made**. Medicare regulations, including the **120-day rule**, explicitly require providers to make reasonable collection efforts before writing off debts as uncollectable. This includes sending at least three letters to the debtor over 120 days to demonstrate compliance with reasonable collection practices. Trustmark/MBO completely failed to meet these requirements.
6. Under 42 CFR Section 413.89, Medicare is to reimburse deductible and coinsurance amounts for Medicare beneficiaries that remain unpaid after the provider has made a reasonable effort to collect. For hospital entities, the Medicare bad debt reimbursement is calculated at approximately 65 percent of the uncollectible amount.

7. Every year hospitals provide the Centers for Medicare & Medicaid Services (CMS) with cost reports, which contain a line item called "Adjusted reimbursable bad debts." The

figure entered for this line item corresponds to the amount of monies CMS reimburses that hospital for Medicare bad debt. Yet, such debt is not reimbursable if it was not subjected to a reasonable debt collection effort first. In my experience at Trustmark, 0% of Medicare bad debts were subjected to reasonable debt collection efforts by Trustmark.

8. Instead of returning these accounts to the hospitals, Trustmark/MBO accessed hospital systems directly and marked the accounts as uncollectable within those systems. This practice bypassed hospital oversight and ensured the accounts were falsely treated as eligible for Medicare reimbursement despite noncompliance.

**Retaliation and Termination**

9. On or about March 29, 2017, I protested when Vice President Schade instructed me to write off Medicare bad debt before they received required debt notices and bills. I said it was illegal to do so. She then instructed me that she was in charge and that her rules were mandatory and must be followed. Further, Schade told me that I was prohibited from using the term "illegal" on the job or to the staff.

10. On April 4, 2017, Schade attempted to demote me due to my protests and when I refused the demotion, she terminated my employment on the spot. I did not become employed again until I obtained a temporary position in 2019 by Advance cash as a pay clerk at a yearly salary of $12/ hr. I received $4,451in 2019 and$12,489 in 2020 my assignment ended in 4/01/2020. I have not worked since In total, my damages from being terminated for protesting Trustmark's illegal practices is $571,060.00 **(Exhibit 4)**

**Damages and Legal Claims**

11. Trustmark collected Medicare debt for multiple hospital systems in the greater Chicago area including parts of Indiana close to Chicago. They had over 28 clients that they did this service for. Below is a few representative clients and cost report Examples/evidence of the clients and damages sustained by CMS

a. Community Hospital at 901 MacArthur Boulevard, Munster, Indiana 46321 from _2001 to at least the end of 2018 (**Exhibit 6,7**).

b. Methodist Hospitals, Inc. at 600 Grant Street, Gary, Indiana 46402 from 2008 to at least the end of 2018 (**Exhibit 5, 6**).

c. University of Illinois Hospital System at 1740 W Taylor Street, Chicago, Illinois 60612 from 2011 to at least the end of 2017 (**Exhibit 7**).

d. St. Mary Medical Center, Inc. at 1500 South Lake Avenue, Hobart, Indiana 46342 from 2008 to at least the end of 2018 (**Exhibit 7,8**).

10. Trustmark caused **$13,006,866.60** in total damages to CMS just as a subcontractor for Community Hospital for bad debt alone which doesn't even include the damages for the double billing, triple billing and other damages caused by them: On one relative example for 1 year of filed cost reports dated November 30th of 2015 Line Item # 27 on Page 17 shows Medicare bad debts for the entire hospital complex $1,667,547.00. Being generous providing an estimated amount for Medicare bad debts for the entire hospital complex at a rate of $1,667,547.00 although this amount could be higher. For 2016, 2017 & 2018 the damages for this one client out of their 28 clients of TRS/MBO single FCA damages in the amount of $4,335,622.20 which is at 65% of the uncollectible amount for the 4 years combined. **The combined total amount of FCA damages x 3 is= $13,006,866.60**

| Community Hospital | | | |
|---|---|---|---|
| Cost Report Year | Reported Bad Debt by Community Hospital on Cost Report Actual 11/30/2015 and Estimated #'s for the other years | Fraud Rate | Damages & Reimbursable Bad Debt @ 65% |
| 2015 | $ 1,667,547.00 | 100% | $ 1,083,905.55 |
| 2016 | $ 1,667,547.00 | 100% | $ 1,083,905.55 |
| 2017 | $ 1,667,547.00 | 100% | $ 1,083,905.55 |
| 2018 | $ 1,667,547.00 | 100% | $ 1,083,905.55 |
| | = $6,670,269.00 | Damages | **Calculated once: $4,335,622.20 FCA Damages x 3 = $13,006,866.60** |
| (Exhibit 9 Community Hospital 2015 Cost Report) | | | |

11. We decided to use the **Borenstein Damages Calculations Method (Exhibit 6)**:
LEXSEE 423 U.S. 303, 315 UNITED STATES v. BORNSTEIN ET AL. No. 74-712
SUPREME COURT OF THE UNITED STATES 423 U.S. 303; 96 S. Ct. 523; 46 L. Ed. 2d 514; 1976 U.S. LEXIS 96 Argued October 8, 1975 January 14, 1976
**The "Borenstein method"** refers to a method for calculating effect sizes in meta-analysis, typically used to combine results from multiple studies on the same topic, where the key component is to calculate a weighted average of effect sizes from each study, giving more weight to studies with larger sample sizes and therefore considered more reliable; this approach is often associated with the work of Michael Borenstein and colleagues who extensively researched and promoted its use in meta-analysis, according to the experts if one account and/or one misrepresented figure is intentionally and illegally reported on the cost report Medicare Bad Debt line item then the entire amount is presumed misrepresented on that line item due the false certification and improper calculation of data, amount and numbers of accounts inaccurately turned over to bad debt as reports on the CMS cost report.

12. The False Claims Act requires a penalty for each violation. The FCA penalty amount also increases with inflation each year. Currently, **False Claims Act penalties range as high as $27,894 per violation.** February 12, 2024, the penalties for False Claims Act (FCA) violations are $13,946–$27,894 per claim for violations that occurred after November 2, 2015. These penalties are the result of an annual inflation adjustment required by Congress. The adjustment is based on the percentage change in the Consumer Price Index (CPI) between October 2022 and October 2023. The 2024 inflation factor is 1.03241. In addition to the per-claim penalties, violators may also be responsible for:

- **Treble damages, which is up to three times the amount of damages the government sustained**
- Covering the government's costs for pursuing the civil action
The FCA covers seven types of violations, including:
- Presenting a false claim for payment or approval
- Making or using a false record or statement
- Conspiring to violate the FCA
- Failing to return government property
- Making or delivering a false receipt for government property
- Unlawfully purchasing government property
- Making a false record or statement material to an obligation to pay money to the government

1. Based on **Methodist Hospital South** entries to the "Adjusted reimbursable bad debts" line items in their cost reports from 2015 to 2018 in which Trustmark did not provide reasonable collection efforts for 100% of Methodist Hospitals, Inc.'s Medicare bad debt, Trustmark caused $1,884,639.00 in damages to CMS for bad debt alone which doesn't even include the damages for the double billing, triple billing and other damages caused by them: On one relative example for 1 year of filed cost reports. Being generous providing an estimated amount for Medicare bad debts for the entire hospital complex at a rate of $1,884,639.00 although this amount could be higher. For 2016, 2017 & 2018 the damages for this one client out of their 28 clients of TRS/MBO single FCA damages in the amount of $1,225,015.35 which is at 65% of the uncollectible amount for the 4 years combined. **The combined total amount of FCA damages x 3 is= $14,700,184.20**

| Methodist Hospital South. Cost Report Dated 12/31/2015 | | | |
|---|---|---|---|
| Cost Report Year | Reported Bad Debt by Methodist South Hospital on Cost Report Actual 11/30/2015 and Estimated #'s for the other years | Fraud Rate | Damages & Reimbursable Bad Debt @ 65% |
| 2015 | $1,884,639.00 | 100% | $ 1,225,015.35 |
| 2016 | $ 1,884,639.00 | 100% | $ 1,225,015.35 |
| 2017 | $ 1,884,639.00 | 100% | $ 1,225,015.35 |
| 2018 | $ 1,884,639.00 | 100% | $ 1,225,015.35 |
| | =$7,538,556.00 | Damages | Calculated once: $4,900,061.40 FCA Damages x 3 = $14,700,184.20 |
| (Exhibit 10) | | | |

2. Based on **University of Illinois Hospital's** entries to the "Adjusted reimbursable bad debts" line items in their cost reports from 2015 to 2017 and in which Trustmark did not provide reasonable collection efforts for 100% of University of Illinois Hospital's Medicare bad debt, Trustmark caused $1,326,007.00 in damages to CMS on the cost filed with CMS for bad debt alone which doesn't even include the damages for the double billing, triple billing and other damages caused by them: On one relative example for 1 year of filed cost reports. Being generous providing an estimated amount for Medicare bad debts for the entire hospital complex at a rate of $1,326,007.00 although this amount could be higher. For 2016,2017 & 2018 the damages for this one client out of their 28 clients of TRS/MBO single FCA damages in the amount of $861,904.55 which is at 65% of the uncollectible amount for the 4 years combined. **The combined total amount of FCA damages x 3 is= $10,342,854.60**:

| University of Illinois Hospital Cost Report Dated 11/30/2015 | | | |
|---|---|---|---|
| Cost Report Year | Reported Bad Debt by University of Illinois Hospital on Cost Report Actual 11/30/2015 and Estimated #'s for the other years | Fraud Rate | Damages & Reimbursable Bad Debt @ 65% |
| 2015 | $1,326,007.00 | 100% | $861,904.55 |
| 2016 | $1,326,007.00 | 100% | $861,904.55 |
| 2017 | $1,326,007.00 | 100% | $861,904.55 |
| 2018 | $1,326,007.00 | 100% | $861,904.55 |
| | =$5,304,028.00 | Damages | Calculated once: $3,447,618.20 FCA Damages x 3 = $10,342,854.60 |
| (Exhibit 11) | | | |

13. Medicaid Services (CMS) aggregates these claims but does not negate their individual status. Damages must be calculated based on each false claim, with treble damages applied as permitted under the FCA.

## Conclusion

Under the False Claims Act, the United States is due three times the damages it sustains from persons who cause the submission of false claims to it. In total, Trustmark caused at least **$756,000,000.00** in single damages to CMS by failing to provide reasonable collection efforts for its 28 clients from 2015 to 2022, which caused them to report inflated and false entries in their "Adjusted reimbursable bad debts" cost report line items. Thus, under the False Claims Act, Trustmark owes the United States **$2,268,000,000.00 billion dollars** in treble damages.

1. Finally, in pursing these False Claims Act and retaliation claims against Trustmark my attorneys at Mendenhall Law Group have incurred _____ in attorney fees for which they are due under the False Claims Act (**Exhibit 9**).

**FURTHER AFFIANT SAYETH NAUGHT.**

*Jasmeka Collins* _____

**Jasmeka Taylor**
Date: 01/02/2025 _____

**NOTARY PUBLIC ACKNOWLEDGMENT**

Before me, a Notary Public in _____ Virginia County, _____, Fairfax appeared Jasmeka Taylor, who acknowledged that she signed the foregoing affidavit and verified that the facts therein are true.

**IN TESTIMONY WHEREOF,** I have set my hand and affixed my official seal.


Notary Public
My Commission Expires: 01/31/2027



Notarized remotely online using communication technology via Proof.